# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **RICHARD A. ARRIETA, CHRIS CALIP, BEN CROMMEDY, RUBIN HERNANDEZ, ROGER JOHNSON, JOHN KETTERER, AND ABRAM TREVINO,** | § § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § § | **Civil Action No.  3:05-CV-2271-D ECF** |
| **YELLOW TRANSPORTATION, INC. C/O THE FRICK CO.,** | § § § | |
| **Defendant.** | § | |

---

## DEFENDANT YELLOW TRANSPORTATION, INC.'S
## BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,


/s/ Cathryn Blaine by permission for Shauna Johnson Clark

Shauna Johnson Clark
State Bar No.  00790977
sclark@fulbright.com
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246

Attorney-in-Charge for Defendant
YELLOW TRANSPORTATION, INC.

OF COUNSEL:
FULBRIGHT & JAWORSKI L.L.P.
Cathryn L. Blaine
State Bar No. 24040531
cblaine@fulbright.com
Jaclyn A. Hermes
State Bar No. 24041091
jhermes@fulbright.com

LOCAL COUNSEL:
Danielle Clarkson
State Bar No. 24027915
dclarkson@fulbright.com
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone:  (214) 855-8000
Facsimile:  (214) 855-8200

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Federal Rules of Civil Procedure, this pleading was served on opposing counsel this 8th day of July, 2008, via the Court's ECF electronic service system.

Ms. Janette Johnson
Janette Johnson & Associates
2601 Welborn Street
Dallas, Texas 75219


_____/s/ Cathryn Blaine_____

## TABLE OF CONTENTS

I.      INTRODUCTION      ...................................................................................................1

II.     SUMMARY JUDGMENT STANDARD ........................................................................2

III.    PLAINTIFF RICHARD A. ARRIETA ...........................................................................2

        A.      Statement of Facts.................................................................................................2

        B.      Arguments and Authorities ...................................................................................8

                1.      Arrieta Cannot Establish Race or National Origin Discrimination ..........8

                        a.      Arrieta's claims are not adverse employment actions .................8

                        b.      Arrieta fails to identify a similarly situated employee................10

                2.      Arrieta Cannot Establish Retaliation .....................................................11

                3.      Arrieta Cannot Establish Hostile Work Environment ............................12

                        a.      The harassment was not based on race/national origin...............13

                        b.      The alleged harassment did not affect a term, condition, or
                                privilege of employment ............................................................13

                        c.      Arrieta failed to take advantage of corrective opportunities.......15

IV.     PLAINTIFF CHRIS CALIP ........................................................................................16

        A.      Statement of Facts...............................................................................................16

        B.      Arguments and Authorities .................................................................................21

                1.      Calip Cannot Establish Race or National Origin Discrimination ..........21

                        a.      Calip's claims are not adverse employment actions ..................22

                        b.      Calip fails to identify a similarly situated employee .................23

                2.      Calip Cannot Establish Retaliation ........................................................24

                3.      Calip Cannot Establish Hostile Work Environment ..............................26

                        a.      The alleged harassment did not affect a term, condition, or

privilege of employment ................................................................26

          b.      Calip failed to take advantage of corrective opportunities .........27

V.      PLAINTIFF BEN CROMMEDY ....................................................................28

    A.     Statement of Facts...........................................................................28

    B.     Arguments and Authorities ...............................................................34

         1.     Crommedy Cannot Establish Race/National Origin Discrimination ......34

         2.     Crommedy Cannot Establish Retaliation.................................................35

         3.     Crommedy Cannot Establish Hostile Work Environment.....................36

             a.      The alleged harassment was not based on
                    race/national origin .................................................36

             b.      The alleged harassment did not affect a term, condition, or
                    of employment privilege ...........................................37

             c.      Yellow Transportation took prompt, remedial action.................38

VI.     PLAINTIFF RUBIN HERNANDEZ.............................................................39

    A.     Statement of Facts...........................................................................39

    B.     Arguments and Authorities ...............................................................43

         1.     Hernandez Cannot Establish Race/National Origin Discrimination.......43

             a.      Hernandez fails to identify similarly situated employee.............44

              b.      Hernandez cannot establish pretext .............................................45

         2.     Hernandez Cannot Establish Retaliation ................................................46

         3.     Hernandez Cannot Establish Hostile Work Environment ......................48

VII.    PLAINTIFF ROGER JOHNSON.................................................................49

    A.     Statement of Facts...........................................................................49

    B.     Arguments and Authorities ...............................................................53

1.      Johnson Cannot Establish Race/National Origin Discrimination ..........53

2.      Johnson Cannot Establish Retaliation....................................................54

3.      Johnson Cannot Establish Hostile Work Environment..........................55

a.      The alleged harassment did not affect a term, condition,
or privilege of employment........................................................56

b.      Yellow Transportation took prompt remedial measures.............56

VIII.   PLAINTIFF JOHN KETTERER ................................................................................57

A.      Statement of Facts............................................................................................57

B.      Arguments and Authorities ..............................................................................62

1.      Ketterer Cannot Establish Race Discrimination ....................................62

2.      Ketterer Cannot Establish Retaliation....................................................63

3.      Ketterer Cannot Establish Hostile Work Environment..........................64

IX.     PLAINTIFF ABRAM TREVINO ...............................................................................66

A.      Statement of Facts............................................................................................66

B.      Arguments and Authorities ..............................................................................70

1.      Trevino Cannot Establish Race/National Origin Discrimination ..........70

2.      Trevino *Cannot* Establish Retaliation....................................................71

3.      Trevino Cannot Establish Hostile Work Environment ..........................72

X.      CONCLUSION          ...................................................................................73

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 ................................................................6

*Barnes v. Levitt*, 118 F.3d 404 ........................................................................................38

*Beaumont v. Tex. Dept of Criminal Justice*,
    468 F. Supp. 2d 907 ....................................16, 17, 18, 29, 30, 40,41, 42, 51,60, 69, 76, 77

*Bryan v. Chertoff*, 217 F. App'x 289, 293 .....................................................................40

*Burlington Northern & Sante Fe Railway Co. v. White*,
    126 S. Ct. 2405  ..............................................................................................13, 15, 28

*Burrell v. Crown Petroleum, Inc.*,
    255 F. Supp. 2d 591 ...........................................................18, 19, 31, 42, 43, 61, 70, 78

*Byers v. Dallas Morning News, Inc.*, 209 F.3d 419 ......................................................19

*Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343 ..................................................5

*Celestine v. Petroleos Venezuela SA*, 108 F. App'x 180, 188 .......................................17

*Celotex Corp. v. Catrett*, 477 U.S. 317 ....................................................6, 7, 8, 9, 10, 11

*Chambers v. Joseph T. Ryerson & Son, Inc.*, No. 3:05-CV-1533-D,
    2007 U.S. Dist. LEXIS 48338 ...........................................14, 27, 48, 49, 59, 75

*Conley v. TXI Operations, LP*, No. 3:03-CV-0071-N,
    2004 U.S. Dist. LEXIS 14291 ..............................................................13, 26, 58

*Davis v. Dallas Area Rapid Transit*, 383 F.3d 309.......................................................12

*DeHart v. Baker Hughes Oilfield Operations, Inc.*, No. 05-21087,
    2007 U.S. App. LEXIS 1362 ...............................................16, 28, 29, 39, 40, 51, 77

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 ....................................................................50

*Dilworth v. Cont'l Constr. Co.*, No. 07-60850,
    2008 U.S. App. LEXIS 13042 ..............................................................................13

*Dixon v. Moore Wallace, Inc.*, No. 3:04-CV-1532-D,
    2006 U.S. Dist. LEXIS 47560 ...........................................................9, 12, 22, 64

*Dixon v. Moore Wallace, Inc.*, No. 06-10899,
  2007 U.S. App. LEXIS 13440 ..............................................................9, 11, 24

*Dogan-Carr v. Saks Fifth Ave.*, H-05-1236,
  2007 U.S. Dist. LEXIS 12977 ......................................................................13

*Dotson v. Gulf*, No. H-05-0106, 2006 WL 44071 .........................................27

*Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187............................................6

*EEOC v. Hewlett Packard Co.*, No. H-05-1197,
  2007 U.S. Dist. LEXIS 22957 ......................................................................13

*Fields v. J.C. Penney*, 968 F.2d 533 .............................................................17

*Gillespie v. Dallas Hous. Auth.*, CA 3:01-CV-895-R,
  2003 U.S. Dist. LEXIS 29 ......................................................................18, 61

*Grice v. FMC Techs.*, No. 06-20509, 216 F. App'x 401 ...................26, 29, 69

*Hart v. Life Care Center Of Plano*, No. 06-11347,
  2007 U.S. App. LEXIS 15206 .....................................13, 16, 27, 48, 58, 75, 77

*Hockman v. Westward Commc'ns,* , 407 F.3d 317.........................16, 18, 19, 30, 31, 43, 51, 70, 78

*Holmes v. DEA*, No. EP-04-CA-474-FM,
  2007 U.S. Dist. LEXIS 26223 ......................................................................13

*Hutchings v. Potter*, No. SA-06-CV-245-XR,
  2007 U.S. Dist. LEXIS 22810 ......................................................................13

*Indest v. Freeman Decorating, Inc.*,
  164 F.3d 258 .......................................20, 31, 35, 36, 43, 53, 55, 57, 58, 61, 62, 63, 64, 78

*Ingram v. Papa John's Int'l, Inc.*, 171 F. App'x 439, 441 ............................12

*Jones v. Overnite Transport Co.*, No. 05-20363,
  2006 U.S. App. LEXIS 30626 ..................................................................27, 50

*King v. Enter. Leasing Co. of DFW*, No. 3:05-CV-0026-D,
  2007 U.S. Dist. LEXIS 50103 .................................................12, 30, 58, 59, 60

*Lauderdale v. Texas Dep't of Criminal Justice*, 512 F.3d 157 ....................19

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162 ......30, 48, 60

*Lenihan v. Boeing Co.*, 994 F. Supp. 776 ........................................................................6

*Long v. Eastfield Coll.*, 88 F.3d 300 ...............................................................................15

*Martin v. Kroger Co.*, 65 F. Supp. 2d 516 ................................13, 26, 27, 48, 50, 58, 75

*Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 ....................................6

*Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086 .............................................................51

*McCoy-Eddington v. Brazos Cty.*, No. H-05-0395, 2007 U.S. Dist. LEXIS 30052 ...............14, 27

*McCoy v. City of Shreveport*, No. 06-30453,
        2007 U.S. App. LEXIS 16582 ................................................................13, 39

*McCray v. DPC Indus., Inc.*, 942 F. Supp. 288 ...................................................17, 52, 60

*McCullough v. Kirkum*, 212 F. App'x 281, 285 ...............................................................39

*Mims v. Carrier Corp.*, 88 F. Supp. 2d 706 ...................................................................18

*Nat'l Passenger R.R. Corp.(AMTRAK) v. Morgan*, 536 U.S. 101 ...........................17, 30, 52, 60

*Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38 .............................................................50

*Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507 ...........................12, 14, 25, 27, 49

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 ...............................................18

*Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333 .............................................50

*Pittman v. Gen. Nutrition Corp.*, No. H-04-3174,
        2007 U.S. Dist. LEXIS 22332 .....................................................26, 29, 67, 69

*Preston v. Tex. Dep't of Family & Protective Servs.*, No. 06-20752,
        2007 U.S. App. LEXIS 2870 ...............................................13, 14, 27, 75

*Price v. Choctaw Glove & Safety Co.*, 459 F.3d 595 .....................................................38

*Pryor v. Wolfe*, 196 F. App'x 260, 262-63 ......................................................................13

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 ...............................................................50

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 ...............................................49, 50

*Richardson v. Monotronics, Int'l, Inc.*, 484 F.3d 327 .....................................................50

*Rios v. Rossotti*, 252 F.3d 375 .................................................................................17, 50

*Roberson v. Alltel Info. Servs.*, 373 F.3d 647 ...............................................................19

*Rosales v. TXI Operations, LP*, No. 3:03-CV-2923-N,
    2005 U.S. Dist. LEXIS 3977 ..................................................................................13, 26

*Sandstad v. C.B. Richard Ellis, Inc.*, 309 F.3d 893 ......................................................51

*Septimus v. Univ. of Houston*, 399 F.3d 601..........................15, 16, 17, 18, 27, 28, 30, 41, 50, 76

*Shabazz v. Texas Youth Comm'n*, 300 F. Supp. 2d 467................................................38

*Shackelford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398..............................................12

*Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871 ..........................18, 30, 42, 61

*Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606 ...........20, 31, 43, 53, 61, 62, 78

*Skinner v. Brown*, 951 F. Supp. 1307 ...........................................................................18

*Slaughter v. Jones Day*, No. H-05-3455,
    2007 U.S. Dist. LEXIS 2198 ..................................................................28, 29, 39, 77

*Speedy v. Rexnord Corp.*, 243 F.3d 397 .......................................................................17

*Stanley v. Univ. of Tex. Med. Branch, Galveston*, 425 F. Supp. 2d 816...............13, 26, 48, 58, 75

*Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180...........................................................17, 51

*Taylor v. Books A Million, Inc.*, 296 F.3d 376.............................................................38

*Tiller v. Fluker*, No. 5:05CV00352,
    2007 U.S. Dist. LEXIS 36982 ................................................................................19, 31

*Watts v. The Kroger Co.*, 170 F.3d 505 .......................................................................19

*Wilkinson v. Potter*, No. 06-30921,
    2007 U.S. App. LEXIS 11941 .................................................................................26

*Woods v. Delta Beverage Group*, 274 F.3d 295 ..........................................................19

*Wooten v. Fed. Express*, No. 3:04-CV-1196-D,
    2007 U.S. Dist. LEXIS 2195 ..................................................................14, 27, 41

*Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296 ..........................................................................17

## DOCKETED CASES

*Core v. Sprint/United Mgmt. Co.*, No. 3:96-CV-2265-D.............................................................13

## FEDERAL STATUTES

42 U.S.C. § 1981.............................................................................................................................5

42 U.S.C. § 2000e(g) ....................................................................................................................50

42 U.S.C. § 2000e-5(f).................................................................................................................38

## FEDERAL RULES

FED. R. CIV. P. 56......................................................................................................................5, 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **RICHARD A. ARRIETA, CHRIS CALIP,** | § | |
| **BEN CROMMEDY, RUBIN** | § | |
| **HERNANDEZ, ROGER JOHNSON,** | § | |
| **JOHN KETTERER, AND ABRAM** | § | |
| **TREVINO,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| | § | **Civil Action No.  3:05-CV-2271-D** |
| **v.** | § | **ECF** |
| | § | |
| **YELLOW TRANSPORTATION, INC.** | § | |
| **C/O THE FRICK CO.,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT YELLOW TRANSPORTATION, INC.'S BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Defendant Yellow Transportation, Inc.

("Yellow Transportation")[1] respectfully files its Brief in Support of its Motion for Summary

Judgment on all of Plaintiffs' claims.  As demonstrated below, Defendant is entitled to summary

judgment as a matter of law on each Plaintiff's claims.

**I.**

**INTRODUCTION**

In this employment discrimination lawsuit, Plaintiffs allege Yellow Transportation

violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and

the Texas Commission on Human Rights Act ("TCHRA") (Plaintiffs' Third Amended

Complaint ¶¶ 14-15).  Specifically, Plaintiffs assert race and/or national origin discrimination,

retaliation, and hostile work environment.[2]  Plaintiffs informed this Court that they worked

---

[1] Yellow Transportation does not own or operate The Frick Co.
[2] To the extent Plaintiffs assert pattern or practice allegations in their Third Amended Complaint, Yellow
Transportation is entitled to summary judgment because Plaintiffs make no class or disparate treatment claims.  *See*

different jobs on different shifts[3] and, as a result, have varied experiences and allegations. Thus, for the Court's convenience, this Brief separately addresses each Plaintiff's claims.

## II.
## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Once the moving party meets its burden of showing no genuine issue of material fact exists, the burden shifts to the non-moving party to set forth affirmative evidence and "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). As the non-moving party, Plaintiffs "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, Plaintiffs cannot simply rest on their allegations and denials; rather, they must provide significant probative evidence[4] that would enable a jury to return a verdict for them. *Anderson,* 477 U.S. at 256-57. Since Plaintiffs are unable to meet their burden, this Court should grant summary judgment for Yellow Transportation. *See Celotex*, 477 U.S. at 322.

## III.
## PLAINTIFF RICHARD A. ARRIETA

### A.    Statement of Facts

On or about April 1, 2003, Yellow Transportation and the International Brotherhood of

---

*Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 355 (5th Cir. 2001). Instead, Plaintiffs' lawsuit consists of seven individual's separate allegations against the same defendant.

[3] *See* Plaintiffs' Motion for Extension of Time for Completion of Discovery and the Movement of All Discovery Deadlines at ¶ 8 and Declaration of Janette Johnson at ¶ 8 (Docket No. 73).

[4] Evidence presented in a summary judgment proceeding must be of the same quality and admissibility as would be admissible in a conventional trial. *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991). Unsubstantiated opinions, speculation, and subjective beliefs are insufficient to defeat a properly supported summary judgment motion. *Lenihan v. Boeing Co.*, 994 F. Supp. 776, 790 (S.D. Tex. 1998).

Teamsters ("Teamsters Union") agreed to be bound by the terms and conditions of the National Master Freight Agreement and Southern Region Pickup and Delivery and Over-the-Road and Local Freight and Forwarding Garage and Office Clerical Supplement Agreements ("CBA") (Appendix 1484) (hereinafter "App.").[5]  This CBA governs the terms and conditions of all Yellow Transportation employees at the Dallas terminal who are members of Teamsters Union.

Article 37 of the CBA prohibits discrimination in any form (App. 1628).  Similarly, Yellow Transportation's Policy Guide to Workplace Conduct ("Policy Guide") also prohibits discrimination, harassment, or retaliation in any form (App. 3, 94-118, 1475).  Should an employee encounter a perceived incident of discrimination or harassment, the Policy Guide specifically outlines the complaint procedure the employee should follow (*Id.*).[6]

Arrieta is a current employee in good standing who began his full-time career with Yellow Transportation in June of 1999 (App. 2, 74).  To be sure, over the course of his tenure with Yellow Transportation, Arrieta *never* experienced a reduction in pay, was *never* transferred to a less desirable shift, and *never* demoted[7] (App. 5-6).

On September 27, 2004, Arrieta and some of his union coworkers sent a letter to James Welch ("Welch"), then President of Yellow Transportation, and to the International Teamsters Union (App. 89-91, 144-45).  The letter generally identified the following issues: (1) safe work environment; (2) personal property vandalized during work hours; (3) retaliation for refusal to

---

[5] On April 1, 2008, Yellow Transportation and the Teamsters Union agreed to another CBA, reflecting many of the same terms as in the 2003 version (App. 1474).
[6] Not only does Yellow Transportation maintain its Policy Guide, but it also trains its supervisors during orientation, including diversity training (App. 1454-1456).
[7] Likewise, Arrieta only received two warning letters in almost ten years of employment.  One warning letter was for an accident in which he flipped a rear trailer (App. 4).  Arrieta does claim he was given what he considers verbal warnings.  Specifically, on one occasion he was asked how many moves he had made in an evening, and, in 2000, he once was asked not to leave the company property to go to Whataburger (App. 40, 43-47).  Next, in October 2007, Arrieta received a warning letter for failure to follow instructions when he took a road power unit instead of a city power unit (App. 1476).  Arrieta lodged a harassment complaint and South Division Human Resources Manager Tammy Stephenson ("Stephenson") investigated (*Id.*).  The investigation revealed Arrieta did not follow company policy and no different treatment occurred (*Id.*).

allow someone else to punch in time cards; (4) harassment from management and coworkers; (5) hiring practices; and (6) double standards in lunch breaks (App. 431-432, 596-636).

In response to this letter, John Derry ("Derry"), then Yellow Transportation's Human Resources Manager in Dallas, and Don Emery ("Emery"), then Yellow Transportation's Senior Vice-President of Labor Relations and Human Resources, met with representatives of the group on November 18, 2004 to discuss their concerns (App. 469, 596-636, 1437). As follow-up to this meeting, Welch sent a letter to the employees detailing the steps Yellow Transportation planned to take to address their concerns (462, 596-636). Specifically, Welch informed the group that Yellow Transportation would increase the number of security surveillance cameras on site, install the Kronos[8] time keeping system at the Dallas terminal, and monitor lunch break standards to ensure all employees were held to the same standard (App. 359, 462-465, 596-636). Welch also explained the changes Yellow Transportation already implemented regarding its hiring processes (App. 468, 596-636). Finally, Welch discussed the employees' non-specific harassment allegations, which seemed to be aimed at the Teamsters Union, and encouraged the employees to report any and all harassment to Derry or Jerome Wilson ("Wilson"), Yellow Transportation's then Manager-Fair Employment, so that an investigation could occur (App. 466, 596-636, 1438). Arrieta testified that he never provided supplemental information to Welch, Derry or Wilson (App. 92).

The Teamsters Union also responded to the September 27, 2004 letter. Specifically, on or about November 9, 2004, Ruben Armendariz ("Armendariz"), an investigator formerly with the National Labor Relations Board ("NLRB"), met with a group of the employees who authored

---

[8] Yellow Transportation did not implement the Kronos time keeping system due to budgetary restraints (App. 1477). To address Plaintiffs' allegations that their time cards were misplaced, at the beginning of each shift, the Shift Operations Manager ("SOM") distributed the time cards and retrieved them after the employees clocked in (*Id.*). At the end of the shift, the SOM returned the time cards to the employees so that the could clock out (*Id.*).

the letter to discuss their allegations (App. 433-434, 596-636).  During this meeting, Armendariz requested to meet with each employee individually to discuss the allegations and asked each employee to provide a list of potential witnesses (App. 434-437, 445, 596-636).   Despite Armendariz's attempt to investigate the complaints, none of the employees, including Arrieta, met with Armendariz individually or provided a list of potential witnesses (App. 91, 434-437, 445, 596-636).   Moreover, the employees refused Armendariz's third request to meet in December 2004, and they further failed to answer questions Armendariz submitted to them in interrogatory form (App. 446-447, 453, 596-636).

Even though Arrieta absolutely refused to cooperate in the investigation of the September 2004 letter, he participated in a protest against the Union and the company in  November and December of 2004. (App. 16-17, 39, 88).   After this lawsuit was filed, Arrieta filed an EEOC charge in August 2006 (App. 139-141).

Despite the fact that Arietta is still a Yellow Transportation employee in good standing, he alleges race and national origin discrimination, retaliation, and racially hostile work environment claims.  Specifically, Arrieta alleges he was assigned a heavier workload[9] and was subjected to unprofessional conduct, such as vandalism and the promulgation of graffiti[10] (App. 7-12, 18, 23-38, 48-50, 54-64, 84-86).

To support his heavier workload claim, Arrieta avers that over the course of a few months he performed a dozen "extra" moves and frequently worked harder than his white counterparts (App. 23-38).  Of course, Arietta testified he never served in a managerial capacity, has no role

---

[9] Arrieta also asserts that supervisors did not discipline white employees who took extended breaks (App. 64-65).  Remarkably, Arrieta admits that he too took breaks that exceeded his allotted time and was not disciplined.  *Id.*

[10] Notably, Arrieta did not report the vast majority of this allegedly offensive conduct (App. 21-22, 25, 30-31, 34-35, 52-53, 57-59).  For example, Arrieta testified that he never complained about his heavier workloads (App. 41-42).  Rather than follow company procedure and alert management to his perception of discriminatory treatment, Arrieta simply decided to deliberately reduce his productivity (*Id.*).   Notwithstanding Arrieta's intentional decrease in productivity, Arrieta has not been disciplined in any form or fashion (*Id.*).

in assigning tasks, and has not reviewed productivity reports (App. 18, 23, 38, 54-55, 60-64, 87). Arietta admits he has no personal knowledge and is not aware of the work performed on other shifts (*Id.*).   Moreover, even on his own shift, Arrieta admits he does not spend his time computing the work of others (App. 19-20).   In short, Arrieta's only basis for his heavier workload claim is his personal opinion and speculation[11] (App. 61-64).

To support his vandalism allegation, Arrieta claims his locker was glued.   However, Arrieta himself links the gluing to race-neutral disagreements (App. 75-79 & 142-143).   For instance, in 2004, Arrieta began "saving" the "good" handheld company computers by locking them in his locker after his shift (App. 77).   Yellow Transportation did not sanctioned Arrieta's conduct (App. 79).   Indeed, Arrieta admits that, by hoarding the "good" computers, he was, naturally, leaving the "bad" computers for the remaining employees (App. 77).   Arrieta testified that his conduct upset his coworkers (App. 78).   In fact, Arrieta testified that his union steward expressly told him that his locker was glued because he was observed squirreling away the good computers[12] (App. 75 & 142-143).

Arrieta also asserts that his locker was glued becase he refused to abide by his union's suggestion to engage in a slow down in 2004 (App. 13-14).   Arrieta admits that his refusal to support his fellow Teamsters in the slowdown greatly upset his union brethren (*Id.*).   To be sure, after Arrieta refused to participate in the union slow down, his locker was glued (App. 14, 81-82).   In fact, Arrieta's own personal memorandum concerning this conduct actually states that

---

[11] Similarly, Arrieta asserts that white employees received better trucking equipment (App. 66).  Specifically, Arrieta complained that he was assigned *city* units as opposed to, in his opinion, the allegedly nicer *road* units (*Id.*). However, as a *city* driver, *city* units are exactly what Arrieta is supposed to drive.

[12] In a personal memorandum, never given to anyone at Yellow Transportation, Arrieta suggests that white employees were allowed to stash good computers and did not suffer any consequences (App. 75-79 & 142-143).  To be sure, Yellow never received this document (App. 75).   Rather, Arrieta had two conversations with supervisors regarding the glued locker, but Arrieta never complained about  any alleged discriminatory or retaliatory conduct (App. 75, 119-136, 142-143).

the **reason** the **union** glued his locker is because he refused to participate in the slowdown[13] (App. 14, 119-136) (emphasis added).   Moreover, Arrieta admits that, once he began participating in the union slow-downs, his lock was never glued again (App. 82-83).

Arrieta also alleges his car was vandalized on or around December 6, 2005 (App. 39 & 137-138).   At that time, however, the police report filed in connection with the incident reads **"[Arrieta] believes** the damage is in retaliation to [sic] a Teamsters union decision that has taken place recently" (*Id.*) (emphasis added).   Arrieta did not complain that the vandalism occurred based on his race or national origin (*Id.*).[14]

Finally, to support his graffiti allegation, Arrieta alleges he saw derogatory words aimed at the Hispanic community such as "greaser" and "wetback" on bathroom walls (App. 56).   He also heard coworkers referring to another employee as "chili dog," and expressing frustration about a coworker's broken English (App. 52-53).   Arrieta testified that insensitive and childish remarks were made concerning **_all_** classifications of employees: white employees, black employees, Hispanic employees, and even white supervisors were described in offensive terms (App. 69-73).   Furthermore, Arrieta testified that all of the alleged remarks were made by coworkers, and he readily admits that no supervisor ever made a derogatory or racially insensitive remark to him (App. 51).

More importantly, Arrieta **never** reported any of these alleged offensive remarks (App. 52-53; 1436).   Similarly, Arrieta **never** reported any graffiti displays (App. 57).   In fact, rather than alert Yellow Transportation to the alleged problem, Arrieta admits that he simply decided to file a lawsuit (App. 58).   Arrieta admits that Yellow Transportation promptly removed graffiti

---

[13] Indeed, Arrieta admits that other employees who decided not to participate in the slow-down were also victims of lock gluing (App. 15).

[14] Arrieta also claims that he **_might_** have been greased and unspecified people at an unspecified time gave him a cool reception (App. 67-68, 70).

when it was notified of its existence (App. 58-59).[15]

## B.   Arguments and Authorities

### 1.   *Arrieta Cannot Establish Race or National Origin Discrimination*[16]

Summary judgment is proper on Arrieta's race and national origin discrimination claims under Title VII, § 1981 and the TCHRA.[17]   To establish a *prima facie* case of discrimination, Arrieta must show: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was subject to an adverse employment action; and (4) he was replaced by someone outside of his protected class, or similarly situated employees outside his protected class were treated more favorably.   *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).   Arrieta simply cannot establish this *prima facie* case of discrimination.

### a.   Arrieta's claims are not adverse employment actions

To support his claims, Arrieta alleges he was assigned a heavier workload and less desirable trucking equipment (App. 7-12, 18, 23-38, 48-50, 54-64, 66, 84-86).   Even if true, summary judgment is still proper because these allegations do not constitute adverse employment actions.   For intentional discrimination claims, an actionable adverse employment action must be an "ultimate employment decision" such as "hiring, granting leave, discharging, promoting, and compensating."[18]   *Dixon*, 2006 U.S. Dist. LEXIS 47560, at*26-27.

---

[15] In fact, when graffiti is reported, Yellow Transportation's Security personnel reviews video and attempts to identify suspects (App. 1471).

[16] Throughout this Brief, for Plaintiffs' § 1981 claims, the Court should apply the same summary judgment analysis as a race discrimination claim under Title VII.   *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004); *King. Enter. Leasing Co. of DFW*, No. 3:05-CV-0026-D, 2007 U.S. Dist. LEXIS 50103, at *5 (N.D. Tex. July 11, 2007)(Fitzwater, J.).   Likewise, the Court should apply the same Title VII analysis to Plaintiffs' TCHRA claims.   *Shackelford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398, 404 n.2 (5th Cir. 1999).

[17] To the extent any of the Plaintiffs allege national origin claims under § 1981, Yellow Transportation is entitled to summary judgment as § 1981 is reserved solely for race discrimination claims.   *Ingram v. Papa John's Int'l, Inc.*, 171 F. App'x 439, 441 (5th Cir. 2006).

[18] The Supreme Court's decision in *Burlington Northern & Sante Fe Railway Co. v. White* did not affect the standard regarding adverse employment actions for Title VII discrimination cases; rather, it only altered the test for adverse employment actions in the Title VII retaliation context.  126 S. Ct. 2405 (2006); *see also Dilworth v. Cont'l Constr. Co.*, No. 07-60850, 2008 U.S. App. LEXIS 13042, at *4-5 (5th Cir. June 19, 2008); *McCoy v. City of*

Alternatively, it must affect a term or condition of his employment. *Core v. Sprint/United Mgmt. Co.*, No. 3:96-CV-2265-D, slip op. at 9-10 (N.D. Tex. Oct. 24, 1997) (Fitzwater, J.).

Here, Arrieta's claims simply fail to meet this standard. First, being assigned a heavier work load is not an actionable adverse employment action. *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 539 (S.D. Tex. 1999); *see also Hart v. Life Care Ctr. Of Plano*, No. 06-11347, 2007 U.S. App. LEXIS 15206 (5th Cir. June 26, 2007) (unpublished) (holding being assigned more difficult tasks is not actionable); *Stanley v. Univ. of Tex. Med. Branch, Galveston*, 425 F. Supp. 2d 816, 824 (S.D. Tex. 2003) (holding that being asked to do more physical labor and receiving unequal breaks are not actionable). Second, receiving what Arrieta claims to be inferior trucking equipment is also not an adverse employment action. *Rosales v. TXI Operations, LP*, No. 3:03-CV-2923-N, 2005 U.S. Dist. LEXIS 3977, *10 (N.D. Tex. Mar. 14, 2005) (Godbey, J.) (finding no *prima facie* case when plaintiff alleged receipt of inferior trucks, tires, maintenance, and load assignments); *Conley v. TXI Operations, LP*, No. 3:03-CV-0071-N, 2004 U.S. Dist. LEXIS 14291, at *9-10 (N.D. Tex. July 26, 2004) (Godbey, J.) (same). Likewise, none of these acts interfered with Arrieta's terms or conditions of his employment.

In sum, "not everything that makes an employee unhappy is an actionable adverse employment action." *Martin*, 65 F. Supp. 2d at 535. Though Arrieta may have preferred less work and different equipment, his job dissatisfaction simply does not rise to the level of an actionable adverse employment action. Moreover, the only evidence Arrieta offers to support his allegations of race and/or national origin discrimination is his own subjective belief, which is

---

*Shreveport*, No. 06-30453, 2007 U.S. App. LEXIS 16582, at *14-15 (5th Cir. July 11, 2007); *Preston v. Tex. Dep't of Family & Protective Servs.*, No. 06-20752, 2007 U.S. App. LEXIS 2870, at *12 n.18 (5th Cir. Feb. 7, 2007); *Pryor v. Wolfe*, 196 F. App'x 260, 262-63 (5th Cir. 2006); *Holmes v. DEA*, No. EP-04-CA-474-FM, 2007 U.S. Dist. LEXIS 26223, at *28, *53 (W.D. Tex. Mar. 30, 2007); *EEOC v. Hewlett Packard Co.*, No. H-05-1197, 2007 U.S. Dist. LEXIS 22957, at *9-10 (S.D Tex. Mar. 29, 2007); *Hutchings v. Potter*, No. SA-06-CV-245-XR, 2007 U.S. Dist. LEXIS 22810, at *20 (W.D. Tex. Mar. 28, 2007); *Dixon v. Moore Wallace, Inc.*, No. 3:04-CV-1532-D, 2006 U.S. Dist. LEXIS 47560, at *27, n.13 (N.D. Tex. July 13, 2006) (Fitzwater, J.), *aff'd* No. 06-10899, 2007 U.S. App. LEXIS 13440 (5th Cir. June 7, 2007).

insufficient to defeat summary judgment as a matter of law. *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 654 (5th Cir. 2004); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000). Thus, Yellow Transportation respectfully requests that this Court grant it summary judgment on Arrieta's Title VII, § 1981 and TCHRA claims.

### b. Arrieta fails to identify a similarly situated employee

Even if the above could somehow constitute adverse employment actions, summary judgment is still proper because Arrieta cannot establish a similarly situated employee outside his protected class received preferential treatment in "nearly identical" circumstances. *Preston*, 2007 U.S. App. LEXIS 2870, at *12; *Okoye*, 245 F.3d at 512-14; *McCoy-Eddington v. Brazos Cty.*, No. H-05-0395, 2007 U.S. Dist. LEXIS 30052, at *16 (S.D. Tex. Apr. 24, 2007); *Wooten v. Fed. Express*, No. 3:04-CV-1196-D, 2007 U.S. Dist. LEXIS 2195, at *36-40 (N.D. Tex. Jan. 9, 2007) (Fitzwater, J.); *Chambers v. Joseph T. Ryerson & Son, Inc.*, No. 3:05-CV-1533-D, 2007 U.S. Dist. LEXIS 48338, at *18, *28-32 (N.D. Tex. July 2, 2007) (Fitzwater, J.) (holding that to be nearly identical, comparator must same supervisor, same job responsibilities and capabilities, and have engaged in same conduct).

First, in regards to a heavier workload,[19] Arrieta testified he has no personal knowledge of the work that occurs on other shifts, and in fact, does not spend his time computing the amount of work his coworkers perform (App. 19-20, 61-64). Consequently, he failed to identify a similarly situated employee who received preferential treatment. *See, e.g. Preston*, 2007 U.S. App. LEXIS 2870, at *12–14 (holding plaintiff had not established a white employee received preferential treatment in "nearly identical" circumstances because she had no personal knowledge about the circumstances surrounding the employee's situation).

---

[19] Moreover, to the extent Arrieta claims white employees received longer breaks without discipline, his claim fails because Arrieta testified that he too has taken extended breaks without punishment (App. 64-65).

Arrieta's claim that white employees received better trucking equipment likewise fails. He alleges white employees drive what he considers nicer road unit trucks, while he drives city unit trucks (App. 66). However, as a city driver, city trucks are exactly what Arrieta is suppose to drive. He has not identified a white employee with the same position, responsibilities, and supervisors that is allowed to drive the road trucks. As such, Arrieta cannot establish his *prima facie* case under Title VII, § 1981 or the TCHRA, and summary judgment for Yellow Transportation is proper as a matter of law.

### 2.   *Arrieta Cannot Establish Retaliation*

Summary judgment is also proper on Arrieta's retaliation claim. Arrieta ostensibly claims the alleged heavier work loads and vandalism were retaliatory. However, to establish a *prima facie* case of retaliation, Arrieta must show: (1) he engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action. *Septimus v. Univ. of Houston*, 399 F.3d 601, 610; *see also Burlington N.*, 126 S. Ct. at 2414. Arrieta's ultimate burden is to prove that engaging in the protected activity was the "but for" cause of the adverse employment action. *Dixon*, 2007 U.S. App. LEXIS 13440, at *4-5; *Septimus,* 399 F.3d at 608; *Long v. Eastfield Coll.*, 88 F.3d 300, 305 (5th Cir. 1996).

Assuming Arrieta participated in a protected activity when he sent a letter to Welch and then protested against the company in November/December 2004, his claim still fails because he cannot establish that his protected activities were the "but for" cause of his alleged heavier work loads and vandalism. To the contrary, Arrieta testified his locker was glued because he refused to abide by the union's suggestion to engage in a slow down in 2004 (App. 13-14, 119-136).

Once he started participating in the union slow down, his locker was never glued again[20] (App. 82-83). Similarly, when Arrieta's car was allegedly vandalized, he informed the police the vandalism was retaliation from the union (App. 39,137-138). Clearly, it was Arrieta's response to the union's slow down that was the "but for" cause of the alleged vandalism—not any protected activity under Title VII or § 1981.[21]

In regards to his allegations of a heavier workload,[22] Arrieta testified he often shouldered more work than his white counterparts (App. 23-38). Even if true, the fact that Arrieta may have worked harder both before and after he engaged in protected activity is not evidence of retaliation. Rather, since his protected activity did not change his work environment, it could not be the "but for" cause of the heavier workloads. *See Dixon*, 2006 U.S. Dist. LEXIS 47560, at *40. Consequently, Arrieta's claim fails and summary judgment under Title VII, § 1981 and the TCHRA is proper as a matter of law.

### 3. *Arrieta Cannot Establish Hostile Work Environment*

Finally, summary judgment is also proper on Arrieta's hostile work environment claim. To establish a racially hostile work environment, Arrieta must prove: (1) he belongs to a protected class; (2) he was subjected to unwelcome harassment; (3) this harassment was based on his race/national origin; (4) the harassment affected a term, condition, or privilege of

---

[20] Arrieta even testified that other employees who did not participate in the union slow down also had their lockers glued (App. 15). Moreover, Arrieta testified that his union steward told him his locker was being glued because Arrieta was hoarding the good computers (App. 75, 142-143). Once again, Arrieta's own testimony establishes that his protected activity was <u>not</u> the but for cause of the alleged vandalism.

[21] The alleged vandalism also does not constitute retaliation because it did not dissuade a reasonable person from filing a discrimination complaint. To the contrary, after the vandalism occurred in 2004 and 2005, Arrieta filed an EEOC charge. *See DeHart v. Baker Hughes Oilfield Operations, Inc.*, No. 05-21087, 2007 U.S. App. LEXIS 1362, at *11 (5th Cir. Jan. 19, 2007) (holding that written warning was not retaliatory because it did not dissuade a reasonable employee from filing a charge of discrimination because a charge was in fact later filed); *Beaumont v. Tex. Dep't of Criminal Justice*, 468 F. Supp. 2d 907, 925 (E.D. Tex. 2006) (holding supervisor's conduct not retaliatory because it did not dissuade reasonable employee from complaining because employees did in fact complain).

[22] In fact, the Fifth Circuit has indicated that being assigned more difficult work tasks is not a materially adverse employment action even under *Burlington Northern. See Hart,* 2007 U.S. App. LEXIS 15206, at *4.

employment; and (5) the employer knew or should have known about the harassment but failed to take prompt remedial action.  *Septimus*, 399 F.3d at 611; *Hockman v. Westward Commc'ns*, 407 F.3d 317, 325-26 (5th Cir. 2004).  Arrieta simply cannot meet this burden.[23]

### a.    The harassment was not based on race/national origin

Arrieta relies on the alleged vandalism of his locker and car as evidence of racial harassment.  However, as described above in Section III(B)(2), Arrieta himself testified that the vandalism was in response to his refusal to participate in the union slow-down and his decision to hoard the good computers (App. 13-14, 39, 75-83, 119-136, 137-138, 142-143).   In other words, by Arrieta's own admission, the alleged vandalism was not based on his race or national origin.  As such, it cannot support a hostile work environment claim under Title VII, § 1981 or the TCHRA as a matter of law.  *See Beaumont*, 468 F. Supp. 2d at 919-20 (holding harassment that does not have racial character or purpose cannot support a hostile work environment claim).

### b.    The alleged harassment did not affect a term, condition, or privilege of employment

Arrieta also claims he was subjected to a hostile work environment because he saw the words "greaser" and "wetback" on bathroom walls, and because his coworkers referred to another employee as "chili dog" and expressed frustration over an employee's broken English (App. 52-53, 56).  However, it is well-established that the mere utterance of offensive epithets does not sufficiently affect the terms and conditions of employment.   *Nat'l Passenger R.R. Corp.(AMTRAK) v. Morgan*, 536 U.S. 101, 115 (2002); *see also McCray v. DPC Indus., Inc.*,

---

[23] To establish a hostile work environment, the plaintiffs cannot simply make broad generalizations of harassment in the workplace.  Rather, each plaintiff must specifically identify the alleged harassment that they themselves experienced.  *Celestine*, 108 F. App'x at 188; *see also Septimus*, 399 F.3d at 612 (holding evidence about the harassment of others is not relevant because plaintiff did not personally experience such conduct); *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 303-04 (5th Cir. 2000); *Rios v. Rossotti*, 252 F.3d 375 381 n.2 (5th Cir. 2001); *Speedy v. Rexnord Corp.*, 243 F.3d 397, 406 (7th Cir. 2001); *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180 1186 (5th Cir. 1997); *Fields v. J.C. Penney*, 968 F.2d 533, 538 (5th Cir. 1992); *Dogan-Carr v. Saks Fifth Ave.*, H-05-1236, 2007 U.S. Dist. LEXIS 12977 (S.D. Tex. Feb. 26, 2007); *Dixon*, 2006 U.S. Dist. LEXIS 47560, at *29 n.14.

942 F. Supp. 288, 292-93 (E.D. Tex. 1996) (finding no hostile environment even though supervisor made racial jokes and used racial slurs).[24]   Rather, in order to prevail, Arrieta must show that his work environment was "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability" of workers in his protected class. *Gillespie v. Dallas Hous. Auth.,* CA 3:01-CV-895-R, 2003 U.S. Dist. LEXIS 29, at *18–19 (N.D. Tex. Jan. 3, 2003); *see also Hockman*, 407 F.3d at 326 (holding "to survive judgment, the harassment must be 'so severe [or] pervasive that it destroys a protected classmember's opportunity to succeed in the work place") (quoting *Shepherd*, 168 F.3d at 874); *Beaumont*, 468 F. Supp. 2d at 919-20 (same).

Arrieta failed to meet this onerous burden.  Even if Arrieta did see the words "greaser" or "wetback" on the bathroom wall and heard his coworkers call another Hispanic "chili dog," such graffiti and statements did not "destroy completely" Arrieta's ability to succeed in the workplace. To the contrary, the evidence shows Arrieta has, in fact, succeeded at Yellow Transportation: he remains an employee in good standing, he receives pay raises, and he has never been demoted or transferred to a less desirable shift (App. 5-6).  Since Arrieta failed to meet his burden, summary judgment is proper as a matter of law.  *See Burrell v. Crown Petroleum, Inc.*, 255 F. Supp. 2d 591, 615-16 (E.D. Tex. 2003) (holding no hostile work environment because though plaintiff may have taken offense to conduct, it did not interfere with her work performance or undermine

---

[24] The United States Supreme Court and the Fifth Circuit impose a heavy burden on a plaintiff to show that the harassment is severe or pervasive.  *See, e.g., Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-82 (1998); *Septimus*, 399 F.3d at 611-12; *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999). Whether conduct is "hostile" or "abusive" depends on the totality of the circumstances, including the frequency of the conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work performance.  *Septimus*, 399 F.3d at 611.  It is not enough for Arrieta to claim he was treated badly.  *Mims v. Carrier Corp.*, 88 F. Supp. 2d 706, 713 n.3 (E.D. Tex. 2000); *see also Hockman*, 407 F.3d at 326 (stating "the alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents"); *Shepherd*, 168 F.3d at 874 (holding that even "boorish" and "offensive" comments are not enough to establish a hostile work environment); *Beaumont*, 468 F. Supp. at 919 ("conduct that only 'sporadically wounds or offends but does not hinder' an employee's performance is not actionable")(quoting *Skinner v. Brown*, 951 F. Supp. 1307, 1322 (S.D. Tex. 1996)).

her competence).

### c.   Arrieta failed to take advantage of corrective opportunities

Summary judgment is also proper because Arrieta cannot show Yellow Transportation knew or should have known of his alleged complaints, and he failed to take advantage of the corrective opportunities Yellow Transportation offered.[25]  *Hockman*, 407 F.3d at 329.  Yellow Transportation's Policy Guide prohibits discrimination, harassment, or retaliation in any form and specifically outlines the complaint procedure an employee must follow to report any prohibited conduct (App. 3, 94-118).  Despite these remedial measures, Arrieta testified that he *never* reported his coworkers' offensive remarks and he *never* reported any graffiti[26] (App. 52-53, 57-58).  In fact, Arrieta even refused to participate in any investigation of potential harassment (App. 91-92).  Since Arrieta unreasonably failed to take advantage of the available remedial measures,[27] summary judgment under Title VII, § 1981 and the TCHRA is proper as a matter of law.  *Hockman*, 407 F.3d at 330; *Burrell*, 255 F. Supp. 2d at 614.

Finally, even if Arrieta had complained, summary judgment would still be proper because Yellow Transportation took prompt remedial measures.[28]  For instance, Arrieta testified that Yellow Transportation promptly removed the graffiti when it was made aware of its existence

---

[25] For all Plaintiffs' hostile work environment allegations in this Brief, the Court should apply the five-factor co-worker test outlined in *Watts v. The Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999) since no supervisor conduct is alleged.

[26] To the extent he relies on the alleged heavier workloads as evidence of a hostile work environment, Arrieta's claim still fails because he testified that he never complained about it (App. 41-42).

[27] Whether Arrieta subjectively felt he could not report the alleged conduct is immaterial.  *Hockman*, 407 F.3d at 330; *see also Woods v. Delta Beverage Group*, 274 F.3d 295, 301 (5th Cir. 2001) (granting summary judgment because reasonable person would have felt compelled to report harassment); *see also Tiller v. Fluker*, No. 5:05CV00352, 2007 U.S. Dist. LEXIS 36982, at *16 (E.D. Ark. May 17, 2007) (holding that an employee's "fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment") (quoting *Williams v. Mo. Dep't of Mental Health*, 407 F.3d 972, 977 (8th Cir. 2005)).

[28] Additionally, had Plaintiffs not been satisfied with Yellow Transportation's initial response, its Policy Guide provides for more than one avenue of complaint, and Plaintiffs should avail themselves of other reporting avenues if they felt Yellow Transportation's responses were not reasonable.  *See Lauderdale v. Texas Dep't of Criminal Justice*, 512 F.3d 157, 164-65 (5th Cir. 2007).

(App. 58-59; *see also* App. 270, 305).   Since Yellow Transportation took prompt remedial measures, summary judgment is proper as a matter of law.  *See Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 616 (5th Cir. 1999); (examining whether the offending behavior in fact ceased); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265 (5th Cir. 1999) ("by promptly invoking a company's grievance procedure, a plaintiff has received the benefit Title VII was meant to confer.  In such cases, an actionable hostile claim will rarely if ever have matured").

## IV.
## PLAINTIFF CHRIS CALIP

### A.    Statement of Facts

Plaintiff Christopher Calip ("Calip") is a current employee[29] of Yellow Transportation who began his tenure as a regular employee in April 1999 (App. 147).  Calip is a member of the Teamsters Union, and the terms and conditions of his employment are governed by the CBA as well as Yellow Transportation's policies and procedures[30] (App. 148-153, 309, 310).

Throughout the duration of his employment, Calip received several warning letters for violations of the CBA.  For instance, on August 9, 1999, Calip was warned for failing to follow instructions[31] (App. 210-211, 318).  Specifically, he failed to return permits to his tractor that

---

[29] Calip was in a work related accident on May 17, 2007 (App. 1480).  As of the filing of this motion, he remains on workers' compensation leave (*Id.*).

[30] Calip testified that Yellow Transportation's equal employment opportunity policy, which outlines the complaint procedure, was posted on the company bulletin board as well as contained in Yellow Transportation's Policy Guide (App. 154, 311-313).

[31] On March 7, 2000, Calip was again warned for failing to follow instructions because he left his personal articles and trash in his tractor (App. 213-214, 319-320).  Calip also received warning letters for other types of misconduct. For instance, on April 5, 2000, Calip was "on call" for work (App. 215).  However, when Yellow Transportation called to give him an assignment, it kept getting his voice mail (App. 215-216, 321-322).  Consequently, on April 6, 2000, he received a warning letter for failure to be available for work (App. 321-322).  Calip blamed his failure to report to work on his cell phone (App. 217).  On April 11, 2000, Calip received a warning letter for delay of freight and equipment (App. 218-222, 323-324).  On May 22, 2000, Calip received a warning letter because he failed to take a run he had stated he would take (App. 223, 325).  On April 9, 2001, he received a warning letter for excessive absenteeism (App. 228, 326-327).  On March 4, 2002, Calip received another warning letter for failure to follow instructions (App. 229-230, 328-329).  On June 12, 2002, Calip received another warning letter for absenteeism

were required to remain on the tractor (App. 211).  Calip felt this warning letter was harassing because it would be "very strenuous" for him to "walk back a hundred yards" to put the permit cards back in the tractor (App. 212).

In July 2002, Yellow Transportation received a complaint from a hotel manager about Calip.  According to Calip, he stopped at the hotel to take a shower (App. 300).  The hotel staff said he could have the room for one hour, but Calip claimed it took him longer than one hour to take a shower (App. 300-301).  The next morning, the hotel informed Calip he needed to vacate the premises.  Calip's driving partner, who was also at the hotel, left the hotel and went back to the terminal (App. 302).  Calip, on the other hand, stayed on the premises (*Id.*).  According to the hotel manager, Calip made disrespectful and insulting remarks about the motel and about Yellow Transportation (App. 306-307, 357).  The hotel then stated that, because they have had problems with Calip in the past, he was no longer welcome on hotel property (App. 307, 357).

In December 2004, Calip was selected for a random[32] drug test to be conducted at the Elmbrook Clinic, a medical facility not related to Yellow Transportation[33] (App. 156).  Calip went to the clinic, but was unable to void enough urine to complete the test (App. 156, 165).  Thus, the clinic instructed Calip to return to the lobby and drink water (*Id.*).  Under both the

---

(App. 236, 330).  On July 9, 2002, Calip received a warning letter for being forty-five minutes tardy (App. 237, 331).  On December 13, 2002, Calip received yet another warning letter for excessive absenteeism (App. 238, 332).  On March 12, 2003, Calip again received a warning letter for excessive absenteeism (App. 245, 344).  On March 21, 2003, Calip received another warning letter for failing to be available for call (App. 241-242, 341).  One week later, on March 28, 2003, Calip again failed to be available for call (App. 242, 342-343).  Once again, Calip blamed these incidences on his cell phone (App. 242-243).  Calip testified that as of May 30, 2003, he was on final written warning for his failure to be available for call (App. 242-245, 343).  On May 25, 2004, Calip received another warning letter for delay of freight (App. 246-250, 345).  On July 6, 2004, Calip once again received a warning letter for excessive absenteeism (App. 250-251, 346).  On October 7, 2005, Calip received another warning letter for excessive delay of freight (App. 288, 352-353).  On December 14, 2005, Calip received a warning letter for failure to follow instructions (App. 290, 354).  On December 27, 2005, Calip received again warning letter for excessive absenteeism (App. 291-292, 355).  On July 21, 2006, Calip received another warning letter for excessive absenteeism (App. 293, 356).  Finally, on May 23, 2007, Calip received a warning letter for causing a preventable accident (*See* App. 1480).

[32] Calip does not dispute this was a random test (App. 188-189).

[33] Pursuant to Department of Transportation regulations, drivers like Calip are subjected to random drug testing (App. 164; *see also* App. 729-730).

CBA and the Department of Transportation ("DOT") regulations, when an employee is unable to void enough urine, that employee must **remain supervised** while he/she drinks water over the next three hours in order to make a second attempt (App. 165-167, 314-317).

Contrary to these regulations, Calip left the supervised area and went outside to his car (App. 157, 166).  While he was outside, the clinic called Calip's name for the test retake; however, since Calip was no longer in the clinic he did not hear his name and missed his test[34] (App. 157, 166-167).  Since Calip missed the test, the clinic considered it a refusal[35] to submit to a drug test, and an employee of the Elmbrook clinic notified Dave Parker ("Parker"), then Dallas Distribution Center Manager at Yellow Transportation (App. 157, 169, 174, 176-177).  Calip was then discharged in accordance with the CBA (App. 170, 314-317, 347-348).

Following his discharge, Calip contacted his union to file a grievance about his discharge (App. 171).  He also contacted the Teamster Union's national grievance department (App. 162). At the grievance committee hearing, the Elmbrook Clinic employee[36] testified that after she called Calip's name for the test retake, she went outside to look for Calip (App. 173-174).  She further testified that Calip did not complete his retake test, which the clinic considered a refusal to take a drug test (App. 174).  Calip also testified at the hearing regarding his version of the facts (App. 180-181).  After hearing all of the evidence, the neutral grievance committee denied Calip's grievance[37] (App. 181, 185).

Despite Calip's test being considered a positive test result, the CBA allows employees, like Calip, to return to work if they successfully completed a drug/alcohol rehabilitation program

---

[34] Calip alleges other employees were also outside, but did not miss their names being called (App. 268).
[35] Under the CBA, a refusal to take a drug test is presumed to be a positive result that subjects an employee to immediate discharge (App. 168-169, 172, 252, 314-317).
[36] Calip testified that he holds no personal animus towards the Elmbrook Clinic employee who testified against him (App. 175).  Nevertheless, he contends that this Elmbrook employee, who he does not know, perjured herself at his grievance committee hearing (App. 178-179).
[37] After his grievance was denied, Calip filed a complaint against his union with the NLRB (App. 182, 239, 240, 253-255, 333-340).

(App. 158-160, 183-184, 252-253).   Upon completion of the program, Calip took a reemployment drug test (App. 161).  He passed and returned to work around January 2005 (App. 161-162).

In February 2006, Calip met with Tammy Hardge Stephenson ("Stephenson"), Human Resources Manager-South Division, to discuss his concerns that he was being harassed with the drug testing policy (App. 155-156, 186).  First, he claimed it was harassment when the Elmbrook Clinic did not allow him to complete his retake drug test even though he left the supervised area (App. 186-187).  However, Calip readily admits that Yellow Transportation employees do not work at the Elmbrook Clinic (App. 187).  Second, after his drug test was considered a positive drug test result, Calip claimed it was harassment to subject him to thirteen drug tests, including follow-up tests, over the course of the next year[38] (App. 163, 186).  Nevertheless, Calip admits that pursuant to the DOT regulations, employees who test positive for drugs are subjected to both random and follow up testing for a year[39] (App. 271-273).

During his meeting with Stephenson, Calip also complained that he has received too many warning letters for excessive absenteeism (App. 194-195).  Calip claims he missed work because he was in a custody dispute over his son (App. 196).  Notably, Yellow Transportation provided Calip the opportunity to take off work for thirty (30) days (App. 196-197).  However, Calip did not take advantage of this opportunity (*Id.*).  Rather, he chose to remain "on call" for work (App. 197).  Calip testified that, because he was "on call," he was representing to Yellow Transportation that he was available to work and agreed his failure to report to work was a

---

[38] Calip also claimed it was race discrimination for Yellow Transportation to require him to report for these additional drug tests at the Elmbrook Clinic (App. 265).  Calip then ignored these instructions and went to a different testing clinic (App. 280).

[39] Calip also alleges that Randy Hill, a white employee, failed a drug test two years before Calip, but was not required to take additional tests (App. 190, 267, 273-274).  However, Calip testified he has no personal knowledge or documentation to support this allegation (App. 190-194, 274).

violation, regardless of the reason (App. 197-198).  Nevertheless, Calip felt it was harassment to give him warning letters for his unexcused absences[40] (App. 199, 256).  In fact, Calip even avers it was discriminatory for his supervisors to call him and tell him they would like to see an improvement in his attendance/performance (App. 262).

Notwithstanding the fact that he is a current employee, Calip alleges race discrimination, retaliation, and hostile work environment claims against Yellow Transportation.[41]  In support of his race discrimination claim, Calip claims some of his white coworkers discriminated against him because they complained about him and did not want to be his driving partner[42] (App. 224-227).  However, Calip testified he did not know *why* his coworkers did not want to drive with him (App. 224).  He also claims it is discriminatory that the white employees who do want to ride with him do not hold the seniority to do so (App. 227).  Finally, Calip claims Yellow Transporation subjected him to race discrimination when he was assigned to drive with a 300 pound man in a Volvo truck[43] (App. 258-261).  Notably, Calip does *not* allege that his supervisors made racial slurs, nor does he assert that any supervisor made any sort of inappropriate remarks based on his race (App. 296).  In fact, Calip does not allege his coworkers made inappropriate racial statements (*Id*.).

In support of his retaliation claim, Calip claims that someone put a dent in his car after he

---

[40] Calip alleges that white employees have not received warnings for arriving late to work (App. 199).  However, once again, Calip's allegation is based only on his speculation and not on any personal knowledge (App. 199-200).  Rather, Calip testified that Mike Smith, then Assistant Line Haul Operations Manager, instructed dispatchers to follow procedure when an employee was late to work (App. 257-258).

[41] In March 2005, Calip filed a charge of discrimination with the EEOC, identifying the only date of personal harm as December 7, 2004 (App. 265, 349-350).  The EEOC dismissed his charge on June 29, 2005 (App. 265-266).  Calip filed an additional charge in February 2006, listing only July 2, 2005 to January 6, 2006 (App. 268, 351).

[42] However, Calip also testified that black drivers did not want to ride with him (App. 230-236).

[43] Calip also claims he was subjected to race discrimination when he was assigned to drive to Nebraska, Utah, and Oregon during the winter months (App. 263-264).  However, Calip concedes that business necessitated these trips (App. 264).  Additionally, Calip alleges it was discriminatory for Troy Hastings, a dispatcher, to call him to verify his location when his load was late (App. 274-279).  He also claimed it was discriminatory for Hastings to ask him why he folded his papers a certain way (App. 281).  Finally, he claims Hastings "watched" him carefully (App. 282).  However, Calip testified that Hastings was not his supervisor (*Id*.).

protested across the street (App. 283). He reported the vandalism to Stephenson and to the head of security (App. 284). In response, Calip was allowed to review video surveillance, but it did not reveal any vandalism taking place (App. 285). Calip also claims the additional drug testing is retaliatory, as well as his 2005 warning letters (App. 286, 287, 289-292, 293, 352-356). Finally, Calip claims he is being "watched" (App. 286-287).

In support of his hostile work environment claim, Calip claims the "N" word was carved into the dashboard of a truck on August 10, 2005 (App. 269). He did not report this slur until January 2006[44] (App. 295). He also avers he saw graffiti on the bathroom walls in 1986 or 1987 and then from 1999 until 2001 or 2002 (App. 201-203, 297). Once again, Calip did not complain about this graffiti until his February 2006 meeting with Stephenson[45] (App. 201-203, 294, 298-299). Importantly, Calip testified that since his complaints, Yellow Transportation has taken action to remove the graffiti (App. 270, 305). In fact, in his February 2006 meeting, Calip testified he had no complaints about any current graffiti (App. 202).

## B.   Arguments and Authorities

### 1.   *Calip Cannot Establish Race or National Origin Discrimination*

Summary judgment is proper on Calip's Title VII, § 1981 and TCHRA race and national origin discrimination claims because he did not suffer an adverse employment action, and, even if he did, he cannot establish that similarly situated employees outside his protected class were treated more favorably. *Okoye*, 245 F.3d at 512-13. As such, Calip cannot establish his *prima facie* case.[46]

---

[44] Calip did not lodge any complaints regarding the graffiti either of his EEOC charges. (App. 303-304).

[45] Calip also alleges in January 2006 he saw a piece of rope on a beam, which he believed to be part of a noose (App. 204-205). He took pictures of this rope, but never provided them to Yellow Transportation (App. 206). In fact, Calip testified that he does not even know whether he ever complained to Yellow Transportation about the alleged noose (App. 206-209).

[46] See Section III(B)(1) for the *prima facie* elements. For the sake of brevity, Defendant will not continuously repeat the relevant standards.

### a.      Calip's claims are not adverse employment actions

To support his discrimination claim, Calip ostensibly claims: (1) some of his white coworkers complained about him and did not want to be his driving partner (App. 224-227); (2) he was assigned to drive with a 300 pound man in a Volvo truck (App. 258-261); (3) he was assigned to drive to Nebraska, Utah, and Oregon during the winter months (App. 263-264); and (4) a dispatcher, who was not his supervisor, "watched" him carefully and called to ask why his load was late (App. 274-279, 282).

None of these claims constitute actionable adverse employment actions because they do not involve hiring, granting leave, discharging, promoting, or compensating. *Dixon*, 2006 U.S. Dist. LEXIS 47560, at *26–27. Likewise, none of these allegations affected a term or condition of Calip's employment. For instance, even if driving with a 300 pound man or driving to certain states in winter required Calip to shoulder a heavier work load or perform more physical labor, his claims still fail. *Martin*, 65 F. Supp. 2d at 439; *Stanley*, 425 F. Supp. 2d at 824; *see also Rosales*, 2005 U.S. Dist. LEXIS 3977, at *10 (being assigned inferior trucks and load assignments not actionable). Moreover, a non-supervisor dispatcher "watching" Calip or asking Calip why he was late is simply insufficient to establish an adverse employment action. *See, e.g., Wilkinson v. Potter*, No. 06-30921, 2007 U.S. App. LEXIS 11941, at **5-6 (5th Cir. May 21, 2007) (holding supervisor staring at employee and making unnecessary visits to work area not actionable); *Grice v. FMC Techs.*, No. 06-20509, 216 F. App'x 401, 407 (5th Cir. Jan. 30, 2007) (holding supervisor closely watching employee not actionable); *Pittman v. Gen. Nutrition Corp.*, No. H-04-3174, 2007 U.S. Dist. LEXIS 22332, at *66 (S.D. Tex. Mar. 28, 2007) (holding that supervisor repeatedly calling employee early in the morning with questions about the employee's work not actionable). In fact, even if Calip bases his claims on the written warning

letters he received, his claims would still fail. *Hart,* 2007 U.S. App. LEXIS 15206, at *2-3

(holding disciplinary warnings not actionable adverse employment actions); *Martin*, 65 F. Supp.

2d at 536 ("negative performance evaluations, even if undeserved, are not adverse employment

actions giving rise to actionable discrimination claims").   Since Calip cannot establish he

suffered an adverse employment action or that the terms and conditions of his employment were

affected, Yellow Transportation respectfully requests this Court grant it summary judgment on

his Title VII, § 1981 and TCHRA claims.[47]

### b.    Calip fails to identify a similarly situated employee

Even if Calip's complaints could somehow constitute adverse employment actions, his

Title VII, § 1981 and TCHRA claims still fail because he cannot identify a similarly situated

employee who received preferential treatment in nearly identical circumstances.[48]  *Preston*, 2007

U.S. App. LEXIS 2870, at *12; *Okoye*, 245 F.3d at 512-514; *Chambers*, 2007 U.S. Dist. LEXIS

48338, at *17-18, *28-32; *McCoy-Eddington,* 2007 U.S. Dist. LEXIS 30052, at *16; *Wooten*,

2007 U.S. Dist. LEXIS 2195, at *36-40.   For instance, Calip testified he had no personal

---

[47] Moreover, the only evidence Calip offers to support his allegations of race and/or national origin discrimination is his own subjective belief, which is insufficient to defeat summary judgment as a matter of law.  *Roberson*, 373 F.3d at 654; *Byers*, 209 F.3d at 427.

[48] To the extent Calip bases his discrimination claim on the Elmbrook Clinic's decision to treat Calip's failure to take a drug test as a positive result, his claim fails because Calip testified that no Yellow Transportation employees were involved in that decision (App. 187).  Even if Yellow Transportation could be liable for Elmbrook's actions, his claim still fails because a drug test is not an adverse employment action.  *Dotson v. Gulf*, No. H-05-0106, 2006 WL 44071, at *9 (S.D. Tex. Jan. 9, 2006).  Calip's claim also fails because he cannot identify a similarly situated employee who received preferential treatment.  Specifically, Calip testified he was the only individual who missed his name being called and thus missed his test (App. 268).  To the extent Calip claims it was discriminatory to discharge him after his positive drug test, his claim fails because Yellow Transportation had a legitimate, nondiscriminatory reason, and Calip cannot prove pretext.  *Septimus*, 399 F.3d at 610.  First, Calip was discharged in accordance with the CBA's provision on positive drug test results (App. 170, 314-317, 347-348).  Calip has no evidence this legitimate reason is pretextual because a neutral grievance committee upheld the decision (App. 181, 185).  *Jones v. Overnite Transp. Co.*, No. 05-20363, 2006 U.S. App. LEXIS 30626, at *12-13 (5th Cir. Dec. 13, 2006).  To be sure, Calip admits none of his supervisors ever made racial statements (App. 296).  Finally, to the extent Calip bases his discrimination claim on the requirement that he report for additional drug tests after his positive result in order to return to work, his claim fails because he testified he has no personal knowledge of any white employee who failed a drug test under nearly identical circumstances but was not required to take additional tests (App. 190-194, 274).  *See Preston*, 2007 U.S. App. 2870, at *12–14 (holding plaintiff had not established a white employee received preferential treatment in "nearly identical" circumstances because she had no personal knowledge about the circumstances surrounding the employee's situation).

knowledge of a white employee who had the same job responsibilities, same supervisors, and had engaged in the same pattern of absenteeism but who was not issued warning letters[49] (App. 199-200).   In fact, Calip testified that dispatchers were instructed to follow the disciplinary procedures when an employee was late to work (App. 257-258).   Similarly, Calip failed to identify a similarly situated white employee who had the same record of coworkers requesting not to ride with him/her that received what Calip subjectively felt were better driving partners and assignments.   As such, Calip cannot establish his *prima facie* case, and summary judgment is proper on his Title VII, § 1981 and TCHRA claims.

### 2.   *Calip Cannot Establish Retaliation*

Summary judgment is also proper on Calip's retaliation claim because he cannot establish that his protected activity[50] was the "but for" cause of any material adverse conduct.   *See Burlington N.*, 126 S. Ct. at 2414; *Dixon*, 2007 U.S. App. LEXIS 13440, at *4-5; *Septimus*, 399 F.3d at 610.   In support of his retaliation claim, Calip alleges some unidentified individual dented his car (App. 283).   However, Calip has no evidence that a Yellow Transportation manager or employee made the alleged dent.   In fact, Yellow Transportation allowed Calip to review surveillance tapes, which did not reveal any vandalism taking place (App. 285).   Put simply, Calip has no evidence that anyone at Yellow Transportation had anything to do with the alleged vandalism, let alone meet his burden of proving his complaints were the "but for" cause.

Calip also claims he was retaliated against because he was being "watched," because he received warning letters and because he was required to undergo additional drug tests after his

---

[49] Calip readily admits his excessive absenteeism violated company policy (App. 197-198).   *See DeHart*, 214 F. App'x at 442 (having colorable grounds for warning not actionable); *Slaughter v. Jones Day*, No. H-05-3455, 2007 U.S. Dist. LEXIS 2198, at *17-18 (S.D. Tex. Jan. 11, 2007) (holding discipline for admitted policy violations not actionable).

[50] For purposes of this motion only, Yellow Transportation assumes Calip's participation in picketing in November 2004 and his complaint to Stephenson in February 2006 are protected activities.

test was considered a positive test result (App. 286-287, 289-293).  First, being "watched" is not a materially adverse employment action.  *Grice,* 216 F. App'x at 401 (holding supervisor watching employee more closely not retaliation); *Pittman,* 2007 U.S. Dist. LEXIS 22332, at *66 (holding that supervisor questioning employee's work and making "vindictive visits" not retaliation).  Second, being disciplined for admitted policy violations is not a materially adverse employment action.  *DeHart*, 214 F. App'x at 442 (holding warning letter not a materially adverse employment action that would dissuade a reasonable employee from making a discrimination complaint because there were colorable grounds for the warning and "a reasonable employee would have understood a warning under these circumstances was not necessarily indicative of a retaliatory mind-set"); *Slaughter*, 2007 U.S. Dist. LEXIS 2198, at *17 (holding discipline for admitted misconduct not materially adverse employment action that would dissuade a reasonable employee from filing a complaint).  Similarly, Calip admits that because he had a positive drug test result, DOT regulations mandate that he be subject to additional follow-up and random testing for one year (App. 271-273).  Calip has no evidence that his protected activity was the but for cause of these additional drug tests.  To the contrary, DOT regulations require these tests.

Finally, Calip's retaliation claims fail because none of the alleged retaliatory conduct would dissuade a reasonable employee from complaining or filing a charge.  *DeHart*, 214 F. App'x at 442 (holding that written warning was not retaliatory because it did not dissuade a reasonable employee from filing a charge of discrimination because a charge was in fact later filed); *Beaumont,* 468 F. Supp. 2d at 925 (holding supervisor's conduct not retaliatory because it did not dissuade reasonable employee from complaining because employees did in fact complain).  The evidence is undisputed that Calip was not dissuaded from making a complaint.

Not only did he complain to Human Resources in February 2006, he also filed two separate EEOC charges. Calip simply cannot establish his retaliation claim as a matter of law. Yellow Transportation respectfully requests that this Court grant it summary judgment on Calip's Title VII, § 1981 and TCHRA claims.

### 3. *Calip Cannot Establish Hostile Work Environment*

Finally, summary judgment is proper on Calip's hostile work environment claim. To support his claim, Calip avers he saw the "N" word carved into the dashboard of a truck on August 10, 2005 and because he saw graffiti in 1986 or 1987 and from 1999 until 2001 or 2002 (App. 201-203, 269, 297). First, his claims fail because they are time-barred.[51] *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162, 2171-72 (2007) (holding that a Title VII claim is barred if not filed within 300 days); *Morgan*, 536 U.S. at 114 (holding plaintiff must file a charge within 300 days "or lose the ability to recover for it"). Second, even if his allegations were timely, his claim fails because: (1) he cannot establish it affected a term, condition, or privilege of employment and (2) he cannot establish that Yellow Transportation knew or should have known about the harassment but failed to take prompt remedial action. *Septimus*, 399 F.3d at 611; *Hockman*, 407 F.3d at 325-26.

### a. The alleged harassment did not affect a term, condition, or privilege of employment

Calip testified that neither his supervisors nor his coworkers made inappropriate racial statements to him (App. 296). Rather, to support his hostile work environment claim, he relies on graffiti by unidentified perpetrators, the carving, and his claim that he once saw a rope that allegedly looked like a noose. Though boorish and offensive, none of these have destroyed

---

[51] Calip's graffiti allegations are also barred for failure to exhaust his administrative remedies because he failed to include these allegations in his EEOC charge. *See King v. Enter. Leasing Co. of DFW*, No. 3:05-CV-0026-D, 2007 U.S. Dist. LEXIS 50103 (N.D. Tex. July 11, 2007) (Fitzwater, J.) ("federal courts do not have jurisdiction to consider unexhausted claims"); *Dixon*, 2006 U.S. Dist. LEXIS 47560, at *20-21 (Fitzwater, J.).

Calip's opportunity to succeed in the work place. *Shepherd*, 168 F.3d at 874; *Beaumont,* 468 F. Supp. 2d at 919-20; *Burrell*, 255 F. Supp. 2d at 615-16. To the contrary, Calip remains a successful employee of Yellow Transportation. Put simply, the handful of incidents of which Calip complains simply are insufficient to establish a hostile work environment as a matter of law.

### b. Calip failed to take advantage of corrective opportunities

Even if Calip could demonstrate the graffiti, carving, and alleged noose destroyed his opportunity to succeed in the work place, his hostile work environment claim would still fail because he failed to take advantage of Yellow Transportation's remedial measures. First, Calip never even complained about the rope he believes looked like a noose (App. 204-209). As such, any claim based on it fails as a matter of law. *Hockman*, 407 F.3d at 330; *Burrell*, 255 F. Supp. 2d at 614. Second, though Calip allegedly saw the carving in August 2005, he did report it until January 2006 (App. 269, 295). Such a delay in reporting is fatal to his claim. *Tiller v. Fluker*, 2007 U.S. Dist. LEXIS 36982, at *17. Similarly, though Calip allegedly saw the graffiti in 1986-1987 and in 2001-2002, he did not complain until February 2006 (App. 201-203, 294, 298-299). Once again, such a delay is fatal.

Importantly, Calip testified that once he did complain, Yellow Transportation promptly took action to remove the graffiti (App. 270, 305). In fact, Yellow Transportation's prompt remedial action worked—Calip testified he has no other complaints about graffiti after February 2006 (Calip at 104). Accordingly, Calip received the benefits Title VII and § 1981 were meant to confer, and his hostile work environment claims fail as a matter of law. *Skidmore*, 188 F.3d at 616; *Indest*, 164 F.3d at 265. Yellow Transportation respectfully requests that this Court grant it summary judgment.

**V.**

**PLAINTIFF BEN CROMMEDY**

**A.     Statement of Facts**

Plaintiff Benjamin Crommedy ("Crommedy") currently works as a city driver for Yellow Transportation's Fort Worth terminal[52] (App. 368, 393).  Prior to transferring to Fort Worth in August 2005, Crommedy worked as a full-time dock worker and then hostler at the Dallas terminal (App. 369-370).   Crommedy testified that he never had any problems with any of his supervisors at the Dallas terminal and he never filed any complaints against them (App. 374-378).

On May 20, 2004, Crommedy contacted Wilson regarding issues he was allegedly experiencing at work (App. 593-595).   Specifically, Crommedy complained his coworker Miguel Jimenez ("Jimenez") almost backed into his vehicle in the parking lot (*Id*.).  According to Crommedy, Jimenez yelled at him to "close [his] damn door" (App. 421-422, 593-595).  Thereafter, they both "exchanged words" (App. 593-595).   However, Crommedy admitted that Jimenez made no comments based on his race during this confrontation (App. 421-423).

Crommedy also claimed his vehicle was "keyed" while parked in Yellow Transportation's parking lot (App. 593-595).   However, because Crommedy did not witness the alleged incident, he could not identify the individual allegedly responsible for keying his vehicle (App. 405, 484).   Additionally, there was no evidence that this alleged incident even occurred on Yellow Transportation property (App. 417).   Nevertheless, Crommedy filed a police report and a complaint with Yellow Transportation (App. 404-407, 1467).    In response, Yellow Transportation installed security cameras in its parking lot (App. 406-407, 1476).

---

[52] Crommedy is a member of the Teamsters Union and his employment is subject to the terms and conditions of the CBA (App. 361-365).  Crommedy's employment is also subject to Yellow Transportation's policies and procedures. (App. 366-367, 371, 571-590).

Crommedy claimed his vehicle was keyed a second time after he filed his first police report (App. 408-409). Once again, Crommedy could not identify who allegedly keyed his vehicle (App. 410, 417, 484). He filed another police report and reported the incident to his supervisors Al Freeman ("Freeman"), Parker, B. J. Rodgers ("Rodgers"), and Tim Ott ("Ott") (App. 409-410). Freeman asked Jaime Olivarez ("Olivarez"), Yellow Transportation's Security Investigator, to review the surveillance videotapes; however, the tapes did not show anyone keying Crommedy's vehicle (App. 412-413, 1457-1458, 1468). Nonetheless, in response to Crommedy's complaint, Olivarez blocked off a non-parking zone in Yellow Transportation's parking lot for Crommedy to park his vehicle[53] (App. 416,484).

As part of his May 20, 2004 letter to Wilson, Crommedy also claimed his April 10 and 24, 2004 time cards were missing (App. 593-595). However, Crommedy testified he believed his time cards were missing in retaliation for his refusal to punch some of his union coworkers' time cards and, thus, was not based on race (App. 428-429). Furthermore, Crommedy readily admits he was paid for all hours worked (App. 413).

Crommedy also alleged his locker was glued shut on May 4, 2004 (App. 414, 593-595). Although Yellow Transportation investigated Crommedy's complaint, the surveillance camera videotapes did not reveal anyone gluing Crommedy's locker (App. 415). Similar to his other claims, Crommedy has no knowledge of who allegedly glued his locker or whether it was related to race (App. 414-415).

In May 2004, Crommedy also met with Olivarez regarding complaints of mistreatment by the Teamsters Union (App. 1465). Olivarez interviewed Crommedy and other employees identified by Crommedy, but none of the employees identified individuals responsible or provided specific information to Olivarez (App. 1466).

---

[53] Crommedy testified his vehicle was no longer vandalized after he parked in the no-parking zone (App. 418).

Subsequently, like Arrieta, Crommedy was one of the employees who sent the September 27, 2004 letter to Welch complaining about work conditions[54] (App. 430-431, 596-636).  Derry and Emery met with the employees, and Welch later informed them of the steps Yellow Transportation planned to take to resolve their complaints[55] (App. 462-469, 499-563).  However, like Arrieta, Crommedy refused to participate in any investigation of his allegations (App. 434-447, 453, 596-636).

Despite the fact that Crommedy refused to participate in any investigation, Crommedy continued to lodge complaints.  On August 10, 2005, Crommedy complained to Derry about racial slurs on the bathroom stalls (App. 426, 448-452, 455-457, 489, 637).  In response, Yellow Transportation painted the bathroom stall (App. 456, 1481, 1442-1445).  Crommedy never complained about bathroom stall graffiti again (App. 456-458).

On August 23, 2005, Crommedy complained to Derry that his vehicle's tires were allegedly cut in the parking lot (App. 411, 470-471, 639, 1446).  However, the surveillance videotape did not reveal anyone other than Crommedy around his vehicle on the day in question (App. 419).  In fact, the surveillance videotape actually showed Crommedy driving his vehicle out of Yellow Transportation's parking lot at the end of the day (App. 360).  To be sure, Crommedy admits he has no proof that anyone at Yellow Transportation cut his tires (App. 411, 419-420).

Nevertheless, Crommedy filed this lawsuit asserting claims of race discrimination, retaliation, and hostile work environment against Yellow Transportation.  Specifically, Crommedy claims Yellow Transportation discriminated against him based on his race because Yellow Transportation was "fined by the EEOC for not hiring enough minorities and Hispanics"

---

[54] Crommedy also participated in the 2004 picketing (App. 481).
[55] For a detailed discussion, see Section III(A) at pp. 4-5.

and because its hiring practices list race on individuals' casual cards (App. 478-480). However, Crommedy admits he does not have a failure to hire claim against Yellow Transportation (App. 478). Crommedy also admits he was never called a racial slur by anyone at Yellow Transportation (App. 493-494). In fact, Crommedy testified that he never even heard anyone refer to anyone else by a racial slur (*Id.*).

Crommedy claims Yellow Transportation subjected him to a hostile work environment based on his race because: he saw racial symbols and graffiti[56] on the walls, he saw a rope tied in the form of a noose in 2004 and 2005, employees threatened other employees, he received warning letters, and his property was vandalized (App. 424-425, 448-452, 489). However, Crommedy admits he <u>did not</u> complain to anyone about these alleged incidents until his August 10, 2005 complaint to Derry (App. 425, 448-452, 455-457, 489, 637).

Crommedy further claims he was subjected to a hostile work environment because he saw weapons in the break room (App. 448-452, 489). Crommedy admits he was never threatened with a gun at work (App. 490). Nevertheless, he vaguely asserts a coworker threatened his life, even though he cannot identify any employee who actually threatened his life[57] (App. 452-454). Crommedy further claims he was intimidated when he had to walk past a group of white coworkers, including Eddie Thomas ("Thomas") (App. 472-475). However, Crommedy admits Thomas never assaulted him, and, in fact, Crommedy never heard Thomas say anything to him (App. 473-474). Crommedy further claims a firecracker was thrown in the break room, but he did not see who allegedly threw the firecracker (App. 472). Finally, Crommedy claims an unidentified individual "greased" his vehicle (App. 490-492).

---

[56] Crommedy testified that he observed a racial picture referring to Robert Queen and Roger Johnson, but he did not complain because the picture had already been taken down (App. 495).

[57] Notwithstanding the police reports Crommedy filed for the alleged damage to his car, Crommedy never filed a police report regarding the alleged threats to his life (App. 453).

In support of both his hostile work environment claim and retaliation claim, Crommedy claims his managers issued him warning letters (App. 384-385, 485).   Throughout his employment at the Dallas terminal,[58] Crommedy received only two warning letters between 1999 and 2005 (App. 378).   First, on March 21, 2005, Jim Gardner ("Gardner") issued Crommedy a warning letter for having a preventable accident with a handheld computer (App. 379-382, 591). However, this warning letter did not reduce Crommedy's pay, and it did not affect his ability to bid on his preferred position and shift (App. 383, 391-392).   Furthermore, Crommedy was not required to reimburse Yellow Transportation for the repair of the handheld computer (App. 383). Simply put, no action was taken against Crommedy as a result of the March 21, 2005 warning letter (App. 383, 385).

Crommedy received his second warning letter in June 2005 for pulling a trailer out of the wrong door (App. 385-386).   Crommedy readily admits he pulled the trailer out of the wrong door (App. 386-387).   Although Crommedy believes other people did not receive warning letters for the same conduct, Crommedy cannot identify any other employee who pulled a trailer out of the wrong door, but who did not receive a warning letter (App. 388-389).   Once again, no action was taken against Crommedy as a result of the June 2005 warning letter (App. 389-392).

Crommedy also alleges he was subject to a hostile work environment when Rodgers requested Crommedy return to work even though he was on a break (App. 458-461, 638). Crommedy did not receive any form of written discipline regarding this incident (App. 461).   In fact, Gardner, Crommedy's supervisor, informed him that he was doing a good job (App. 460).

Finally, after transferring to the Fort Worth terminal in August 2005, Crommedy alleged Ken Mink ("Mink"), the City Dispatcher, harassed him by watching his time card, directing his

---

[58] On August 11, 2006, Crommedy received a warning letter from the Fort Worth terminal for failure to follow instructions regarding a scheduled pickup (App. 394-397, 592).   Though he claims this warning is retaliation for this lawsuit, Crommedy readily admits he failed to make the pickup as instructed (*Id.*).

work, calling him on the radio, and observing his break time (App. 398-402). Crommedy admits Mink never issued him a written warning regarding any of these alleged incidents, and he always received payment for every hour worked (App. 402-403). Nevertheless, Crommedy filed a complaint, which Yellow Transportation promptly investigated[59] (App. 1481).

In support of his retaliation claim, Crommedy asserts he was labeled as a "TDU suck-ass" or a "company man" even though he protested against the company in 2004 and 2005 (App. 486). Like his other allegations, Crommedy cannot identify who allegedly made the statements (App. 488). Moreover, Crommedy never reported this alleged incident or complained about it (App. 486-488). Crommedy also claims the air line on his hostling mule was cut in retaliation for his protesting of Yellow Transportation in 2004 and 2005; however, he has no knowledge of who allegedly cut the air line (App. 481-482). Moreover, according to Crommedy, he continued to protest, filed complaints and the current lawsuit despite this alleged incident (App. 483). Finally, although Crommedy generally alleges he was forced to carry a heavier workload, he never complained about it (App. 476).

In fact, Crommedy never filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and never received a right to sue letter (App. 427, 477). Although Crommedy filed complaints with Stephenson, picketed across the street from the terminal, and filed this lawsuit against Yellow Transportation, Crommedy's salary and hourly rate have not decreased, his health and welfare benefits have not been decreased, he has never been demoted, and he has been allowed to bid on the position and shift he wanted based on his seniority (App. 496-497).

---

[59] The investigation revealed that it was appropriate for Mink to inquire about Crommedy's whereabouts because Mink's primary function as a City Dispatcher was to directly supervise all activities of drivers responsible for pickups and deliveries (App. 1481).

### B.      Arguments and Authorities

First and foremost, all of Crommedy's Title VII and TCHRA claims fail for failure to exhaust administrative remedies because he failed to file an EEOC charge.  *See* 42 U.S.C. § 2000e-5(f)(1); *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378-79 (5th Cir. 2002); *Barnes v. Levitt*, 118 F.3d 404, 408 (5th Cir. 1997); *Shabazz v. Texas Youth Comm'n*, 300 F. Supp. 2d 467, 471 (N.D. Tex. 2003).   Moreover, Crommedy cannot piggyback onto the charges of the co-plaintiffs because, as plaintiffs themselves admit, their claims are distinctly different because they all have different jobs and different shifts.  *See* Plaintiffs' Motion for Extension of Time for Completion of Discovery and the Movement of All Discovery Deadlines at ¶ 8 (Docket No. 73); *Price v. Choctaw Glove & Safety Co.*, 459 F.3d 595, 598 (5th Cir. 2006) (holding piggybacking is a carefully limited exception that only applies if non-exhausted plaintiff is similarly situated to plaintiff who filed the EEOC charge).   Since Crommedy failed to exhaust his administrative remedies, summary judgment for Yellow Transportation on his Title VII and TCHRA claims is proper as a matter of law.

### 1.      *Crommedy Cannot Establish Race/National Origin Discrimination*

Even if Crommedy exhausted his administrative remedies, summary judgment is still proper on his Title VII, § 1981 and TCHRA claims.   Crommedy avers he suffered race discrimination because he believes Yellow Transportation was fined for not hiring enough minorities (App. 478-480).   However, Crommedy readily admits that he does ***not*** have a failure to hire claim against Yellow Transportation (App. 478).   Moreover, Crommedy's conclusory allegations, without more, that he received a heavier workload are insufficient to establish his race/national origin claim.  Indeed, Crommedy does not identify any other conduct to support his disparate treatment discrimination claim.  In fact, the only evidence Crommedy offers to support

his allegations of race and/or national origin discrimination is his own subjective belief, which is insufficient to defeat summary judgment as a matter of law. *Roberson*, 373 F.3d at 654; *Byers*, 209 F.3d at 427. Moreover, Crommedy has not suffered an adverse employment action and cannot show that this alleged conduct affected a term or condition of his employment because of his race/national origin. Even if he could, Crommedy cannot identify anyone treated differently or better than him. Thus, his race/national origin discrimination claim fails. *See McCoy,* 2007 U.S. App. LEXIS 16582, at *14-15.

### 2.   *Crommedy Cannot Establish Retaliation*

Summary judgment is also proper on Crommedy's Title VII, § 1981, and TCHRA retaliation claims. To support his claims, Crommedy alleges his car was "keyed," his tires were cut, his locker was glued, two of his time cards were taken, and he was labeled a "TDU suck-ass" and "company man" by some unidentified individuals.[60] He also claims his two warning letters were retaliatory. However, Crommedy readily admits to the conduct necessitating the warning letters (App. 386-387, 394-397). As such, these warning letters do not constitute materially adverse employment actions that would dissuade a reasonable worker from filing a complaint. *DeHart*, 214 F. App'x at 442; *Slaughter*, 2007 U.S. Dist. LEXIS 2198, at *17.

Moreover, Crommedy simply cannot establish that any of the complained-of conduct would not have occurred but for his participation in the September 2004 letter to Welch or his August 2005 complaints to Derry.[61] To the contrary, Crommedy testified he has no knowledge of who vandalized his car (App. 405, 414-415, 419-420, 481-482, 484, 488). In fact, Crommedy concedes the complained-of conduct was related to intra-union issues. For example, Crommedy

---

[60] Vague statements by unidentified individuals are simply not actionable. *McCullough v. Kirkum*, 212 F. App'x 281, 285 (5th Cir. 2006).

[61] To the extent Crommedy claims a retaliatory hostile work environment, such a claim fails as a matter of law because the Fifth Circuit does not recognize such a cause of action. *See Bryan v. Chertoff*, 217 F. App'x 289, 293 (5th Cir. Jan. 29, 2007).

testified that someone took his time cards because he refused to improperly punch some of his union coworkers' time cards (App. 428-429).  Though Crommedy may have had conflicts with his union brethren, he has produced no evidence that Yellow Transportation retaliated against him for his complaints.[62]

Finally, even if Crommedy had evidence that his supervisors or management were the ones engaging in vandalism, his retaliation claims still fail because the alleged conduct was not so materially adverse that it would dissuade a reasonable employee from complaining.  To the contrary, even after the alleged vandalism and after being labeled a "company man," Crommedy continued to protest and file complaints (App. 483).  As such, his retaliation claim fails as a matter of law.  *DeHart*, 214 F. App'x at 442; *Beaumont*, 468 F. Supp. 2d at 925.

### 3.     *Crommedy Cannot Establish Hostile Work Environment*

Summary judgment is also proper on Crommedy's racially hostile work environment claim.  To support his claim, Crommedy alleges: he had a confrontation with his coworker Jimenez, his property was vandalized, he saw racial graffiti, he saw a rope he thought looked like a noose, he was intimidated when he had to walk past his white coworker Thomas, and he received warning letters.  Even if true, Crommedy's claims fail because: (1) any alleged harassment was not based on his race/national origin; (2) the alleged harassment did not affect a term, condition, or privilege of his employment; and (3) he cannot prove Yellow Transportation knew or should have known about the harassment but failed to take prompt remedial action. *Septimus*, 399 F.3d at 611.

### a.     The alleged harassment was not based on race/national origin

Summary judgment is proper because the alleged harassment of which Crommedy

---

[62] To be sure, Crommedy testified that he has never had any problems with any of his Yellow Transportation supervisors (App. 374-378).

complains is not based on his race or national origin.  For instance, Crommedy avers that he had a confrontation with his coworker Jimenez in the parking lot.  However, Crommedy admits that Jimenez made no comments about his race during this confrontation (App. 421-423).  Similarly, Crommedy claims he was intimidated when he had to walk past his coworker Thomas.  However, once again, Crommedy admits Thomas never even talked to him, let alone made any racial statements to him (App. 473-474).  In fact, Crommedy readily admits that he was ***never*** called a racial slur by anyone at Yellow Transportation and he never heard anyone refer to anyone else by a racial slur (App. 493-494).  Though Crommedy may have had personality conflicts with his coworkers, such non-race based discord is not actionable under the discrimination statutes.  *Beaumont*, 468 F. Supp. 2d at 919-20 (holding discrimination statutes do not protect against all harassment; only harassment that has a racial character or purpose can support a hostile work environment claim); *Wooten*, 2007 U.S. Dist. LEXIS 2195, at *67.

Similarly, Crommedy attempts to rely on alleged vandalism to support his hostile work environment claims.  However, once again, Crommedy has no evidence it was based on race.  In fact, Crommedy admits he has no evidence that much of this alleged vandalism even took place at work (App. 405, 411, 414-415, 417, 419-420, 484).  Finally, Crommedy has no evidence that his two warning letters were based on his race because Crommedy admits he engaged in the conduct necessitating the warning letters (App. 385-386).  Title VII and § 1981 do not protect against all unpleasantness in the workplace, only that which is based on race.  Since Crommedy cannot establish he suffered a racially hostile work environment, summary judgment is proper as a matter of law.

> ### b. The alleged harassment did not affect a term, condition, or privilege of employment

Even if Crommedy could establish the alleged harassment was based on race, summary

judgment is still proper because he cannot establish that it affected a term, condition, or privilege of employment.   For instance, though Crommedy alleges he saw racial graffiti and a rope allegedly tied in the shape of a noose in 2004 and 2005, these did not destroy completely Crommedy's ability to succeed in the workplace.[63]   *See Shepherd*, 168 F.3d at 874; *Beaumont*, 468 F. Supp. 2d at 919-20.   To the contrary, Crommedy is still employed at Yellow Transportation, his salary and hourly rate have not decreased, he has not been demoted, and he continues to be able to bid on any positions and shifts his seniority will hold (App. 496-497). Moreover, Crommedy has been informed he is doing a good job[64] (App. 460).   Since Crommedy cannot establish that the alleged harassment was so severe or pervasive that it destroyed his ability to succeed, his hostile work environment claim fails as a matter of law.   *See Burrell*, 255 F. Supp. at 615-16.

### c.     Yellow Transportation took prompt, remedial action

Summary judgment is also proper because Yellow Transportation took prompt, remedial action once it learned of Crommedy's complaints.[65]   First, after Crommedy complained about his car being keyed, Yellow Transportation installed security cameras (App. 406-407).   When Crommedy alleged his tires had been cut, Yellow Transportation used these security cameras to investigate (App. 419).   When his car was keyed again, Yellow Transportation blocked off a separate zone for Crommedy to park his vehicle (App. 416, 484).   Thereafter, Crommedy's car was never vandalized again (App. 418).   Since Yellow Transportation's prompt remedial

---

[63] Moreover, Crommedy transferred from Yellow Transportation's Dallas terminal in August 2005, and he cannot attempt to rely on any other Plaintiff's allegations to support his own hostile work environment claims.

[64] Crommedy only received two warning letters while at the Dallas terminal.   Neither of these warning letters affected his pay or his ability to bid on positions or shifts (App. 383, 389-392, 402-403).

[65] However, Crommedy did not always take advantage of the available corrective opportunities.   For instance, he refused to participate in the September 2004 investigation (App. 434-435, 436-447, 453).   Moreover, to the extent he avers he was subjected to a hostile work environment because he was labeled a "TDU suck-ass" and "company man," or that he was required to carry a heavier work load, his claim fails because he never complained about this conduct (App. 476, 486-488). *Hockman*, 40 F.3d at 330; *Burrell*, 255 F. Supp. 2d at 614.

measures were reasonably calculated to, and did, stop the vandalism, Crommedy "received the benefit Title VII was meant to confer." *Indest*, 164 F.3d at 265; *see also Skidmore*, 188 F.3d at 616. As such, no hostile work environment claim is available for the alleged car vandalism. *Id.*

Similarly, after Crommedy complained about his glued locker, Yellow Transportation investigated, and, after Crommedy complained about graffiti in the bathroom stalls, Yellow Transportation removed it (App. 415, 456). After these prompt remedial measures, Crommedy testified he never again complained (App. 456-458). Thus, once again, any hostile work environment claim fails as a matter of law. *Skidmore*, 188 F.3d at 616. Yellow Transportation respectfully requests that this Court grant it summary judgment on Crommedy's Title VII, § 1981 and TCHRA claims.

## VI.
## PLAINTIFF RUBIN HERNANDEZ

### A.    Statement of Facts

Rubin Hernandez ("Hernandez") started working for Yellow Transportation as a casual in 1990 and became a full-time employee in 1993 (App. 642, 646). Hernandez was a member of the Teamsters Union, and, thus, the CBA and Yellow Transportation's policies and procedures governed his employment[66] (App. 641-644, 647-651, 669). Prior to his discharge in March 2007, Hernandez testified he was never demoted, and his benefits, salary, and hourly rate never decreased (App. 644-645). Hernandez also testified that he did not have any problems working with his direct supervisors,[67] he never filed any complaints against his supervisors, and, in fact,

---

[66] Hernandez acknowledged that he received EEO training and he was aware of Yellow Transportation's process for filing a discrimination complaint (App. 651-652, 738, 745). In fact, he testified that employees have a responsibility to report violations. Hernandez further testified that, if someone brings a complaint to Yellow Transportation's attention, the company investigates and takes action (App. 757).

[67] Hernandez only identified one supervisor, albeit not his direct supervisor, with whom he had problems during his employment (App. 654, 656, 761). Hernandez's sole complaint against this supervisor, Pete Collins ("Collins"), is that he believed Collins showed favoritism to Randall Jones ("Jones"), a coworker with less seniority than Hernandez, by giving Jones available overtime (App. 654, 656, 721, 752). Hernandez did not file a complaint or

no supervisor at Yellow Transportation ever used any type of derogatory or racially offensive language towards him (App. 653-654, 656, 761).   To be sure, Hernandez testified that Yellow Transportation **took no discriminatory action** against him (App. 710).   Specifically, Hernandez testified to the following:

> Question [Defendant's counsel]:
>
> **Let's start with your race and national origin complaint-- complaints.   What action did Yellow take against you that you believe to be discrimination based on your race, national origin and color?**
>
> Answer [Plaintiff Hernandez]:
>
> **None**.

(*Id*.).

Despite this admission, Hernandez filed this lawsuit against Yellow Transportation for race/national origin discrimination, retaliation, and a racially hostile work environment (App. 710-711, 722).   To support his claims, Hernandez alleges he received heavier workloads[68] than white employees[69] from 1993 until 1998 and he received a warning letter in 1997 (App. 691-692, 711).   Other than these examples, Hernandez testified at his first deposition that he was never treated differently than white employees (App. 711).   Subsequently, Hernandez alleged he was discriminated against because of his complaints regarding his Hazardous Materials ("HazMat")

---

grievance about this alleged favoritism (App. 654, 655, 728).

[68] Hernandez also believes that from 1993 until 1998, white employees were given more break time than minority employees (App. 688, 693).   However, Hernandez could not identify any white employee who received this alleged additional break time (*Id.*).   Moreover, Hernandez never complained about the allegedly unequal break time (App. 688).

[69] Hernandez identified Randall Jones, Ron Green, David Sullivan, Billy Havard, and Guy Swindell as white employees who received better loads and assignments and who did not have to work as hard as minority employees (App. 694-696, 712-717, 720).   However, Hernandez testified he did not have the same supervisor as any of these employees (App. 718-720).   Moreover, to the extent Hernandez bases his allegation that these employees had better assignments on his belief that they had access to vans on rainy days, Hernandez admits that he too had access to these vans (App. 694-696).

endorsement[70] and his discharge[71] (App. 767-768, 796).

To support his retaliation claim, Hernandez alleges Yellow Transportation retaliated against him by not associating itself with his coworkers' activities, by not donating money, and by labeling employees who complain as being instigators or troublemakers[72] (App. 722-723, 727, 731-732).   He also alleges that one of his coworkers placed a dead rat on his house doorstep[73] (*Id*.).   Additionally, Hernandez claims that, while he was on the road performing his shuttle driving duties, Yellow Transportation retaliated against him by somehow orchestrating unknown individuals in private vehicles to throw objects at his truck (App. 746-750, 762). Finally, Hernandez alleges his complaints that he was not allowed to drive without his HazMat endorsement and about a tractor seat being greased, as well as his protest across the street from the terminal, resulted in his termination[74] (App. 784-795, 800-802).       Hernandez does ***not*** allege that he was disciplined[75] as a result of his participation in the 2004 protests against the company, or because of his Office of Federal Contract Compliance Programs ("OFCCP") complaint,[76] his EEOC charge,[77] or the current lawsuit[78] (App. 753-754).

---

[70] Hernandez cannot rely on Bob Miller as a comparator for his HazMat endorsement as he was not treated differently after Stephenson's investigation and Hernandez admits he has no personal knowledge of Miller's HazMat status (App. 806-807).

[71] Hernandez agrees that DOT regulations would not allow him to drive (App. 797).  Notwithstanding, Hernandez continued to work and was compensated for his shifts (App. 797-799).

[72] Hernandez only provided two examples of being called an "instigator."  First, in 2005, after Hernandez complained to Parker that another employee was harassing him, Hernandez received a warning letter from Doug Farrish for Hernandez's DOT violations (App. 724-727, 751).  Second, Hernandez alleges Yellow Transportation accused him of instigating an incident in which Randall Jones threw a lug nut at Hernandez's tractor (App. 660, 666-668, 744).

[73] Hernandez did not report the alleged rat incident to Yellow Transportation, and he did not file a complaint with his union (App. 732-733).

[74] Notably, Hernandez testified his situation regarding his expired HazMat had <u>nothing</u> to do with his race or national origin (App. 795).  Likewise, Hernandez testified that no supervisor made any negative or derogatory comments to him in any regard (App. 801-802).

[75] Hernandez was permanently discharged on March 20, 2007 for outrageous conduct (App. 767-768, 810).  After his first deposition, Hernandez amended his complaint to assert a retaliatory and discriminatory discharge claim. Hernandez received his right to sue letter on July 27, 2007 from the EEOC, which stated, based on its investigation, it was unable to conclude there had been a violation of the statutes (App. 1476).

[76] In September 2005, Hernandez filed a discrimination complaint with the Department of Labor's OFCCP (App. 672-673, 683-685).  However, Hernandez concedes that many of the allegations in the OFCCP complaint did not

In regards to his hostile work environment claim, Hernandez testified he could not specifically describe the alleged harassment by Yellow Transportation because of his race/national origin (App. 675-677, 710-711). Hernandez testified that he had problems with three of his Teamsters Union coworkers.[79] First, Hernandez claimed a shuttle driver on a separate shift called him "fat f—king Mexican" sometime in July 2006 because Hernandez was coming to work before his shift started (App. 657-659, 668). However, Hernandez did not complain about this remark (App. 659-660). Second, Hernandez alleges that Randall Jones ("Jones"), another coworker and, may have thrown a lug nut or stud towards Hernandez's truck while Hernandez was parked at the rail yard (App. 661-663). Hernandez reported[80] the incident to dispatcher Bert McWilliams ("McWilliams"), who informed Hernandez he would investigate (App. 664-667). Hernandez testified that he no longer has any problems with Jones (App. 671). Third, Hernandez alleges his coworker Ron Green ("Green") pulled a knife on him in 2003 (App. 679, 781-783). Although Hernandez claims he reported the incident to McWilliams, he admits he did not follow up with McWilliams or file a complaint with his union (App. 679-680). Notwithstanding, Hernandez testified he has had no other hostile confrontations with Green, and

---

relate to him and he lacked any personal knowledge regarding these complaints (App. 683-689). Prior to this OFCCP complaint, Hernandez **never** informed anyone at Yellow Transportation of any discrimination complaints (App. 672-673, 674-678).

[77] Hernandez filed his first EEOC charge on August 9, 2006, **after** he filed this lawsuit (App. 689-690, 755).

[78] Hernandez testified he **never complained** to Yellow Transportation about what he believed to be discrimination or harassment and his only protected activities were his September 2005 OFCCP compliant and his August 2006 EEOC charge (App. 709-710).

[79] In his OFCCP complaint, Hernandez also alleges white employees intimidated him. For instance, he claimed he was intimidated when he walked through a hallway while his white coworkers were lined up along the wall (App. 686-687). However, Hernandez concedes he was never hit or subjected to racial slurs; rather, he simply felt intimidated by the situation (*Id.*). He also claimed he was intimidated because one of his coworkers gave him a "bad stare" in the parking lot in May 2006 (App. 682, 733-735). However, Hernandez never complained about this "stare" (App. 733-735). Similarly, he claims another coworker moved his personal belongings out of his truck and moved them into another truck, but, once again, Hernandez never complained (App. 736). Finally, Hernandez claims he was intimidated because he was involved in a near accident with another coworker. Again, Hernandez never complained about the incident (App. 737).

[80] Notably, Hernandez did **not** file a union grievance regarding the incident because he believed his **fellow Teamsters Union members**, not Yellow Transportation, would have retaliated against him (App. 667-668, 670).

that Green has never called him a racial slur (App. 680-681).

At the time of his initial deposition, Hernandez testified he had no other hostile confrontations with Green (*Id.*).  However, on March 12, 2007, Hernandez was involved in a verbal altercation with Green in the break room for which both employees received warning letters (App. 811, 1475).  Notwithstanding, Hernandez escalated the situation and approached Green out on the yard and threatened him (App. 1475).  Accordingly, Hernandez was discharged for outrageous conduct—after he admitted the behavior[81] (App. 810, 1430-1433, 1459-1460, 1475).

Finally, though Hernandez alleges he observed graffiti[82] on restroom walls and billboards, he testified he never complained about it despite knowing that the company's policies and procedures prohibited such graffiti[83] (App. 697-701, 759-760).  Notably, Hernandez testified he had not seen any graffiti since early 2006 (App. 699).  In fact, Hernandez testified that in July 2005 when he checked the restrooms for graffiti, he noted that the company had painted over it per normal company procedure (App. 472-473).

## B.     Arguments and Authorities

### 1.     *Hernandez Cannot Establish Race/National Origin Discrimination*

Summary judgment is proper on Hernandez's race and national origin discrimination claims under Title VII, § 1981 and the TCHRA.  First, prior to his termination, Hernandez

---

[81] To the extent Hernandez points to physical altercations between employees at Yellow Transportation, such conduct is dissimilar as a matter of law and Hernandez has no personal knowledge of these allegations (App. 803-806).

[82] Hernandez also claims, in 2004, he took down a poster that referred to "wetbacks" and Mexicans and, in 2005, he found a document regarding Hispanics in his truck (App. 701-704, 739).  However, Hernandez never complained about these posters and merely gave a copy to his attorney (*Id.*).  In fact, Hernandez never even notified the EEOC or Department of Labor of the alleged derogatory posters (App. 705-706, 756-757).  Interestingly, though he had no problems taking down posters, when he saw derogatory "cartoons" about his supervisors posted at work, he made no effort to take them down (App. 740, 758).

[83] Similarly, to the extent Hernandez claims he saw a rope in the shape of a noose in 2004 and 2005, Hernandez readily admits he never complained about it and made no attempts to take it down (App. 699-700, 741).  In fact, Hernandez never even notified the EEOC or the Department of Labor of the alleged nooses.  (App. 707-708, 741).

testified that Yellow Transportation **took no discriminatory action** against him[84] (App. 710).

After he was terminated, Hernandez amended his complaint to assert a discriminatory discharge claim.  Hernandez's race discrimination claim fails because Hernandez cannot establish a *prima facie* case and cannot establish that Yellow Transportation's legitimate, non-discriminatory reason is pretextual.

### a.       Hernandez fails to identify a similarly situated employee

Hernandez's discriminatory discharge claim fails because he cannot establish that a similarly situated employee in nearly identical circumstances received preferential treatment. *Okoye*, 235 F.3d 507; *Chambers,* 2007 U.S. Dist. LEXIS 48338 at *18, *28-32 (holding that to be nearly identical, comparator must same supervisor, same job responsibilities and capabilities, and have engaged in same conduct).  On March 12, 2007, Hernandez engaged in a verbal altercation in the break room with Green, stating "F--- You" to Green.  Green responded similarly.  As such, both employees received warning letters for their conduct.

Notwithstanding, Hernandez chose to escalate the situation by approaching Green out on Yellow Transportation's work yard and threaten Green.  Specifically, Hernandez left his work area in his hostling unit, exited the vehicle, walked over to Green's hostling unit, and threatened Green by stating he would "meet him on the street" or "run him down on the street" and he knows where Green lives.  After learning of this conduct, Yellow Transportation conducted an investigation, wherein Hernandez **admitted** to threatening Green.[85]   In response, Yellow Transportation terminated Hernandez on March 20, 2007 for outrageous conduct.  Hernandez is

---

[84] To the extent Hernandez bases any disparate treatment claim on his allegations he had a heavier workload than white employees from 1993 until 1998 and received a warning letter in 1997, his claim fails because they are time-barred.  *Ledbetter,* 127 S. Ct. at 2171-2172.  Moreover, a heavier workload and warning letters are not actionable adverse employment actions. *Martin,* 65 F. Supp. 2d at 539; *see also Hart,*  2007 U.S. App. LEXIS 15206, at *4; *Stanley,* 425 F. Supp. 2d at 824.  Finally, Hernandez admits that the employees he claimed had better work loads and assignments did not have the same supervisor as him; thus, they are not similarly situated to him and cannot be used as comparators (App. 718-720).  *Chambers*, 2007 U.S. Dist. LEXIS 48338, at *18, *28-32 (Fitzwater, J.).

[85] During the investigation, Hernandez waived union representation.

not able to point to any similarly situated employee who threatened another coworker and was not discharged for outrageous conduct (App. 779-780).

### b.    Hernandez cannot establish pretext

Even if Hernandez could establish his *prima facie* case, summary judgment is still proper because Yellow Transportation has articulated a legitimate, nondiscriminatory reason for his discharge; namely, Hernandez was discharged based on outrageous conduct for threatening a coworker (App. 1475).   *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (holding that employer bears only a burden of production, not persuasion, when tendering its nondiscriminatory reason).    Consequently, any "presumption of discrimination vanishes." *Okoye*, 245 F.3d at 512.   Hernandez thus bears the burden of establishing either: (1) Yellow Transportation's legitimate reason is not true, but a mere pretext for discrimination (the traditional pretext approach); or (2) although Yellow Transportation's reason is true, it was only reason for its conduct and Hernandez's race was a motivating factor in the disputed employment decision (the mixed motive approach).[86]   *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).    Under either approach, the burden of persuasion remains at all times with Hernandez.  *Reeves*, 530 U.S. at 153; *Rachid*, 376 F.3d at 312.

Hernandez simply has no evidence of pretext.  He admits that no Yellow Transportation supervisor ever used any derogatory or racially offensive language towards him[87] (App. 653-654,

---

[86] The mixed motives approach only applies if Plaintiffs concede that discrimination was not the sole reason for the alleged discriminatory conduct and instead argues it was only a motivating factor.  *See Richardson v. Monotronics, Int'l, Inc.*, 484 F.3d 327, 333, 335 (5th Cir. 2005).  Should Plaintiffs pursue this alternative approach, their damages are limited to declaratory relief, certain types of injunctive relief, attorneys' fees, and costs.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003) (citing 42 U.S. § 2000e-5(g)(2)(B)).   To date, Plaintiffs have not argued mixed-motive; therefore, this Motion examines the pretext alternative.

[87] To the extent Hernandez relies on his coworkers' comments, his claim still fails because the statements of non-decisionmakers are not probative.  *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 343 (5th Cir. 2002); *Rios*, 252 F.3d at 379-80 (holding that statements of non-decisionmakers are not evidence of pretext); *Nichols v. Loral Vought Sys. Corp*., 81 F.3d 38, 41-42 (5th Cir. 1996) (same); *Martin*, 65 F. Supp. 2d at 551 ("comments made by an employee who was neither a decisionmaker nor able to influence the termination decision are not actionable

656, 761).  Moreover, Hernandez grieved his discharge, it was heard by the grievance committee on April 25, 2007, and, after hearing the evidence submitted by the parties and the testimony of Hernandez, the neutral grievance committee upheld Hernandez's discharge.  *See Jones*, No. 05-20363, 2006 U.S. App. LEXIS 30626, at *12-13 (5th Cir. Dec. 13, 2006) (finding no evidence of pretext because neutral peer review board upheld plaintiff's discharge).  Hernandez cannot survive summary judgment by merely relying on his subjective beliefs or speculation.  *Septimus*, 399 F.3d at 610 (holding that a plaintiff's belief of discrimination, "however genuinely held, is not sufficient evidence of pretext"); *Martin*, 65 F. Supp. 2d at 547 (holding that "the evidence of pretext must be more substantial than pure speculation; a plaintiff must provide sufficiently specific reasons for [his] allegations of pretext").  Since Hernandez has no evidence beyond his own personal beliefs, he cannot establish pretext, and summary judgment for Yellow Transportation is proper on his Title VII, § 1981 and TCHRA claims as a matter of law.  *Roberson*, 373 F.3d at 654; *Byers*, 209 F.3d at 427.

### 2.   *Hernandez Cannot Establish Retaliation*

Summary judgment is proper on Hernandez's retaliation claim.   In his deposition, Hernandez testified that Yellow transportation did ***not*** discipline him because of his participation in the 2004 picketing, his OFCCP complaint, his EEOC charge, or this lawsuit[88] (App. 753-754). In fact, Hernandez testified that it was retaliation from the Teamsters Union he feared (App. 667-668, 670).  However, Hernandez amended his complaint to assert a retaliatory discharge claim. Specifically, Hernandez now claims that his complaints to Human Resoursces and his protesting

---

under Title VII").

[88] To the extent Hernandez relies on his allegation that Yellow Transportation retaliated against him by not donating money to his coworkers' activities and by labeling him an "instigator," his claims still fail because such conduct would not dissuade a reasonable employee from filing a charge.  To be sure, after this alleged conduct occurred Hernandez in fact filed EEOC charges.  As such, he cannot establish retaliation as a matter of law.  *DeHart*, 214 F. App'x at 442; *Beaumont*, 468 F. Supp. 2d at 925.

across the street from the terminal resulted in his termination.   Nevertheless, these claims likewise fail because Hernandez cannot establish that his complaints were the but for cause of his discharge.  *Hockman*, 407 F.3d at 331.  Put simply, Hernandez has no evidence that "retaliation was the real motive" for his discharge.  *Swanson*, 110 F.3d at 1188; *see also Sandstad v. C.B. Richard Ellis, Inc.*, 309 F.3d 893, 899-901 (5th Cir. 2002) (holding that whether defendant's decision was correct is irrelevant; the issue is whether the real reason for the decision was discrimination); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (same).

To be sure, a neutral grievance committee upheld the decision to discharge Hernandez, and Hernandez made no allegations that the grievance committee members had any retaliatory animus (App. 776-778).   Hernandez's subjective belief that he was retaliated against is insufficient to establish his claim as a matter of law.  Likewise, Hernandez cannot point to any animus from management regarding his picketing, complaints or participation in this lawsuit (App. 801-802).  Again, Hernandez cannot rely on his own subjective belief of retaliation, which is insufficient to defeat summary judgment as a matter of law.  *Roberson*, 373 F.3d at 654; *Byers*, 209 F.3d at 427.  Since Hernandez failed to meet his burden of establishing retaliation was the "but for" cause of his discharge, summary judgment for Yellow Transportation is proper on his Title VII, § 1981 and TCHRA claims as a matter of law.

### 3.     *Hernandez Cannot Establish Hostile Work Environment*

Summary judgment is also proper on Hernandez's hostile work environment claim.  First and foremost, Hernandez testified that he could not even identify how Yellow Transportation allegedly harassed him because of his race or national origin (App. 675-677, 710-711).  It is axiomatic that if Hernandez cannot even identify how he was harassed, he did not suffer severe or pervasive racial harassment that affected a term, condition, or privilege of employment.

Like his co-plaintiffs, Hernandez's complaints about racial harassment center on problems he had within the Teamsters Union. To support his claim, Hernandez alleges he had problems with three of his union brethren. Specifically, Hernandez alleges one of his union brothers called him a "fat f---ing Mexican," another one threw a lug nut at him, and another allegedly pulled a knife on him. Even if true, these three incidents do not establish a hostile work environment based on race or national origin as a matter of law. First, Hernandez has no evidence that the lug nut or knife incident were based on his race or national origin. Second, one utterance of an offensive epithet does not sufficiently affect the terms and conditions of his employment. *Morgan*, 536 U.S. at 115; *see also McCoy*, 942 F. Supp. at 293 (finding no hostile work environment even though supervisor made racial jokes and called plaintiff a "n-----" and "black yankee"). To be sure, Hernandez never even complained about this comment (App. 659-660).

Moreover, summary judgment is proper because Yellow Transportation took prompt remedial steps in response to Hernandez's complaints. Hernandez readily admits that when a complaint is brought to Yellow Transportation's attention, the company investigates and takes action[89] (App. 757). In fact, Yellow Transportation did just that with Hernandez's complaints. After he complained about Jones allegedly throwing a lug nut at him, Yellow Transportation investigated the incident (App. 664-667). Hernandez testified he no longer has any problems with Jones (App. 671). Similarly, since he reported the knife incident, Hernandez has had no other complaints regarding Green, until the most recent altercation wherein Hernandez ***admitted*** he threatened Green (*See* App. 679-681, 767-775, 812, 1475). Since Hernandez offered no other complaints or problems related to his work conditions, his hostile work environment claims

---

[89] For instance, though he never complained about graffiti, Hernandez testified that after Yellow Transportation was alerted to its presence, it painted over it (App. 742-743). Hernandez testified he has not seen any racial graffiti since early 2006 (App. 699).

under Title VII, § 1981 and the TCHRA fail as a matter of law.  *Skidmore*, 188 F.3d at 616; *Indest,* 164 F.3d at 265.

## VII.
## PLAINTIFF ROGER JOHNSON

### A.    Statement of Facts

Roger Johnson ("Johnson") is a current employee of Yellow Transportation who began his tenure in 1979 (App. 832-833).  Johnson is a member of the Teamsters Union, and the terms and conditions of his employment are governed by the CBA[90] as well as Yellow Transportation's policies and procedures (App. 814-816, 834-835, 837-839, 961-986).

Johnson ostensibly has had a difficult relationship with the Union for several years.  For instance, in 1993 or 1994, Johnson participated in an election against the local Union (App. 825).  Thereafter, Johnson helped form a group called the "Texas Black Caucus" to provide a group of employees a voice within the Union and to provide them with representation against the Union (App. 828, 830).  Johnson testified that Local 745 was diametrically opposed to the formation of the Texas Black Caucus and "did everything in their power to try to stop" the employees and get them fired (App. 829, 831).  In fact, Johnson filed a charge with the NLRB against Local 745 because Johnson believed it was restraining and coercing him for his involvement with the Texas Black Caucus and another group called the Teamsters for a Democratic Union ("TDU") (App. 826-827, 829, 932-933, 1004-1005).  To be sure, Johnson testified that the Union is a "hate group" and it is the Union who is creating a hostile work environment[91] (App. 851-852, 865, 933).  Johnson testified he has no personal animosity or complaints against any Yellow

---

[90] Johnson is familiar with and has availed himself of the Union's grievance process (App. 815-816).  Interestingly, Johnson testified that *the Union* has not fairly represented him during his grievances (App. 816).  In fact, Johnson filed a charge against the Union for failing to adequately represent his needs (*Id.*).

[91] Johnson was one of the employees who sent the complaint letter to Welch and the Union (App. 934).  However, just like his co-plaintiffs, Johnson refused to participate or even cooperate with any investigation of the complaints (App. 935-938, 1006-1046).

Transportation supervisors (App. 865).

Notwithstanding the fact that Johnson believes it is the Union causing the problems,[92] Johnson filed this lawsuit against Yellow Transportation in November 2005 (App. 840).  After the lawsuit was filed, on December 20, 2005, Johnson filed a discrimination charge[93] with the EEOC (App. 840-841, 987-988).  In his charge, Johnson only identified three (3) instances he believes are discriminatory or retaliatory: (1) a used condom was allegedly placed on his forklift gear shift on July 29, 2005; (2) a Hispanic coworker, Paul DeLuna ("DeLuna"), allegedly backed into his forklift on December 13, 2005; and (3) DeLuna almost backed into him on December 14, 2005 (App. 842-843, 922, 987-988).  Johnson avers that his white coworkers orchestrate this conduct because he makes efforts towards racial equality at the terminal (App. 844).

In response to Johnson's EEOC charge, Stephenson, investigated the incidents Johnson identified (App. 847, 908-909).  Stephenson provided Johnson with two follow-up letters to discuss his complaints and the investigation (App. 847-850, 908-917, 991-1000).  Johnson testified that had he had any additional complaints, he would have gone to Stephenson to complain (App. 918).

In this lawsuit, Johnson contends he was subject to race and national origin discrimination, retaliation, and a hostile work environment.  To support his race/national origin discrimination claims, Johnson contends he was assigned undesirable work tasks that cut into his production time (App. 877-878).  Specifically, Johnson alleges "dock to dock" trailers are given to minority employees because white employees do not want these types of trailers (App. 879-880).  However, the last time Johnson received a warning letter for poor production was

---

[92] Similarly, in April 2008, Johnson wrote to Yellow Transportation, requesting it post Union information since the Union is not sharing information with its members.
[93] In his charge, Johnson identifies the dates of discrimination/retaliation as July 29, 2005 to December 14, 2005 (App. 842, 987-989).

approximately six or seven years ago (App. 878).  Johnson has never been discharged for poor production (*Id*.).

Johnson also avers that his warning letters are discriminatory because he feels white employees are not always given warning letters for the same infractions[94] (App. 869-870, 874).  However, Johnson cannot identify any white employee who engaged in the same type of misconduct as him, but was treated better (App. 925-929).  In fact, Johnson testified he has no personal knowledge of any disciplinary actions taken against other employees and has never examined any white employees' personnel files (App. 874-875, 950-951).  Notwithstanding his utter lack of knowledge on the subject, Johnson believes white employees' warning letters have been retracted and removed from their personnel files (App. 875-876, 942-944).  However, Johnson admits he too has retraction letters in his personnel file and that he has had warning letters retracted (App. 877, 953).

Finally, Johnson claims he is discriminated against because he claims black employees' union grievances are pushed to the grievance committee level, while white employees' grievances are settled locally (App. 817-819, 824, 939).  However, Johnson himself admits that he has not been required to proceed to the grievance committee level on all of his discharge grievances (App. 820-824, 959-960).

To support his retaliation claim, Johnson claims he was retaliated against after he participated in the picketing in 2004,[95] filed a complaint with the OFCCP and EEOC, and filed this lawsuit (App. 898-899, 952-954).  However, Johnson could not identify any supervisors at

---

[94] For instance, Johnson claims he was once given a warning letter for leaving the break room at 12:15 p.m., which is the time his break ended (App. 870).  However, Johnson conceded that the white employees who were not disciplined for exceeding their break times may have been Union stewards or representatives, who are allowed to exceed their break times (App. 868).  Importantly, Johnson testified that this warning letter did not have an effect on his employment (App. 871-872).

[95] Johnson testified that fellow Union members were upset with the individuals who picketed (App. 899, 907).

Yellow Transportation that retaliated against him in any way[96] (App. 873-874).  To be sure, in the last twelve years, Johnson has only received two warning letters, one of which was retracted (App. 833, 952-954).

To support his racially hostile work environment claim, Johnson claims that *based on his opposition to the local union*, he has been subjected to leaflets, drawings, and cartoons, he has been shunned, and he has had his car vandalized by members of the local union[97] (App. 826, 862-864, 894, 990, 1001-1003).  Notably, the cartoons did not reference race; rather, Johnson claims they referenced his involvement with the TDU and depicted him as a homosexual (App. 897, 947, 949, 1001-1003).  Moreover, Johnson testified that when the cartoons and leaflets were discovered, both he and management removed them[98] (App. 866-867, 894-901, 920-921).

In fact, in his twenty-eight (28) years of employment, Johnson only identified four instances relating to racially derogatory comments (App. 845-846, 854-857).  Of these four instances, Johnson only has personal knowledge of <u>one</u> instance (*Id.*).[99]  Specifically, Johnson alleges his coworker DeLuna once called him a "black m------ f-----"[100] (App. 845-846).  Johnson never complained about DeLuna's comment[101] (App. 846).  Similarly, though Johnson claims he occasionally saw the "N" word on bathroom walls, he did not always report it (App. 880-886, 944-945, 955).  To the extent he did complain, Johnson testified that Yellow

---

[96] In June 2008, Johnson filed a grievance against a Yellow Transportation supervisor for performing Union work.

[97] The only individual Johnson identified to Yellow Transportation as engaging in inappropriate conduct was DeLuna (App. 923, 1447-1449).  When Derry and Maggard specifically asked Johnson to provide names of individuals engaged in harassing conduct, Johnson did not identify any other coworkers (App. 851-858, 923-924).

[98] Johnson neither provided any of the cartoons or leaflets to the EEOC, nor did he ever include them in his complaints to the EEOC (App. 900-901).

[99] Since his deposition, Johnson complained that DeLuna used profanity towards him in February 2008.  Maggard investigated the incident and spoke with DeLuna, who denied any comments.  As a result, Yellow Transportation reissued its Policy Guide to both employees.

[100] Johnson admits DeLuna never used the "N" word (App. 845-846).

[101] The other three (3) statements of which Johnson admits he has no personal knowledge are: a racially derogatory statement about the 1998 dragging incident of James Byrd in Jasper, Texas; a statement regarding blowing South Dallas off the map; and a coworker calling another coworker the "N" word (App. 854-857).  Johnson never complained about any of these statements (*Id.*).

Transportation promptly painted over the graffiti[102] (Johnson 152-53, 156, 306).

Johnson alleges some unknown person hung a noose on three separate occasions (App. 884-889). First, he claims one was hung in 1997 or 1998 (App. 888). However, Johnson testified his supervisors immediately removed it after he complained (*Id.*). Johnson next alleges his coworker removed another noose in 2004, but Johnson admits he never complained about this one to Yellow Transportation or to the EEOC (App. 886-888). Finally, in October 2006, Johnson complained to management and to Human Resources that a noose had been placed next to the time clock (App. 888-889). Within fifteen minutes, Audy Maggard ("Maggard"), Distribution Center Manager, took it down and initiated an investigation (App. 889-890). As a result of this investigation, Maggard discharged two employees, one Hispanic and one Caucasian (App. 891-893; 1480).

Finally, in 2002 or 2003 and in 2004, Johnson claims he was subjected to a racially hostile work environment[103] because his car was allegedly damaged three times[104] (App. 901-903). For instance, Johnson avers that an unknown person scratched "F.U.M.F." or "bitch" on the passenger side of his car (App. 904-905). After this incident, Yellow Transportation instructed Johnson to park in a different location (App. 903-906). Johnson testified that since this remedial measure, his car has not been damaged (*Id.*).

### B.    Arguments and Authorities

### 1.    *Johnson Cannot Establish Race/National Origin Discrimination*

Summary judgment is proper on Johnson's Title VII, § 1981 and TCHRA discrimination

---

[102] Johnson testified that not all of the graffiti he saw was racial in nature (App. 883, 945).

[103] Johnson also attempts to rely on conduct (urine/feces being placed on forklifts and physical confrontations between coworkers) that he claims happened to other people; however, he admits he has no personal knowledge of these incidents (App. 859-861, 930-931, 940-946, 956).

[104] Johnson was unable to say with certainty who caused this vandalism or whether it even occurred on Yellow Transportation property (App. 903, 908, 918).

claims.  To support his claims, Johnson alleges he was assigned undesirable work tasks and equipment and received warning letters.[105]  First, these claims fail because he did not identify any of this conduct on his EEOC charge and, thus, failed to exhaust his administrative remedies. *King*, 2007 U.S. Dist. LEXIS 50103, at *11.

Moreover, none of the conduct about which Johnson complains constitutes actionable adverse employment actions.  *Hart*, 2007 U.S. App. LEXIS 15206, at *2-3; *Stanley*, 425 F. Supp. 2d at 824; *Conley*, 2004 U.S. Dist. LEXIS 14291, at *9-10; *Martin*, 65 F. Supp. 2d at 539.  Even if they did, Johnson's claim still fails because he cannot establish that a similarly situated employee in nearly identical circumstances received preferential treatment.  For instance, in regards to his warning letter about exceeding break time, Johnson admits the white employees he claims also exceeded their break times were Union stewards or representatives who are allowed to exceed break time.  As such, they are not valid comparators.  *Chambers*, 2007 U.S. Dist. LEXIS 48338, at *28-32.  To be sure, Johnson failed to identify any employee in his same position with the same supervisor who engaged in the same misconduct but did not receive warning letters.  Since Johnson cannot establish a *prima facie* case of discrimination, summary judgment is proper on his Title VII, § 1981 and THCRA claims as a matter of law.[106]

### 2.    *Johnson Cannot Establish Retaliation*

Summary judgment is also proper on Johnson's retaliation claim.  Johnson generically alleges he was retaliated against for the 2004 picketing, the OFCCP complaint, and his EEOC charge.  However, Johnson testified he has no complaints against any Yellow Transportation

---

[105] To the extent Johnson relies on his allegation that he believes white employees were not required to proceed to the Committee level for their grievances, his claim fails because Johnson testified that he also did not have to proceed to the Committee level for each grievance (App. 820-824).

[106] Johnson cannot rely on his own subjective belief to support his allegations of race and/or national origin discrimination.  *Roberson*, 373 F.3d at 654; *Byers*, 209 F.3d at 427.

supervisor and cannot identify any supervisor who retaliated against him in any way[107].  Rather, much like his co-plaintiffs, Johnson identifies the local union as the entity that was restraining and coercing him for his involvement with the TDU and Black Caucus.  Since Johnson cannot even identify a single retaliatory act by Yellow Transportation, summary judgment is proper as a matter of law.

### 3.  *Johnson Cannot Establish Hostile Work Environment*

Summary judgment is also proper on Johnson's hostile work environment claims under Title VII, § 1981 and the TCHRA.  First, Johnson failed to exhaust his administrative remedies regarding his hostile work environment claims.  *King*, 2007 U.S. Dist. LEXIS 50103, at *11.  In fact, his EEOC charge contains none of his current allegations—aside from three specific instances.  Accordingly, summary judgment is proper.

Next, to support his claim, Johnson avers that he has been subjected to leaflets, drawings, and cartoons, he has been shunned, and his car has been vandalized.  Importantly, Johnson testified it was the Union that created the hostile work environment.  Moreover, Johnson testified that the harassment was based on his opposition to the local union.  For instance, the cartoons did not reference race; rather, they referenced his involvement with the TDU and depicted him as a homosexual.  The discrimination statutes do not guarantee a workplace free from all harassment. *Beaumont*, 468 F. Supp. 2d at 919-20.  Since Johnson himself testified that the alleged harassment was not based on his race, summary judgment based on Title VII, § 1981 and the TCHRA is proper as a matter of law.  Even if the harassment was based on race, summary judgment is still proper because: (1) it did not affect a term, condition, or privilege of employment; and (2) Yellow Transportation took prompt remedial action once it learned of his

---

[107] To be sure, Johnson has only received two warning letters in the last twelve years, one of which was retracted (App. 833, 952-954).

complaints.

### a.    The alleged harassment did not affect a term, condition, or privilege of employment

In his twenty-eight years of employment, Johnson could only identify four instances of racially derogatory comments at the workplace.  Of these four, Johnson only had personal knowledge of one.  Specifically, Johnson alleges a coworker once called him a "black mother f-----".  It is well-settled law that one statement in twenty-eight years is insufficient to establish a hostile work environment.  *Morgan*, 536 U.S. at 115; *McCoy*, 942 F. Supp. at 292-93.

Moreover, Johnson's allegations about racial graffiti and a noose[108] are insufficient to create a hostile work environment because they did not destroy Johnson's ability to succeed in the workplace.  Johnson is still a successful employee at Yellow Transportation.  As such, his Title VII, § 1981 and TCHRA claims fail as a matter of law.  *Shepherd*, 168 F.3d at 874; *Gillespie*, 2003 U.S. Dist. LEXIS 29, at *18-19; *Burrell*, 255 F. Supp. 2d at 615-16.

### b.    Yellow Transportation took prompt remedial measures

Even if Johnson could somehow establish that the alleged harassment from the union affected a term, condition, or privilege of employment, summary judgment is still proper under Title VII, § 1981, and the TCHRA because Yellow Transportation took prompt remedial action once it learned of his complaints.  For instance, after Johnson filed his EEOC charge, Yellow Transportation immediately conducted an investigation into the allegations he raised.  After this investigation, Johnson did not bring forth any additional complaints.  As such, Yellow Transportation promptly remedied the situation, and Johnson received the benefits Title VII was meant to confer.  *Skidmore*, 188 F.3d at 616; *Indest*, 164 F.3d at 265.

---

[108] Johnson did not identify the graffiti or the noose in his EEOC charge. Thus, any claim based on these allegations fails for failure to exhaust administrative remedies.  *King*, 2007 U.S. Dist. LEXIS 50103, at *11.  Moreover, to the extent Johnson claims he saw a noose in 1997 or 1998, his claim his time-barred.  *Ledbetter*, 127 S. Ct. at 2171-72.

Similarly, Johnson testified that when Yellow Transportation became aware of offensive cartoons and leaflets, it removed them. Johnson also testified that when he complained about the racial graffiti, Yellow Transportation promptly painted over it. Johnson also testified that Yellow Transportation immediately removed any alleged ropes or nooses once it became aware of the offending object. In fact, in October 2006, Maggard removed an alleged noose and started an investigation within fifteen minutes of Johnson complaining, which lead to the termination of two casual employees. Finally, when Johnson complained about vandalism to his car, Yellow Transportation provided him a different parking location. Since this remedial measure, Johnson's car has not been damaged. In sum, when Johnson complained, Yellow Transportation took prompt remedial action. As such, he cannot establish a hostile work environment as a matter of law. *Skidmore*, 188 F.3d at 616; *Indest*, 164 F.3d at 265. Yellow Transportation respectfully requests that this Court grant it summary judgment.

## VIII.
## PLAINTIFF JOHN KETTERER

### A.    Statement of Facts

Plaintiff John Ketterer ("Ketterer"), a white male and current employee of Yellow Transportation, began his tenure as a regular employee on July 14, 1990 (App. 1051-1052). Ketterer is a member of the Teamsters Union[109] (App. 1048-1050). As such, his employment is governed by the CBA (App. 1048-1051). He also received Yellow Transportation's handbook for new employees, as well as the Policy Guide[110] (App. 1053-1056, 1176-1178).

Throughout the duration of Ketterer's employment, he received several warning letters for his conduct (App. 1057). For instance, on April 2, 1997, Ketterer received a warning for

---

[109] Ketterer testified that if he believed Yellow Transportation had made an unfair decision, he had the right to have his union file a grievance on his behalf (App. 1049-1050).
[110] Ketterer testified that he knew if he had any questions about any policies or procedures, he could contact someone in Human Resources (App. 1055).

creating a hostile work environment because of an altercation he had with his coworker Bob Smiley ("Smiley")[111] (App. 1057-1058, 1179-1180).  In fact, as a result of Ketterer's conduct, the police charged him with simple assault (App. 1058).

The police also investigated and cited Ketterer for assaulting[112] another coworker Josh Congleton ("Congleton") (App. 1059, 1071-1072). [113]   On November 19, 2004, Congleton claimed Ketterer pulled him out of his truck and assaulted him (App. 1066-1067).  Another coworker, Charles Warren Truver ("Truver"), witnessed the altercation and called the police (App. 1067).   Truver, as well as another employee Charles Conine ("Conine"), provided statements describing what they witnessed (App. 1067-1069, 1185-1186).   Both of their statements supported Congleton's version of events (*Id.*).  The only individual who supported Ketterer's version of events was Abe Trevino ("Trevino"), another plaintiff in this case and Ketterer's "good friend" (App. 1069-1070).

Even though the police only charged Ketterer with assault, Yellow Transportation suspended both Ketterer and Congleton for ten days so it could conduct its own investigation (App. 1073).   Following the investigation, both employees were terminated for outrageous conduct (App. 1073, 1187).   Ketterer grieved his discharge, but waived his right to union representation (App. 1074, 1142, 1188).   After negotiating on his own behalf, Ketterer agreed to a suspension without back pay (App. 1075-1076, 1142-1143).  In fact, Ketterer even testified that

---

[111] Ketterer testified that both he and Smiley were terminated.  (App. 1058).  Ketterer did not proceed through the grievance process for this termination; rather, he agreed to return to work with five days suspension without pay (App. 1060, 1179-1180).

[112] Ketterer's misconduct at work has not been limited to assaulting his coworkers.  He has also received warnings for having preventable accidents, failing to follow instructions and causing injuries to coworkers, abusing company time, failing to give fair days work for fair days pay, and sleeping on the job.  (App. 1061-1066, 1078, 1181-1184). Ketterer does not contend these warnings were discriminatory or retaliatory.  For instance, Ketterer testified that he likes the supervisor who warned him about sleeping on the job (App. 1065-1066).

[113] After Ketterer received this assault citation, he filed a complaint with the justice of the peace against Congleton (App. 1076).  Ketterer claims that Congleton called him "shitbag" and made two derogatory signs about his mother (App. 1077).   Ketterer never provided these alleged signs to Yellow Transportation (*Id.*).  Despite the witnesses' accounts, allegations were also made that the Teamsters Union orchestrated the altercation between Congleton and Ketterer based on Union politics—not race or ethnicity (App. 1439-1441)

Derry helped Ketterer get his job back (App. 1157-1158, 1173).  According to Ketterer, it was the **union** he did not trust because it was the **union** who allegedly had a problem with his association with minorities.

Approximately one year later, on December 4, 2005, Ketterer alleges he was across the street "protesting [his] freedom of speech" when another employee drove past him very slowly and gave him the "finger" (App. 1079, 1189).  Though Ketterer prepared a summary of this event for his records,[114] he never complained about this incident to Yellow Transportation[115] (App. 1079-1080).  On December 4, 2005, Ketterer also prepared another summary for his records about a missing timecard (App. 1081-1082).  Nevertheless, Ketterer was properly paid for every hour worked, and he did not file a grievance about this timecard issue (*Id.*).  To be sure, Ketterer testified that he no longer has any issues with his timecards (App. 1152-1153).

In July 2006, Ketterer was involved in yet another altercation with another coworker, Kelly Vineyard ("Vineyard").  Ketterer claims that after he took a posting off the bulletin board in the break room, Vineyard yelled "shitbag, put that back" and "got right in [his] face like real close" (App. 1083).  When Ketterer asked if Vineyard was threatening him, Vineyard said no and returned to his seat on the other side of the break room (*Id.*).  Ketterer reported this incident to Randy Pacheco ("Pacheco"), then Dallas Line Haul Operations Manager, who in turn escalated it to Stephenson in Human Resources (App. 1083-1084).  Upon investigating the incident, Stephenson received conflicting statements (App. 1084-1085).  Though Trevino again supported Ketterer's version of events, the other employees in the break room supported Vineyard (*Id.*).  Namely, Vineyard and three other employees stated that Vineyard did not call Ketterer "shitbag" and did not yell at him (*Id.*).  Since the investigation was inconclusive,

---

[114] Ketterer ostensibly prepared several summaries of alleged events for his own records that he never reported to Yellow Transportation (*See* App. 1098-1099, 1168-1170).
[115] Ketterer had already filed this lawsuit at the time of this alleged incident (App. 1079-1080).

Stephenson instructed both Ketterer and Vineyard that inappropriate behavior will not be tolerated at Yellow Transportation (App. 1085-1087, 1190-1191). Ketterer never brought the issue up to Stephenson again (App. 1088-1089).

On September 9, 2006, Ketterer claimed that his coworker Charles Boozer ("Boozer") accused him of starting a fire on company property (App. 1089). In response, Ketterer complained to Pacheco and alleged that Boozer was upset that Ketterer was not participating in the union slowdown (App. 1090-1091). Yellow Transportation investigated the allegations and interviewed the employees Ketterer identified as witnesses (App. 1092-1097). Interestingly, the employees Ketterer identified as witnesses did ***not*** support his version of events (App. 1093-1097). Rather, they stated that Boozer neither accused nor threatened Ketterer (App. 1093, 1192-1195). Once again, the only person who supported Ketterer's version of events was Trevino (App. 1097). Ketterer did not receive any disciplinary action as a result of this incident (App. 1092).

Notwithstanding the fact that he is a current employee of Yellow Transportation, Ketterer filed this lawsuit in which he alleges claims of race discrimination, retaliation, and hostile work environment. First, Ketterer alleges he has been subjected to race discrimination because of his association, as a white employee, with minorities (App. 1115). Specifically, Ketterer claims it was race discrimination when witnesses provided statements about the Congleton, Vineyard, and Boozer incidents that did not support his version of events[116] (App. 1116, 1118-1119). According to Ketterer, every witness except Trevino (his friend) lied, and these witnesses received preferential treatment when they provided their statements (App. 1120-1124).

---

[116] In his EEOC discrimination charge, Ketterer testified that the earliest date discrimination took place was on April 27, 2005 (App. 1100-1101, 1196). However, in his deposition he could not remember anything happening on that date (App. 1102).

However, Ketterer admits he also was not reprimanded for making his own statements[117]  (App. 1120-1124, 1128).

In support of his retaliation[118] and hostile work environment claims, Ketterer asserts that he has been shunned, harassed, and intimidated by other white employees (App. 1102, 1134). He claims that white supervisors do not have casual conversations[119] with him, but only answer his questions and "talk business" with him (App. 1107-1113).  He also claims that a few of his supervisors "stare" at him or "look" at him weirdly (App. 1110-1113).  However, Ketterer readily testifies that he has not had any altercations or confrontations with this supervisors and he has never filed any complaints against them[120] (App. 1102, 1111).  To be sure, Ketterer testified that he still receives his assignments, performs his job duties, receives pay raises, and even receives awards for his length of service (App. 1106-1107, 1128, 1149-1150, 1155, 1159).[121]

Ketterer also claims he was subjected to a hostile work environment when his coworkers did not testify in support of him for the Congleton, Vineyard, and Boozer incidents (App. 1129-1130).  He does not allege his coworkers threatened to "fight [him] or anything like that.  Just what they did [was] they didn't testify for [him]" (*Id*.).  However, since the investigation of the

---

[117] Ketterer also claims he was subjected to his race discrimination when his Caucasian, African-American, and Hispanic coworkers called him "shitbag" (App. 1125-1126).  Ketterer claims he received this nickname after he himself first used it to reference his coworkers (App. 1127).  Interestingly, Olivarez told Ketterer to let HR and management know if the conduct continues (App. 1467).  Further, when "shitbag" was allegedly written on his work anniversary plaque, Ketterer testified that the ***union*** was the one  who had gotten "ahold of it and wrote that name on it" (App. 1155).  To be sure, Ketterer testified that Yellow Transportation management gave him the original award and even offered to give him a new one (App. 1155-1156).

[118] Ketterer testified none of his supervisors have ever referenced his EEOC charge or his lawsuit (App. 1114).

[119] Interestingly, Ketterer testified that even before he filed this lawsuit, his supervisors did not talk to him a lot (App. 1109).

[120] Ketterer also testified that only one supervisor, Danny Wiand, made a racially insensitive remark "off the wall" approximately two years ago (App. 1102-1104) .  However, Ketterer testified that he did ***not*** report it to Yellow Transportation, and he did ***not*** report it to the EEOC (App. 1103-1104).  Moreover, Ketterer testified that he never had a problem with Wiand (App. 1104-1105).

[121] Since filing this lawsuit, Ketterer received a warning letter on January 30, 2006 for failure to follow instructions, a warning letter on August 8, 2006 for failure to protect bid shift, and a warning letter on March 5, 2007 for excessive absenteeism (App. 1480).  Notwithstanding, Ketterer has not been discharged and his pay, benefits and status as an employee have not decreased since filing this lawsuit (*Id*.).

Vineyard incident, Ketterer testified that Vineyard has been "real sweet" and "extremely nice" to him (App. 1131, 1133).  Similarly, Ketterer testified that Boozer has been "real sweet and real nice" since the investigation of their altercation (App. 1133).  In regards to Congleton, Ketterer testified that he has only had one run-in with Congelton, but that he did not receive any disciplinary action from it (App. 1132-1133).  Ketterer has not had any problems with Congleton since then (*Id.*).

Finally, Ketterer claims he was subjected to a hostile work environment[122] because some of his coworkers called him a "n----- lover" and others threw a firecracker at him (App. 1135-1141).  However, Ketterer testified that he did not complain to anybody at Yellow Transportation about any of these incidents (App. 1136-1141, 1160-1162, 1452-1453).[123]  He seemingly also claims he saw graffiti that was directed at everyone, including white supervisors (App. 1163-1167).  However, once again, Ketterer testified he did not complain about any of it (*Id.*).

**B.   Arguments and Authorities**

      **1.   *Ketterer Cannot Establish Race Discrimination***

Summary judgment is proper on Ketterer's Title VII, § 1981 and THCRA race discrimination claims.  Ketterer, a white male, alleges he has been discriminated against because of his association with minorities.  First and foremost, Ketterer testified that it was the ***union*** who had a problem with his association with minorities, not Yellow Transportation.  Moreover, the Fifth Circuit has questioned whether such an association provides a basis for an actionable claim.  *See Pittman*, 2007 U.S. Dist. LEXIS 22332, at *74 (questioning whether non-intimate

---

[122] Ketterer also avers that his car was vandalized in 1993 or 1994, in 1997 or 1998, and in 2004 or 2005, but that he could not identify the perpetrators (App. 1144-1148).  He did not attribute the alleged vandalism to his race.  On the contrary, Ketterer testified he was threatened with car or other such vandalism when he refused to participate in the union slow-downs (App. 1151, 1154).  Moreover, Ketterer testified that he did not complain about much of this alleged vandalism (App. 1171-1172).

[123] Since his deposition, Ketterer lodged a complaint that his hostling unit was "greased" by a Hispanic coworker, Mark Salazar.  Ketterer also complained that Salazar was selling raffle tickets and the prize was a handgun.  Ketterer's friend, Trevino, purchased a raffle ticket.

relationship with minority is sufficient to support an association discrimination claim). However, even if it is a valid claim, summary judgment is still proper. Ketterer claims it was race discrimination when his coworkers provided statements against him in the investigation of the Congleton, Vineyard, and Boozer incidents (App. 1116-1119). He also claims it was discrimination when his coworkers called him "shitbag," a name he initiated (App. 1125-1126). Neither of these allegations are actionable adverse employment actions.[124] *See, e.g., Dixon*, 2006 U.S. Dist. LEXIS 47560, at *26-27 (holding actionable adverse employment actions involve hiring, granting leave, discharging, promoting, and compensating). Even further, Ketterer cannot show that these acts affected or altered a term or condition of his employment because of his association with minorities. Moreover, none of these acts deterred him from making a complaint or filing a charge of discrimination. Likewise, Ketterer cannot support his allegations of race and/or national origin discrimination based on his own subjective belief. *Roberson*, 373 F.3d at 654; *Byers*, 209 F.3d at 427. As such, summary judgment under Title VII, § 1981 and the TCHRA is proper as a matter of law.

### 2. *Ketterer Cannot Establish Retaliation*

Summary judgment is also proper on Ketterer's retaliation claim. To support his claim, Ketterer alleges his supervisors do not socialize with him and a few of his supervisors "stare" at him or "look" at him weirdly. However, Ketterer testified that none of his supervisors ever referenced his EEOC charge or this lawsuit (App. 1114). In fact, Ketterer has no evidence that any of this alleged retaliatory conduct occurred because of any discrimination complaints he may have filed. To the contrary, Ketterer admits that even before he filed this lawsuit his supervisors

---

[124] Moreover, to the extent Ketterer relies on warning letters he received, his claim still fails because warning letters are not adverse employment actions for disparate treatment claims. Even if they were, Ketterer cannot establish that similarly situated employees received preferential treatment. For example, both Ketterer and Congleton were discharged after their fight (App. 1073). Similarly, both Ketterer and Vineyard were counseled after their fight (App. 1085-1087). Finally, neither Ketterer nor Boozer were disciplined after their altercation (App. 1092).

did not socialize with him (App. 1109).   Since his complaints did not change his working relationship with his supervisors, he simply has no evidence of retaliation.  *Dixon*, 2006 U.S. Dist. LEXIS 47560, at *40.

Moreover, even if his supervisors did not socialize with him, Ketterer testified they still provide him assignments, authorize pay raises, and even award him for his length of service (App. 1106-1107, 1128, 1149-1150, 1155, 1159).  As such, Ketterer did not suffer an injury or harm from his complaints gives rise to an actionable retaliation claim.  *See Beaumont,* 468 F. Supp. 2d at 923.  Finally, "stares" are not materially adverse employment actions that would dissuade a reasonable employee from filing a complaint.  *Grice*, 216 F. App'x 401; *Pittman*, 2007 U.S. Dist. LEXIS 22332, at *66.  Even if they were, Ketterer did not complaint and continues to address issues with Human Resources.  Put simply, Ketterer failed to provide any evidence that retaliation was the real motive behind a materially adverse employment action.  As such, summary judgment is proper on his Title VII, § 1981 and TCHRA claims as a matter of law.

### 3.   *Ketterer Cannot Establish Hostile Work Environment*

Summary judgment is also proper on Ketterer's hostile work environment claim.  To support his claim, Ketterer alleges a coworker drove past him and gave him "the finger," his coworkers shun and intimidate him, his coworkers did not support his position during the Congleton, Vineyard, and Boozer incidents, a coworker allegedly threw a firecracker in his direction, and some of his coworkers called him a "n----- lover."  Even if true, none of these allegations are sufficient to establish a hostile work environment based on his alleged association with minorities.  First, Ketterer has no evidence that much of the conduct had anything to do with his race or his association with minorities.  To the contrary, Ketterer testified that some of

his coworkers were upset with him because he did not participate in the union slow down (App. 1090-1091, 1151, 1154).  If not based on race, alleged harassment is simply not actionable under the discrimination statutes.  *Beaumont*, 468 F. Supp. 2d at 907.

Summary judgment is also proper because none of the alleged harassment affected a term, condition, or privilege of employment.  Though Ketterer may have been annoyed with his coworkers, their conduct did not destroy completely his ability to succeed in the workplace.  *See, e.g., Hockman*, 407 F.3d at 236 (holding that "the alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents" and to survive summary judgment a plaintiff must establish that the harassment was so severe or pervasive that it destroyed his opportunity to succeed in the work place).  Rather, Ketterer testified he is still able to perform his job duties, bid his preferred shift, still receives pay raises, and even received awards for his length of service.  As such, his claim fails as a matter of law.  *Burrell*, 255 F. Supp. 2d at 615-16.

Finally, summary judgment is also proper because Ketterer failed to take advantage of Yellow Transportation's available remedial measures.  Though Ketterer allegedly prepared several summaries of events, he never reported the conduct to Yellow Transportation.  For instance, he never reported his coworker who drove past him slowly and gave him "the finger" (App. 1079-1080).  Similarly, he never complained about a coworker throwing a firecracker at him (App. 1135-1141).  He also did not complain that his coworkers called him a "n----- lover" (*Id.*).  Finally, Ketterer testified he never complained about any graffiti (App. 1163-1167).  Accordingly, Ketterer's failure to complain is fatal to his claims.  *Hockman*, 407 F.3d at 330; *Burrell*, 255 F. Supp. 2d at 614.  Moreover, when given the opportunity Yellow Transportation immediately addressed Ketterer's complaints.  Thus, since Ketterer cannot establish that Yellow Transportation failed to take prompt remedial measures, summary judgment on his Title VII, §

1981 and TCHRA claims is proper as a matter of law.

# IX.
# PLAINTIFF ABRAM TREVINO

## A.      Statement of Facts

Plaintiff Abram Trevino ("Trevino") is a current employee of Yellow Transportation who began his tenure in 1984 (App. 1198-1215).  Trevino is a member of the Teamsters Union, and his employment is governed by the CBA as well as Yellow Transportation's policies and procedures (App. 1198-1203, 1323-1328, 1332-1356, 1384-1388, 1414).

Throughout the duration of his employment at Yellow Transportation, Trevino has never been terminated or denied a promotion (App. 1209-1210).  Moreover, Trevino testified that his supervisors never made any racial slurs or inappropriate comments (App. 1234-1243).  In fact, in his two separate EEOC charges, Trevino does not allege that *anyone* at Yellow Transportation used any type of racial slur or that racial symbols and/or graffiti were present on company property (App. 1271-1273, 1288-1292, 1296-1298, 1360-1361, 1365-1367).   Nevertheless, Trevino filed this lawsuit in which he claims he was subjected to  race discrimination, retaliation, and a hostile work environment.

In support of his race discrimination and hostile work environment claim, Trevino asserts that minority employees are required to carry heavier workloads than white employees[125] (App. 1416).  Specifically, Trevino asserts his coworker Colby Johnson is allowed to have a lighter workload than him (App. 1314-1315, 1381).   However, Trevino never filed a grievance regarding Colby Johnson or complained about the alleged difference in their workloads (App.

---

[125] Despite Trevino's complaints about having a heavier workload, he also complained about not being able to work over Memorial Day weekend in 2006 (Trevino at 24-26, 213-216, Ex. 24).  According to Trevino, some unknown individual removed his bid card to prevent him from working over the weekend (Trevino at 218, 237-38).  Nevertheless, after Trevino filed a grievance, Yellow Transportation resolved the issue and paid Trevino the holiday rate of pay for eight hours of work (Trevino at 24-26, 216-17).

1315-1316).   Trevino also claims white employees get extended breaks, while he is not allowed to have an extended break (App. 1407-1408).   Trevino identifies Colby Johnson and Frank Haskell ("Haskell") as the employees who took longer breaks (App. 1409-1411).   However, Colby Johnson and Haskell hold different positions than Trevino (*Id*.).   Moreover, Trevino admits he has no personal knowledge of when Colby Johnson and Haskell's breaks are scheduled (App. 1411).   Finally, Trevino never complained[126] or filed a grievance about the allegedly unfair break times (App. 1407-1408, 1412).

In May 2004, Trevino met with Olivarez to discuss mistreatment by the Teamsters Union (App. 1465, 1469).   Specifically, Trevino relayed complaints that other individuals had with the Union and complained that the Teamsters Union did not like him because he does not slow his work production when the Union requests employees to do so (App. 1469).   In fact, Trevino only provided information in support of other employee's complaints of the Union (App. 1469-1470).

On August 11, 2005, Trevino reported to his supervisors that he had observed a racial slur carved in the dashboard of a sleeper truck rented by Yellow Transportation (App. 1204-1206, 1267-1268, 1274, 1417).   Thereafter, Trevino informed the Union and Human Resources about the carving (App. 1204-1206, 1296).   Although Trevino claims Yellow Transportation failed to take action to remove the racial slur, he admits that the racial slur is no longer in the sleeper, and, as a result, his complaint was remedied (App. 1270, 1420-1421).   In fact, as a follow up to his complaint, Trevino stated: "I was impressed when I saw the words had been completely scraped off" (App. 1321-1322, 1420-1421).

---

[126] Even though Trevino created documentation to support his allegations, he did not provide that documentation to Yellow Transportation (App. 1248-1251).  To be sure, Trevino testified that he never even complained about many of the alleged incidents contained in this documentation (App. 1255-1263, 1264-1266).  For instance, he never complained or filed a grievance about the alleged use of offensive language over the radio (App. 1237-1238, 1251-1262, 1357-1359).  Similarly, though Trevino "documents" that his white coworker Congleton left discriminatory drawings and writings in the break room, he never complained about it to Yellow Transportation (App. 1258-1259).

Though Yellow Transportation responded to his complaint, Trevino claims his supervisors Wayne Scott ("Scott") and Tim Stippleton ("Stippleton"),[127] and Distribution Center Manager Maggard retaliated against him for his complaint (App. 1391-1392, 1401-1402). For example, Trevino claims Scott retaliated against him by issuing him warning letters[128] (App. 1204-1206, 1216-1217, 1275). However, Trevino **admits** he engaged in the conduct that caused these warning letters (App. 1217-1220, 1275-1287, 1362-1364). Moreover, Trevino's rate of pay and benefits were not altered for any of his warning letters, and he was allowed to bid on any position and shift he wanted based on his seniority (App. 1220-1221).

Trevino further claims Scott retaliated against him by giving him the wrong assignment in 2005; however, the assignment was later retracted on the same day, thereby resolving the issue (App. 1222-1228, 1368-1373). Trevino also claims Scott required him to work both sides of the dock instead of his assigned work area and to work alone repeatedly during 2004 and 2005 (App. 1226-1230, 1368-1373).[129] Similarly, Trevino alleges Scott ordered him to work on the wrong side of the dock and to pick up an inoperable trailer, but Trevino admits he never received a warning or counseling from anyone regarding these incidents (App. 1395-1400). Trevino also avers Scott took away his seniority rights with regards to the assignment of jobs (App. 1231-1233). However, Trevino admits he was later given the opportunity to do the job in question during the same shift, which he accepted[130] (*Id.*). Finally, Trevino alleges that on October 28, 2006, Scott checked his production the first forty-five (45) minutes of his shift (App. 1405-

---

[127] It is unclear whether Trevino complains of supervisor Ricky Templeton or Tim Satterlee regarding these allegations.

[128] Trevino admits he received warning letters throughout his employment at Yellow Transportation, including before he participated in any alleged protests of Yellow Transportation in 2004 and before he complained about alleged discrimination (App. 1244-1248).

[129] Once again, Trevino neither gave his documentation regarding these allegations to anyone at Yellow Transportation either, nor did he file any grievances (App. 1293-1296).

[130] To the extent Trevino claims Scott retaliated against him by giving him more assignments on January 2, 2006, Trevino admits he never complained nor filed a grievance about the alleged incident. (App. 1296-1297).

1406).  However, Trevino received no discipline from anyone regarding his work that day (App. 1393-1394).

Trevino claims Stippleton retaliated against him by asking his coworkers about his whereabouts sometime in 2005 (App. 1401-1404).  However, Trevino did not receive a warning letter or even a verbal counseling from anyone regarding this alleged incident, and he never filed any complaints (App. 1404).

Finally, in May 2006, Trevino claims Maggard retaliated against him by stating, "This is an A and B conversation and C your way out of it"[131] (App. 1301-1307).  Based on this statement, Trevino filed a complaint with Stephenson, who conducted an investigation and determined no action was required based on the facts (App. 1316-1318, 1382-1383).  Trevino admits Maggard made the statement in response to Trevino calling him a liar (App. 1303-1305).  Notably, Trevino admits it was reasonable for Maggard, the Distribution Center Manager, to be upset with him, especially if Maggard believed he did not lie to Trevino (App. 1303-1305).  Trevino also admits Maggard never made a racial slur to him or anyone else (App. 1241-1242).

To justify the fact that Trevino did not complain about much of the allegedly retaliatory conduct, Trevino claims he feared for his job because of Don Wesley's ("Wesley") discharge[132] (App. 1239, 1422).  However, Trevino filed this lawsuit in November 2005 and an EEOC charge of discrimination on January 3, 2006, *after* Wesley's termination (App. 1423-1424).  Additionally, Trevino filed complaints with Stephenson after Wesley's termination (App. 1424-1426).  Finally, Trevino asserts he feared retaliation because he received three warning letters after he filed a complaint in January 2006 (App. 1239).  However, once again, Trevino filed a

---

[131] Trevino asserts that the A/B conversation is his only retaliation claim based on Maggard's actions (App. 1390-1391).

[132] Wesley was discharged for outrageous conduct in March 2005 for playing a pornographic video on company premises.

second EEOC charge of discrimination on February 15, 2006, after he receiving these warning

letters (App. 1239, 1365-1367).

**B.      Arguments and Authorities**

   **1.      *Trevino Cannot Establish Race/National Origin Discrimination***

Summary judgment is proper on Trevino's Title VII, § 1981 and TCHRA race/national

origin discrimination claims.  To support his claims, Trevino alleges he was required to shoulder

a heavier workload and was not allowed to take extended breaks.  However, neither of these

constitute an actionable adverse employment action.[133]  *Martin*, 65 F. Supp. 2d at 539; *see also*

*Hart*, 2007 U.S. App. LEXIS 15206, at *2-3 (5th Cir. June 26 2007) (unpublished) (holding

being assigned more difficult tasks is not actionable); *Stanley*, 425 F. Supp. 2d at 824 (holding

that being asked to do more physical labor and receiving unequal breaks are not actionable).

Moreover, even if they were, Trevino failed to establish a similarly situated employee in nearly

identical circumstances received preferential treatment.  *Chambers,* 2007 U.S. Dist. LEXIS

48338, at *28-32.  For instance, Trevino claims Colby Johnson was allowed to have a lighter

workload, and that both Colby Johnson and Haskell are allowed to take extended breaks.

However, neither Colby Johnson nor Haskell hold the same position as Trevino.  As such, they

are not similarly situated and cannot be used as a basis for a discrimination claim.  *Chambers,*

2007 U.S. Dist. LEXIS 48338, at *28-32.  Moreover, Trevino testified that he has no personal

knowledge of when Colby Johnson and Haskell's breaks are scheduled.  Trevino's speculation

on their schedule is simply not competent evidence.  *Preston*, 2007 U.S. App. LEXIS 2870, at

*12-14.  Similarly, Trevino cannot rely on his own subjective belief to establish his claims of

race and/or national origin discrimination.  *Roberson*, 373 F.3d at 654; *Byers*, 209 F.3d at 427.

Since Trevino cannot establish a *prima facie* case of race or national origin discrimination,

---

[133] Likewise, these acts did not affect or alter a term or condition of Trevino's employment.

summary judgment is proper as a matter of law under Title VII, § 1981 and the TCHRA.

### 2. *Trevino Cannot Establish Retaliation*

Summary judgment is also proper on Trevino's Title VII, § 1981 and TCHRA retaliation claims.  To support his claims, Trevino alleges that his supervisors Scott and Stippleton issued him warning letters after he made a complaint.  He also claims that Stippleton required him to work harder.  He further alleges that Scott checked his production one day and that Stippleton asked his coworkers about his whereabouts.  Finally, Trevino alleges Maggard retaliated against him when, in response to Trevino calling Maggard a liar, Maggard told Trevino "this is an A and B conversation and C your way out of it".

Even if true, none of this alleged conduct is a materially adverse employment action that would well dissuade a reasonable employee from filing a charge.  First, Trevino does not allege that he was disciplined or that his pay or his seniority were in any way affected when his supervisors asked him to work harder and checked up on his work.  To be sure, such conduct is a petty slight or annoyance and not a materially adverse employment action.  *Beaumont*, 468 F. Supp. 2d at 925-26.  Moreover, Trevino provided no evidence that his complaints were the but for cause of his supervisors' conduct.  *Septimus*, 399 F.3d at 608.  In fact, he has no evidence of animus on the part of any supervisor at Yellow Transportation.

Similarly, Maggard asking Trevino to leave after Trevino called him a liar is not a materially adverse employment action that would dissuade a reasonable employee from complaining.  In fact, Trevino himself admits it was reasonable for Maggard to be upset with him.  Once again, Trevino has no evidence that his complaints were the but for cause of Maggard's statement.

Trevino's warning letters are also not materially adverse employment actions that would

dissuade a reasonable employee from complaining because Trevino admits to the conduct necessitating the warning letters. *DeHart*, 214 F. App'x at 442; *Slaughter*, 2007 U.S. Dist. LEXIS 2198, at *17; *see also Hart*, 2007 U.S. App. LEXIS 15206, at *2-3. Moreover, Trevino admits that he received warning letters both before and after he filed complaints; he has no evidence that his complaints were the but for cause of his subsequent warning letters.

Finally, Trevino's retaliation claim fails because none of the conduct of which Trevino complains actually dissuaded Trevino from filing complaints. Rather, Trevino was an active participant in the EEOC process. He filed two separate EEOC charges after such conduct and continued to complain to Stephenson. As such, his Title VII, § 1981 and TCHRA retaliation claims fail as a matter of law. *DeHart*, 214 F. App'x at 442; *Beaumont*, 468 F. Supp. 2d at 925.

### 3.   *Trevino Cannot Establish Hostile Work Environment*

Summary judgment is proper on Trevino's Title VII, § 1981 and TCHRA hostile work environment claims. Trevino testified that none of his supervisors have ever made a racial slur or inappropriate comment. Rather, as evidence of a hostile work environment, Trevino merely alleges he was required to carry a heavier workload and received shorter breaks. He also claims he saw a racial slur carved into the dashboard of a truck.[134] Even if true, Trevino's claims fail because none of the conduct affected a term, condition, or privilege of employment. Trevino has no evidence that the alleged conduct destroyed completely his ability to succeed in the workplace; to the contrary, Trevino remains employed at Yellow Transportation and he has never been terminated or denied a promotion. As such, his claims fail as a matter of law. *Burrell*, 255 F. Supp. 2d at 615-16

---

[134] To the extent Trevino relies on any coworkers' use of racial slurs or any racial graffiti, his claim fails for failure to exhaust his administrative remedies because Trevino did not allege any such conduct in either of his two EEOC charges. Moreover, even if he had exhausted his administrative remedies, his claim fails because Trevino unreasonably failed to take advantage of Yellow Transportation's remedial measures because Trevino readily admits he never complained about much of the alleged conduct.

Trevino's hostile work environment claims also fail because Trevino failed to take advantage of Yellow Transportation's available remedial measures.  Trevino readily admits that, despite the fact he prepared "documentation" of alleged events, he never complained or provided that documentation to Yellow Transportation.  Trevino's failure to complain about the heavier workload, unfair break times, or any other alleged harassment is fatal to his claims.  *Hockman*, 407 F.3d at 330; *Burrell*, 255 F. Supp. 2d at 614.

Finally, summary judgment is also proper because, when Trevino did complain Yellow Transportation took prompt remedial action.  For example, Trevino complained about a racial carving in the dashboard of a leased tractor and testified that the carving is no longer there; in fact, he was "impressed" that it had been completely scraped off.  Since Yellow Transportation promptly remedied Trevino's concerns, his hostile work environment claims under Title VII, § 1981 and the TCHRA fail as a matter of law.  *Skidmore*, 188 F.3d at 616; *Indest*, 164 F.3d at 265.

## X.
## CONCLUSION

Based on the facts presented and the relevant authorities, Defendant Yellow Transportation, Inc. respectfully submits that Plaintiffs failed to establish any of their claims as a matter of law.  Accordingly, Defendant Yellow Transportation, Inc. respectfully requests that this Court grant it summary judgment and all other relief to which it is entitled.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **RICHARD A. ARRIETA, CHRIS CALIP, BEN CROMMEDY, RUBIN HERNANDEZ, ROGER JOHNSON, JOHN KETTERER, AND ABRAM TREVINO,** § § § § § § | |
| **Plaintiffs,** § | |
| **v.** § § | **Civil Action No.  3:05-CV-2271-D ECF** |
| **YELLOW TRANSPORTATION, INC. C/O THE FRICK CO.,** § § § | |
| **Defendant.** § | |

## ORDER

The Court, having considered Defendant Yellow Transportation, Inc.'s Motion for Summary Judgment, its Brief in Support of Motion for Summary Judgment, all responses and replies thereto, and the arguments of counsel, if any, is of the opinion that good cause exists; therefore it is hereby

ORDERED that Defendant Yellow Transportation, Inc.'s Motion for Summary Judgment is GRANTED; and

Further, ORDERED, ADJUDGED, and DECREED that Plaintiff Richard A. Arrieta, Plaintiff Chris Calip, Plaintiff Ben Crommedy, Plaintiff Rubin Hernandez, Plaintiff Roger Johnson, Plaintiff John Ketterer, and Plaintiff Abram Trevino have and take nothing against Yellow Transportation, Inc.

SIGNED _____, 200_____.

_____
HONORABLE SIDNEY A. FITZWATER
UNITED STATES DISTRICT COURT JUDGE

31367447.3