IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RICHARD A. ARRIETA, et al.,      §
                                 §
                Plaintiffs,      §
                                 §  Civil Action No. 3:05-CV-2271-D
VS.                              §
                                 §
YELLOW TRANSPORTATION, INC.,     §
C/O THE FRICK CO.,               §
                                 §
                Defendant.       §

MEMORANDUM OPINION
AND ORDER

In this race-based employment discrimination suit, seven

current or former employees of defendant Yellow Transportation,

Inc. ("YTI") allege that YTI is liable under 42 U.S.C. § 1981,

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et*

*seq.* ("Title VII"), and the Texas Commission on Human Rights Act

("TCHRA"), Tex. Labor Code Ann. §§ 21.001-21.556 (Vernon 2006),[1]

for discriminating against them based on race, retaliating against

them for opposing discrimination, and subjecting them to a hostile

work environment.  YTI moves for summary judgment on all claims.

For the reasons that follow, the court grants the motion in part

_____

[1]As the court noted in *King v. Enterprise Leasing Co. of DFW*,
2007 WL 2005541 (N.D. Tex. July 11, 2007) (Fitzwater, J.):
"'Chapter 21 was entitled the Texas Commission on Human Rights Act
until the abolishment of the Commission on Human Rights.  In 2004,
the "powers and duties" of the Commission on Human Rights were
transferred to the Texas Workforce Commission Civil Rights
Division.'"  *Id.* at *1 n.1 (quoting *Tex. Dep't of Criminal Justice
v. Guard*, 2007 WL 1119572, at *2 n.3 (Tex. App. 2007, no pet. h.)
(not designated for publication)).  As in *King*, the court for
clarity will refer to this claim as brought under the TCHRA.

and dismisses all plaintiffs' race discrimination and retaliation claims and the hostile work environment claims of Rubin Hernandez ("Hernandez"), John Ketterer ("Ketterer"), and Abram Trevino ("Trevino"), and Ben Crommedy's ("Crommedy's") hostile work environment claims brought under Title VII and the TCHRA. The court denies the motion as to the hostile work environment claims of plaintiffs Richard A. Arrieta ("Arrieta"), Chris Calip ("Calip"), and Roger Johnson ("Johnson"), and as to Crommedy's § 1981-based hostile work environment claim. By Fed. R. Civ. P. 54(b) judgment filed today, all claims of all plaintiffs, except the hostile work environment claims of Arrieta, Calip, and Johnson, and the § 1981-based hostile work environment claim of Crommedy, are dismissed with prejudice.

I

Plaintiffs have been employed at YTI's Dallas terminal in varying capacities and for different lengths of time.[2] Arrieta has worked at YTI since 1999 as a dock worker and city driver. Calip is currently a YTI truck driver, and has also worked at YTI since 1999. Crommedy worked as a hostler and dock worker at the Dallas terminal until August 2005, when he was transferred to YTI's Fort

---

[2]The court recounts the evidence in a light favorable to plaintiffs as the summary judgment nonmovants and draws all reasonable inferences in their favor. *E.g., U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.) (citing *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000)).

Worth terminal, where he currently works as a city driver. Hernandez was employed at YTI as a shuttle driver and hostler from 1993 to 2007. In March 2007 YTI permanently discharged Hernandez for engaging in outrageous conduct, including threatening a coworker. Johnson has worked at YTI since 1979, and currently appears to work as a hostler. Ketterer is a dock worker at YTI, where he has worked since 1990. And Trevino, who has been employed at YTI since 1984, is also currently a dock worker.

All plaintiffs are members of the local chapter of the International Brotherhood of Teamsters ("Teamsters Union"). In 2003 YTI and the Teamsters Union entered into a collective bargaining agreement ("CBA") that governs the terms and conditions of employment for all YTI employees who are union members.

Although plaintiffs are members of different racial groups, they all allege that YTI discriminated against them based on race. Arrieta, Hernandez, and Trevino assert that YTI discriminated against them because they are Mexican-American. Calip, Crommedy, and Johnson allege that YTI discriminated against them because they are African-American. And Ketterer, who is Caucasian, alleges that YTI discriminated against him because he associates with racial minorities.

All plaintiffs, except Crommedy, filed charges with the Equal Employment Opportunity Commission ("EEOC") and the Texas Commission on Human Rights ("TCHR") in 2005 or 2006 and received right to sue

letters.  Crommedy has not filed a charge with either the EEOC or the TCHR.  This suit was originally filed in November 2005 and included 13 other YTI employee-plaintiffs.  Twelve of the other employees who were proceeding *pro se* were severed from the lawsuit. After severance, the seven current plaintiffs, plus Don Wesley ("Wesley"), filed amended complaints.  In 2007 Wesley was severed as a plaintiff.  The remaining seven plaintiffs filed a third amended complaint in July 2007.

Because the relevant facts that pertain to each plaintiff's claims vary according to plaintiff, the court will discuss them in its consideration of each individual plaintiff's claims rather than do so generally at this introductory part of the memorandum opinion and order.

## II

YTI moves for summary judgment dismissing all of plaintiffs' claims.  Except as to the affirmative defenses addressed *infra* at § V(D)(4), plaintiffs will bear the burden of proof on these claims at trial.  YTI can therefore meet its summary judgment obligation by pointing the court to the absence of evidence to support a claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once YTI does so, the plaintiff in question must go beyond his pleadings and designate specific facts showing there is a genuine

issue for trial.[3]  *See id.* at 324; *Little v. Liquid Air Corp.*, 37
F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  An issue
is genuine if the evidence is such that a reasonable jury could
return a verdict for the plaintiff in question.  *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The plaintiff's
failure to produce proof as to any essential element of a claim,
however, renders all other facts regarding that claim immaterial.
*See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623
(N.D. Tex. 2007) (Fitzwater, J.).  Summary judgment is mandatory
where the plaintiff fails to meet this burden.  *Little*, 37 F.3d at
1076.

                              III

     YTI moves for summary judgment on plaintiffs' claims of
disparate treatment based on race and national origin

---

[3]It is well settled that the court is not obligated to comb
the record in search of evidence that will permit a nonmovant to
survive summary judgment.  *Adams v. Travelers Indem. Co. of Conn.*,
465 F.3d 156, 164 (5th Cir. 2006).  "Rule 56 does not impose a duty
on the district court to sift through the record in search of
evidence to support a party's opposition to summary judgment."
*Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir. 1996) (citing
*Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir.
1996)).  "Rule 56, therefore, saddles the non-movant with the duty
to 'designate' the specific facts in the record that create genuine
issues precluding summary judgment, and does not impose upon the
district court a duty to survey the entire record in search of
evidence to support a non-movant's opposition."  *Jones*, 82 F.3d at
1338.  Moreover, under N.D. Tex. Civ. R. 56.5(c), "[a] party whose
. . . response is accompanied by an appendix must include in its
brief citations to each page of the appendix that supports each
assertion that the party makes concerning the summary judgment
evidence."

discrimination.[4]  YTI argues that none of the plaintiffs, except

Hernandez, has suffered an adverse employment action.  It also

contends that plaintiffs cannot identify similarly situated

employees who were treated more favorably.  YTI has therefore met

its burden of pointing the court to the absence of evidence to

support these claims, and the burden has shifted to plaintiffs to

introduce evidence that would permit a reasonable jury to find in

their favor.

A

Plaintiffs assert that YTI discriminated against them based on

race, in violation of Title VII, § 1981, and the TCHRA.  Under

Title VII, it is "an unlawful employment practice for an employer

. . . to discharge any individual, or otherwise to discriminate

against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such

individual's race."  42 U.S.C. § 2000e-2(a)(1).  Section 1981

guarantees "[a]ll persons within the jurisdiction of the United

States . . . the same right . . . to make and enforce contracts"

regardless of race.  42 U.S.C. § 1981(a).  Under the TCHRA, "[a]n

_____

[4]Plaintiffs occasionally refer to their disparate treatment
claims as being based on race *and national origin* discrimination.
In their briefing, however, plaintiffs treat their claims as being
based solely on *race* discrimination.  They do not allege national
origin discrimination that is distinct from race discrimination,
and they do not attempt to establish a prima facie case of national
origin discrimination.  Thus the court will refer to and treat
plaintiffs' claims as race discrimination claims.

employer commits an unlawful employment practice if because of race
. . . the employer . . . discharges an individual, or discriminates
in any other manner against an individual in connection with
compensation or the terms, conditions, or privileges of
employment." Tex. Lab. Code Ann. § 21.051 (Vernon 1996 & Supp.
2004-05).

With the exception of procedural issues addressed below, the
analysis under all three statutes is the same in the context of
race discrimination. The Fifth Circuit has consistently held that
"race discrimination claims brought pursuant to section 1981 are
governed by the same evidentiary framework applicable to employment
discrimination claims under Title VII." *Pegram v. Honeywell, Inc.*,
361 F.3d 272, 281 n.7 (5th Cir. 2004); *see also Jones v. Robinson
Prop. Group*, 427 F.3d 987, 992 (5th Cir. 2005) ("[T]he analysis
under both [Title VII and § 1981] [is] identical, the only
substantive differences between the two statutes being their
respective statute of limitations and the requirement under Title
VII that the employee exhaust administrative remedies." (citations
omitted)).[5] Texas courts also construe the TCHRA consistently with
federal law interpreting Title VII. *See Shackelford v. Deloitte &
Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999) ("[T]he law
governing claims under the TCHRA and Title VII is identical.");

---

[5]Plaintiffs contend that § 1981 covers a greater range of
discriminatory employment actions than does Title VII. The court
addresses this argument *infra* at § III(C)(2).

*Caballero v. Cent. Power & Light Co.*, 858 S.W.2d 359, 361 (Tex. 1993) ("Another stated purpose [of the TCHRA] is to coordinate and conform with federal law under Title VII of the Civil Rights Act of 1964, as amended[.]" (citations omitted)). Because the same analysis applies to all three statutes, the court will consider these claims together under the Title VII evidentiary framework.

B

In the context of a Title VII race discrimination claim, each plaintiff must present sufficient direct or circumstantial evidence to enable a reasonable jury to find that his race was a motivating factor in the adverse employment action taken against him. *See, e.g.*, *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 652 (5th Cir. 2004) (addressing Title VII claims for race, color, religion, sex, or national origin discrimination). "'Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.'" *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir. 2003) (Fitzwater, J.) (age discrimination case) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)). A plaintiff who offers "sufficient direct evidence of intentional discrimination should prevail, just as in any other case where a plaintiff meets his burden." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir. 1996) (citing *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 n.6 (5th Cir. 1994)). Because plaintiffs have not

adduced direct proof of race discrimination, they must rely on circumstantial evidence.

If direct evidence is unavailable, plaintiffs can prove discrimination using the "modified *McDonnell Douglas* approach." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (age discrimination case). As modified, *McDonnell Douglas* consists of three stages. First, plaintiffs must establish a prima facie case of discrimination, which "creates a presumption that [YTI] unlawfully discriminated against [them]." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden then shifts to YTI to articulate a legitimate, nondiscriminatory reason for the employment action taken against them. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). YTI's burden is one of production, not proof, and involves no credibility assessments. *See, e.g.*, *West*, 330 F.3d at 385. Finally, if YTI meets its production burden, then plaintiffs may proceed under one of two alternatives: the pretext alternative or the mixed-motives alternative. *See Rachid*, 376 F.3d at 312. Under the pretext alternative, plaintiffs must "offer sufficient evidence to create a genuine issue of material fact . . . that [YTI's] reason is not true, but is instead a pretext for discrimination." *Id.* (internal quotation marks omitted). Under the mixed-motives alternative, plaintiffs must offer sufficient evidence to create a genuine issue of material fact "that [YTI's] reason, while true, is only one of

the reasons for its conduct, and another motivating factor is [plaintiffs'] protected characteristic[.]" *Id.* (internal quotation marks omitted).

C

1

To establish a prima facie case of race discrimination under Title VII, plaintiffs must show that they (1) are members of a protected class, (2) were qualified for the position, (3) were subject to an adverse employment action, and (4) were replaced by someone outside the protected class, or, in the case of disparate treatment, show that other similarly situated employees were treated more favorably. *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004) (addressing discharge-based § 1981 claims); *see also Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005). In this case, except for Ketterer's claims,[6] the first two elements are uncontested.

2

Regarding the third element, the Fifth Circuit "has a strict interpretation of the adverse employment element of [the] prima facie intentional discrimination case" under Title VII and § 1981. *Pegram*, 361 F.3d at 282; *see also Dixon v. Moore Wallace, Inc.*, 2006 WL 1949501, at *8 (N.D. Tex. July 13, 2006) (Fitzwater, J.).

_____

[6]YTI contends that Ketterer—who is Caucasian—is not a member of a protected class. This issue is discussed *infra* at § III(I)(2).

For the purposes of a discrimination claim under these statutes, "[a]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (alteration in original) (citation omitted); *see also Pegram*, 361 F.3d at 282; *Dixon*, 2006 WL 1949501, at *8. *McCoy* held that, although the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), altered the Fifth Circuit's "adverse employment action" standard in the context of *retaliation* claims, it did not affect the standard in the context of *discrimination* claims. *McCoy*, 492 F.3d at 559–60. Thus a plaintiff must show that he was subject to an ultimate employment decision to establish a prima facie case of discrimination.

Plaintiffs maintain that Title VII discrimination claims based on adverse employment actions are not limited to "ultimate employment decisions." And they contend that, even if Title VII claims are so limited, § 1981 claims are distinguishable and do not require an "ultimate employment decision." For support, plaintiffs cite two of this court's opinions: *Wesley v. Yellow Transportation, Inc.*, 2008 WL 294526 (N.D. Tex. Feb. 4, 2008) (Fitzwater, C.J.), and *Hayes v. MBNA Technology, Inc.*, 2004 WL 1283965 (N.D. Tex. June 9, 2004) (Fitzwater, J.).

Plaintiffs' reading of *Wesley* and *Hayes* is reasonable, and

their arguments based on these opinions are on point. But despite what this court wrote in *Wesley* and *Hayes*, it is persuaded that their pertinent holdings do not accurately reflect the current state of the law in this circuit. As the Fifth Circuit explicitly held in *McCoy*, its "precedent recognizing only 'ultimate employment decisions' as actionable adverse employment actions remains controlling for Title VII *discrimination* claims." *McCoy*, 492 F.3d at 560. And, as discussed *supra* at § III(A), "race discrimination claims brought pursuant to section 1981 are governed by the same evidentiary framework applicable to employment discrimination claims under Title VII." *Pegram*, 361 F.3d at 281 n.7. Accordingly, to the extent *Wesley* and *Hayes* hold otherwise, they do not accurately state the governing law of the Fifth Circuit, and neither this court nor plaintiffs can rely on them in this case.[7]

3

The court evaluates the effect of an employment action according to an objective standard. *See Alvarado v. Tex. Rangers*, 492 F.3d 605, 613-14 (5th Cir. 2007) (citing *Pegram*, 361 F.3d at 283); *Dixon*, 2006 WL 1949501, at *9. The Fifth Circuit has frequently admonished "not to expand the definition of adverse employment action to include 'events such as disciplinary filings, supervisor's reprimands, and even poor performance by the

---

[7]Because *Wesley* is still pending, the court is today entering an order in that case that affords the plaintiff the opportunity to address the impact of this decision.

employee—anything that might jeopardize employment in the future.'" *Roberson v. Game Stop/Babbage's*, 152 Fed. Appx. 356, 360 (5th Cir. 2005) (per curiam) (citing *Shackelford*, 190 F.3d at 407).

Neither receiving an increased workload nor being assigned undesirable tasks constitutes an adverse employment action, because neither action is an ultimate employment decision. *See Hart v. Life Care Ctr. of Plano*, 243 Fed. Appx. 816, 818 (5th Cir. 2007) (per curiam) (holding that employee's being assigned more difficult tasks than Hispanic coworkers did not constitute adverse employment action); *Benningfield v. City of Houston*, 157 F.3d 369, 376-77 (5th Cir. 1998) (holding that being assigned an unusually heavy work load is merely administrative matter and not an adverse employment action); *Martin v. Kroger Co.*, 65 F.Supp.2d 516, 539 (S.D. Tex. 1999) (holding that increased work load does not rise to level of adverse employment action). Receiving inferior equipment, including inferior trucks, does not constitute an adverse employment action. *See Rosales v. TXI Operations, LP*, 2005 WL 598195, at *3 (N.D. Tex. Mar. 14, 2005) (Godbey, J.); *Conley v. TXI Operations, LP*, 2004 WL 1672242, at *3 (N.D. Tex. July 26, 2004) (Godbey, J.). It has also been held that receiving unequal break times is not an actionable adverse employment action under Title VII. *See Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 486 (5th Cir. 2008) (holding that denials of break requests were nothing more than "petty slights" or "minor annoyances" and not

actionable); *Stanley v. Univ. of Tex. Med. Branch, Galveston*, 425 F.Supp.2d 816, 824 (S.D. Tex. 2003) ("[S]urely, not receiving equal restroom breaks and being asked to move heavy objects does not rise to the level of an actionable Title VII claim."). Finally, disciplinary warnings and negative performance evaluations do not constitute adverse employment actions because they have only a tangential effect, if any, on ultimate employment decisions. *See Roberson*, 152 Fed. Appx. at 360; *Dixon*, 2006 WL 1949501, at *9; *Cannon v. St. Paul Fire & Marine Ins. Co.*, 2005 WL 1107372, at *3 (N.D. Tex. May 6, 2005) (Godbey, J.) (holding that requiring employee to participate in and complete performance improvement plan was not adverse employment action); *Martin*, 65 F.Supp.2d at 536 ("[N]egative performance evaluations, even if undeserved, are not adverse employment actions giving rise to actionable discrimination claims."). The court now turns to plaintiffs' specific allegations of disparate treatment.

D

Arrieta's disparate treatment claims rest on allegations that he was assigned a heavier work load and that he received inferior trucking equipment. Arrieta avers that he performed extra moves and frequently worked harder than his Caucasian coworkers. He also alleges that Caucasian employees were assigned nicer road units to drive, while he was forced to drive inferior city units. YTI argues that it is entitled to summary judgment on Arrieta's

disparate treatment claims because he has failed to establish a prima facie case of discrimination by not alleging an adverse employment action and not identifying a similarly situated employee who was treated more favorably.

Because the court agrees with YTI that Arrieta has failed to allege an adverse employment action, it need not address whether he identified a similarly situated employee. Neither being assigned a heavier work load nor receiving inferior equipment is an ultimate employment decision. *See, e.g.*, *Benningfield*, 157 F.3d at 376-77 (heavier work load); *Rosales*, 2005 WL 598195, at *3 (inferior equipment). Therefore, Arrieta has failed to establish a prima facie case of disparate treatment, and YTI is entitled to summary judgment on Arrieta's disparate treatment claims brought under Title VII, § 1981, and the TCHRA.

E

1

Calip, a truck driver, argues that YTI discriminated against him based on his race in several ways: (1) he received more undesirable assignments than did Caucasian drivers; (2) he was given inferior equipment; (3) some Caucasian drivers refused to ride with him and complained about him, and other Caucasian drivers who did want to ride with him were not allowed to do so; (4) a dispatcher watched him carefully and called him to see why he was late; (5) he received excessive warning letters and received

warning letters for infractions for which Caucasian employees did not receive them; (6) he was forced to take drug tests that were not truly random; and (7) he was discriminatorily discharged. YTI contends that Calip has not established a prima facie case of disparate treatment because he has not alleged any adverse employment actions and has not identified a similarly situated employee who was treated more favorably.

2

Calip alleges that he received more undesirable assignments than did Caucasian employees. In particular, he posits he was assigned runs that involved driving through Utah, Nebraska, and Oregon during winter months. Calip contends that these runs required more work because chains had to be installed on the truck, and that the runs caused the potential for decreased compensation because snow and ice delays were more likely.

As discussed above, neither receiving undesirable tasks nor an increased work load constitutes an adverse employment action. *See Hart*, 243 Fed. Appx. at 818; *Benningfield*, 157 F.3d at 376-77. Assuming that being assigned winter runs could potentially result in less compensation when compared to a driver assigned only fair weather runs, this effect on compensation is tangential at most and therefore does not constitute an ultimate employment decision. *See Rosales*, 2005 WL 598195, at *3 (holding that truck drivers' being assigned inferior load assignments, which resulted in lower

bonuses, did not rise to the level of ultimate employment decision).

3

Calip further alleges that he and other minority drivers received inferior equipment, including trucks without air conditioning, and that he was forced to ride in a Volvo truck with a partner who weighed over 300 pounds, which warranted the assignment of a larger truck. Assuming *arguendo* that Calip received equipment that was actually inferior, this does not constitute an adverse employment action. *See id.* at *3 (holding that being assigned inferior trucks was not adverse employment action).

4

Calip contends that Caucasian drivers refused to ride with him, that some who did ride with him complained about him to management, and that Caucasian drivers who did want to ride with him could not because they were not senior enough to be his partner. Allegedly, because many drivers did not want to ride with Calip, he received less effective partners and less lucrative runs, which decreased his compensation. In support of these allegations concerning other Caucasian drivers, Calip cites no action at all taken by YTI, much less one that could be construed as an ultimate employment decision.

Calip maintains that Troy Hastings, a Caucasian dispatcher, repeatedly called him to see why he was late delivering a load, confronted him about the way he folded his papers, and watched him carefully.  These actions do not constitute adverse employment actions because they did not implicate any ultimate employment decisions, such as hiring, granting leave, discharging, promoting, or compensating.

Calip contends that he received excessive warning letters and received warning letters for infractions for which Caucasian employees did not receive them.  In particular, Calip asserts that he received warning letters for not making runs he was supposed to make and for being late or absent, and that Caucasian employees did not similarly receive warning letters for such infractions.

Even assuming *arguendo* that the assertions are true, they are insufficient to establish a prima facie case because the receipt of a warning letter or other disciplinary filing does not constitute an adverse employment decision.  As the Fifth Circuit reasoned in *Roberson*, disciplinary warnings or filings have only a tangential effect on ultimate employment decisions and do not constitute adverse employment actions.  *Roberson*, 152 Fed. Appx. at 360; *see also Dixon*, 2006 WL 1949501, at *9.  Indeed, Calip has not alleged that he received any warning letter that has had even the slightest

effect on a YTI employment decision concerning him.

7

Calip alleges that he and other minority workers were subjected to non-random drug tests. Calip has offered no evidence to support this allegation outside of his subjective belief. But even if the court assumes the truth of the allegation, it is insufficient to establish a prima facie case. Being subjected to a drug test, random or not, is not an adverse employment action. *See Dotson v. Gulf*, 2006 WL 44071, at *9 (S.D. Tex. Jan. 9, 2006) ("A drug test does not fall within the scope or definition of an adverse employment action as defined by existing precedent." (citing *Pegram*, 361 F.3d at 282)).

8

Finally, Calip complains that he was discriminatorily discharged after missing a drug test.

a

In December 2004 Calip was selected for a random drug test to be conducted at the Elmbrook Clinic, a medical facility independent of YTI. During the initial test, Calip did not produce sufficient urine, so the clinic instructed him to return to the lobby, drink water, and wait to retake the test. Instead of waiting in the lobby, Calip went out to his car in the clinic's parking lot for an unspecified period of time. When he returned to the lobby, he was informed that his name had already been called to retake the drug

test and that, because he missed the retake, the clinic had contacted Dave Parker ("Parker"), the manager of the YTI distribution center. YTI considered the missed retake a refusal to submit to a drug test, which warranted termination of employment under the CBA,[8] and discharged Calip. Although YTI discharged Calip, he was entitled under the CBA to be reinstated if he completed a drug or alcohol rehabilitation program and passed a reemployment drug test. Calip met these requirements and returned to work in January 2005. Following the discharge and reinstatement, Calip filed a grievance with the Teamsters Union, which denied the grievance. Calip contends that he was discharged based on race.

b

YTI contends that Calip has failed to establish an adverse employment action. The court disagrees. It concludes that, although Calip was reinstated a few weeks after he was terminated, his discharge was an ultimate employment decision that constitutes an adverse employment action.

YTI also maintains that Calip cannot establish a prima facie case because he has not identified a similarly situated employee who was treated more favorably. Calip cites Randy Hill ("Hill"),

---

[8]The CBA provides: "A refusal to provide a urine specimen or undertake a breath analysis will constitute a presumption of intoxication and the employee will be subject to discharge without receipt of a prior warning letter." D. App. 316.

who is Caucasian, as a similarly situated employee. Calip alleges that, although Hill failed a drug test in 2002 or 2003 and was caught smoking "dope" in the YTI parking lot, he was not discharged or otherwise disciplined. YTI replies that Hill is not a similarly situated employee and that Calip has failed to offer admissible summary judgment evidence supporting the allegation concerning Hill.

c

The court will assume *arguendo* that Calip has established a prima facie case based on Hill as a similarly situated employee. This conclusion obligates YTI to produce evidence that it had a legitimate, nondiscriminatory reason for discharging Calip. *See, e.g., Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *5 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 506-07). YTI has met its burden of production. It points to summary judgment evidence that Calip violated company policy by missing a drug test, which was considered a refusal to take a drug test by the Elmbrook Clinic and YTI. Pursuant to the CBA, refusing to take a drug test constitutes a positive test result. Discharging an employee for this misconduct is explicitly authorized by the CBA, and it is a legitimate, nondiscriminatory reason for discharging an employee. *See, e.g., Moore v. Eli Lilly & Co.*, 990 F.2d 812, 816 (5th Cir. 1993) (holding that company's belief that salesman had falsified drug sample records was

"undeniably a legitimate, non-discriminatory reason for its termination of [his] employment"); *Mendez v. Dollar Tree Stores, Inc.*, 114 Fed. Appx. 149 (5th Cir. 2004) (per curiam) (holding that continuing violation of company policy was legitimate, nondiscriminatory reason for terminating employment).

d

Because YTI has satisfied its burden of producing a legitimate, nondiscriminatory reason for Calip's discharge, to survive summary judgment, Calip must create a genuine and material fact issue regarding the ultimate question of discrimination. As noted, under the modified *McDonnell Douglas* approach, Calip can do this in one of two ways. Under the pretext alternative, he can offer sufficient evidence to create a genuine issue of material fact that YTI's reason is not true, but is instead a pretext for discrimination. Under the mixed-motives alternative, he can offer sufficient evidence to create a genuine issue of material fact that YTI's reason, while true, is only one of the reasons for its conduct, and another motivating factor is Calip's protected characteristic. It is not clear under which alternative Calip is challenging YTI's reason for his discharge, but because Calip appears to argue that YTI's proffered reason is untrue, the court will consider his arguments under the pretext alternative.

Calip first argues that he did not miss a drug test because he was available to retake the drug test but was not given an

opportunity to do so.  Although he concedes he was not waiting in the clinic building to retake the drug test, he avers that he was not told he was not permitted to wait in the parking lot.  He further alleges that the clinic employee who testified at his grievance hearing was lying when she said that she not only called his name but went out in the parking lot to tell him he needed to take the test.

This evidence would not enable a reasonable jury to find pretext because they do not concern YTI's reasoning.  The inquiry is not whether Calip actually committed the alleged infraction, but whether YTI believed that he had and based its decision to discharge him on that belief.  *See, e.g., Jackson*, 2006 WL 680471, at *7 ("[T]he inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief." (quoting *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1165-66 (5th Cir. 1993))).  Here, an employee of the Elmbrook Clinic, a medical facility independent of YTI, told YTI that Calip had refused to take a drug test.  In response, Parker terminated Calip's employment.  Calip offers no evidence that would permit a reasonable jury to find that neither Parker nor YTI believed the information the Elmbrook Clinic employee was relaying, or to find that Calip's failure to take the drug test was not the only reason for discharging him.  He merely argues that all the allegations of discrimination he makes in

support of his disparate treatment claims show that Parker and YTI
in fact discharged him because of his race.  Where, as here, a
reasonable jury could only find that an independent medical
facility reported to YTI that Calip had failed to take a drug test
(for which termination was authorized under the CBA), and that a
neutral union grievance committee upheld the termination, the jury
could not find that YTI's reason for terminating him was
pretextual.[9]

9

Accordingly, YTI is entitled to summary judgment dismissing
Calip's claims for race discrimination under Title VII, § 1981, and
the TCHRA.

F

Crommedy's disparate treatment claims appear to be based on a
general allegation that he received a heavier work load than did
Caucasian coworkers and was not allowed to take extended breaks,
and that the EEOC fined YTI for failing to hire enough minorities.

YTI maintains that Crommedy cannot establish a prima facie
case of disparate treatment because he does not allege an adverse
employment action.[10]  The court agrees.  As noted above, neither

_____

[9]Similarly, under a mixed-motives inquiry, Calip has not
offered evidence that would allow a reasonable jury to find that
his race was a motivating factor in YTI's decision to terminate his
employment.

[10]YTI first argues that Crommedy's Title VII and TCHRA claims
were not exhausted because he did not file an EEOC charge.

receiving a heavier work load nor receiving less break time is an adverse employment action. *See Benningfield*, 157 F.3d at 376-77 (heavier work load); *Aryain*, 534 F.3d at 486 (unequal break time). And Crommedy's allegation that YTI failed to hire enough minorities, even if true, provides an insufficient basis for a reasonable jury to find that *Crommedy* was subjected to disparate treatment based on race. YTI did not fail to hire Crommedy. He has been and is employed by YTI. Nor could a reasonable jury find that it took any other adverse employment action against him. Thus YTI is entitled to summary judgment on Crommedy's disparate treatment claims under Title VII, § 1981, and the TCHRA.

---

Crommedy contends that he can "piggyback" on the exhausted claims of the other plaintiffs. Because all of Crommedy's disparate treatment claims fail on the merits, the court will assume *arguendo* that he has exhausted his administrative remedies as to these claims. The court defers discussion of Crommedy's "piggyback" argument until it considers his hostile work environment claims. *See infra* § V(B).

"There is disagreement in this circuit on whether a Title-VII prerequisite, such as exhaustion, is merely a prerequisite to suit, and thus subject to waiver and estoppel, or whether it is a requirement that implicates subject matter jurisdiction." *Pacheco v. Mineta*, 448 F.3d 783, 788 n.7 (5th Cir. 2006). If exhaustion is a prerequisite to subject matter jurisdiction, the court must determine which of Crommedy's claims, if any, are exhausted. *See Hayes*, 2004 WL 1283965, at *2 ("[T]his court is obligated, *sua sponte* if necessary, to note a lack of subject matter jurisdiction[.]") (citing *In re Bowman*, 821 F.2d 245, 246 (5th Cir. 1987)). "Although the court has previously relied on Fifth Circuit precedent in stating that exhaustion is a requirement of subject matter jurisdiction, it has more recently reached the opposite conclusion." *Dixon*, 2006 WL 1949501, at *7 n.12 (citing cases). Because the court adheres to its more recent decisions that hold that exhaustion is not jurisdictional, it may assume *arguendo* that Crommedy exhausted his administrative remedies and reach the merits of his disparate treatment claims.

G

Hernandez alleges that he was discriminatorily discharged, that he received heavier work loads and less break time than did Caucasian employees, and that he was not allowed to drive without his Hazardous Materials ("HazMat") endorsement, while Caucasian employees were permitted to do so.

1

Hernandez's claims of heavier work loads and unequal break times fail because they are not adverse employment actions.[11] *See supra* § III(C)(3).

2

Hernandez's claim concerning his HazMat endorsement also fails. He alleges that, during the period when he did not have a valid HazMat endorsement, he was not allowed to drive a shuttle, and was forced to work the dock or hostle. Hernandez asserts that Bob Miller ("Miller"), a Caucasian, was allowed to drive a shuttle without a valid HazMat endorsement. Because the claim fails on other grounds, the court will assume *arguendo* that Hernandez has established a prima facie case.[12]

_____

[11]YTI also argues that these claims are time-barred. Because the court has already held that these claims do not constitute adverse employment actions, it need not consider this argument.

[12]The court neither holds that prohibiting Hernandez from driving a shuttle without a valid HazMat endorsement is an actionable adverse employment action, nor holds that he has shown that Miller is a similarly situated employee. It merely assumes *arguendo* that Hernandez has established a prima facie case of

The burden has therefore shifted to YTI to proffer a legitimate, nondiscriminatory reason for not allowing Hernandez to drive a shuttle without a valid HazMat endorsement. YTI has adduced summary judgment evidence that operating a shuttle without a valid HazMat endorsement violates Department of Transportation ("DOT") regulations. Abiding by DOT regulations is a legitimate, nondiscriminatory reason for an employment action. *See, e.g.*, *Milton v. Nicholson*, 256 Fed. Appx. 655, 658 (5th Cir. 2007) (holding that attempt to follow government regulations is legitimate, nondiscriminatory reason).

Hernandez has failed to produce evidence that would permit a reasonable jury to find that this reason is a mere pretext for discrimination or only part of the reason for not allowing him to drive a shuttle (another motivating factor of which was his protected characteristic). The only allegation that even arguably supports the contention that YTI's reason was pretextual is Hernandez's subjective belief that Miller was allowed to drive without a HazMat endorsement. This is insufficient to create a genuine issue of material fact concerning YTI's reason. *Cf. Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (holding that "[A]n employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary

disparate treatment.

judgment motion, in the face of proof showing an adequate nondiscriminatory reason[,]" and affirming summary judgment when plaintiff offered in response to employer's legitimate, nondiscriminatory reason only his personal perceptions and speculation that his employer's decision was based on age).

3

The court now turns to Hernandez's discriminatory discharge claim.

YTI terminated Hernandez following a confrontation with Ron Green ("Green"), a Caucasian coworker.[13] During roll call, an employee whom Hernandez believed to be Green yelled to Hernandez, "Go with your girlfriend Ketterer."[14] Ps. App. 881. Angered by this statement and its implications, Hernandez cursed Green, and Green cursed Hernandez in response. Later in the shift, Hernandez approached Green, asked him if he wanted to "take it out in the street," told him he "could run him down," and reminded Green that he "knew where he lived." *Id.* at 887. Green then walked away and complained to management about Hernandez's threats. After the incident, YTI took Hernandez and Green out of service pending an investigation. Following the investigation, YTI issued warning

---

[13]As required, *see supra* note 2, the court considers the facts surrounding the discharge in the light most favorable to Hernandez and draws all reasonable inferences in his favor.

[14]Green denied making the statement, and another employee later admitted that he made the comment but argued that it was not directed at Hernandez.

letters to Hernandez and Green for the initial exchange of curse words, and also discharged Hernandez for the subsequent threats to Green. All of these actions violated YTI's Workplace Threats and Violence Policy. Following his discharge, Hernandez filed a grievance, but a formal grievance committee upheld his discharge. Hernandez now contends that YTI discharged him due to his race.

YTI concedes that Hernandez's discharge constitutes an adverse employment action, but it argues that he cannot establish a prima facie case because he has not identified a similarly situated employee who was treated more favorably. Hernandez contends that he has identified numerous Caucasian employees who have not been terminated after threatening and physically confronting other employees. The court will assume *arguendo* that Hernandez has met the burden of identifying a similarly situated employee who was treated more favorably and has thus established a prima facie case.[15] This conclusion obligates YTI to produce evidence that it terminated Hernandez for a legitimate, nondiscriminatory reason.

YTI has met its burden of production by pointing to summary judgment evidence that Hernandez threatened Green, in violation of YTI's Workplace Threats and Violence Policy. "An employee's violation of a company work rule is a legitimate, nondiscriminatory

_____

[15]YTI has challenged the admissibility of much of the "evidence" that Hernandez has offered to establish that a similarly situated employee has been treated more favorably. Given the court's disposition of Hernandez's claim, it need not address the objections in detail.

reason for discharging him." *Walker v. Norris Cylinder Co.*, 2005 WL 2278080, at *6 (N.D. Tex. Sept. 19, 2005) (Fitzwater, J.). Furthermore, Hernandez admitted that he violated YTI's policy and that he made the statements to Green for which YTI terminated him.

Because YTI has satisfied its burden of production, Hernandez must create a genuine and material fact issue regarding the ultimate question of discrimination. To do so, he may proceed under either the pretext or the mixed motive alternative. Hernandez relies on the pretext alternative; therefore, he can satisfy his burden by showing "that the legitimate reasons offered by [YTI] were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253). That is, he must produce sufficient evidence for a reasonable jury to find either that YTI's proffered explanation is unworthy of credence or that a discriminatory reason more likely motivated YTI's decision to terminate him. *See Burdine*, 450 U.S. at 256. "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 255 n.10).

Hernandez contends that he can demonstrate pretext based on instances where similarly-situated persons were treated more fairly than he was. In particular, he posits that several Caucasian

employees who provoked physical violence or participated in fights were not terminated. Although identifying similarly situated employees who were treated more favorably is enough to establish a prima facie case and may be considered when attempting to establish pretext,[16] it is not independently sufficient here to raise a genuine and material fact issue concerning pretext.[17] Hernandez alleges that some Caucasian employees who violated the Workplace Threats and Violence Policy were not terminated, but he also alleges that some minority employees who violated the policy were *not* terminated, and that other employees, including some Caucasian employees, *were* terminated for violating the policy. Hernandez has not offered evidence that would permit a reasonable jury to find that he was terminated for any reason other than violating the Workplace Threats and Violence Policy, that he was disciplined more

---

[16]As noted, the court is only assuming *arguendo* that Hernandez has identified similarly situated employees who were treated more favorably.

[17]Although *Reeves* teaches that, even without additional evidence of discrimination, a prima facie case "may permit the trier of fact to conclude that the employer unlawfully discriminated," this is true only when the prima facie case is "combined with sufficient evidence to find that the employer's asserted justification is false." *Reeves*, 530 U.S. at 148. The Court in *Reeves* determined that the employee had "made a substantial showing that [the employer's] explanation was false," *id*. at 144, and the employee was not therefore required to adduce additional evidence of discrimination. Hernandez, however, has not shown that YTI's explanation for his termination is false. Accordingly, he cannot simply rest on his prima facie case to satisfy his burden at the pretext stage of the modified *McDonnell Douglas* analysis.

severely because of his race, or that YTI's stated reason for terminating his employment was pretextual.

Hernandez also contends that the fact that his grievance was sent to the formal grievance committee rather than settled informally supports a finding of pretext. He ostensibly argues that the grievances of minority employees are more likely to be sent to the formal grievance committee, and that the formal grievance committee is more likely to deny a grievance or deal more harshly with an employee. This argument is merely speculative. It is not supported by evidence that would enable a reasonable jury to find that the grievances of minorities are more likely to be sent to the formal grievance committee, much less that the formal grievance committee deals with grievances more harshly. "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate[.]" *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (quoting *Douglass*, 79 F.3d at 1429); *see also Lawrence v. Univ. of Tex. Med. Branch*, 163 F.3d 309, 313 (5th Cir. 1999) (per curiam) ("[A] subjective belief of discrimination, however genuine, [may not] be the basis of judicial relief.") (second alteration in original) (quoting *Elliott v. Group Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983))); *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 435 (5th Cir. 1995) ("[B]ald assertions of . . . discrimination are inadequate to permit a finding that proscribed discrimination motivated [the defendant's]

actions against [the plaintiff]."). And even if Hernandez could prove this predicate fact, it would not enable a reasonable jury to find that YTI's proffered reason for terminating him was pretextual. Contrary to Hernandez's argument, the fact that a neutral grievance committee upheld his termination supports the finding that YTI's reason was *not* merely pretextual.[18]

Accordingly, the court concludes that Hernandez has not adduced sufficient evidence to allow a reasonable jury to find that YTI's proffered reason for terminating Hernandez is unworthy of credence or otherwise pretextual. The court holds that YTI is entitled to summary judgment on Hernandez's claims of disparate treatment and discriminatory discharge under Title VII, § 1981, and the TCHRA.

H

1

In support of his disparate treatment claims, Johnson alleges that he was assigned undesirable work tasks, he received warning letters for infractions for which Caucasian employees do not always receive such letters, he was not allowed extended breaks as were Caucasian employees, and that African-American employees are required to proceed to the committee level with their union

---

[18]Hernandez asserts in his response brief that he "question[s] the neutrality of such committees," Ps. Br. 57, but he provides no support for this assertion, and the court can discern from the record no reason to question the committee's neutrality when it comes to the race of the employee.

grievances while Caucasian employees' union grievances are settled locally. Johnson also appears to assert that the following three other actions were discriminatory: a used condom was placed on his forklift; a coworker, Paul DeLuna ("DeLuna"), backed into Johnson's forklift; and, on another occasion, DeLuna almost backed into Johnson's forklift. YTI contends that Johnson has not established a prima facie case of discrimination because none of the alleged actions taken against Johnson constitutes an adverse employment action, and Johnson has not identified similarly situated employees who were treated more favorably.[19]

2

Johnson's claim fails because he has not alleged that YTI took an adverse employment action against him.

First, the three actions allegedly taken against him by his coworkers (placing a condom on his forklift, running into his forklift, and almost running into his forklift) obviously are not adverse employment actions, and they were not taken by YTI in any event.

___

[19]YTI also mentions that these claims fail because Johnson did not identify them in his EEOC charge, and thus failed to exhaust his administrative remedies. To satisfy the exhaustion requirement, however, Johnson need not identify in the EEOC charge every incident on which his lawsuit is based. He may allege any kind of discrimination that is like or related to the allegations contained in the charge. *See, e.g.*, *King*, 2007 WL 2005541, at *4. The claims in question were exhausted because they are sufficiently related to the allegations of discrimination contained in Johnson's EEOC charge.

Second, being assigned undesirable work tasks is not an adverse employment action for the reasons discussed above. *See Hart*, 243 Fed. Appx. at 818; *Benningfield*, 157 F.3d at 376-77.

Third, receiving a warning letter is not an adverse employment action. Disciplinary warnings or filings have only a tangential effect on ultimate employment decisions and do not constitute adverse employment actions. *See Roberson*, 152 Fed. Appx. at 360. Johnson has not alleged, much less adduced evidence, that his receipt of a warning letter has had even the slightest effect on an employment decision.

Fourth, being forced to proceed through a formal grievance process instead of having a grievance settled informally is not an adverse employment action. The Fifth Circuit has held that denying an employee access to an internal grievance process is not an ultimate employment decision. *See Gregory v. Tex. Youth Comm'n*, 111 Fed. Appx. 719, 721 (5th Cir. 2004) (per curiam). If denying access to a grievance process is not an ultimate employment decision, requiring a formal rather than informal grievance process certainly is not one.

Because Johnson has not alleged that an adverse employment action was taken against him, he has not established a prima facie case of disparate treatment, and YTI is entitled to summary judgment dismissing Johnson's disparate treatment claims under Title VII, § 1981, and the TCHRA.

Ketterer's disparate treatment claims rest primarily on allegations that his coworkers have given him a vulgar nickname and that coworkers have provided false statements against him during the investigation of work incidents. He also mentions in passing in his response brief that his terminations supported a race discrimination claim.[20]

2

YTI maintains that Ketterer does not have an actionable race discrimination claim under Title VII, § 1981, or the TCHRA because he is Caucasian and has not been discriminated against because of his race. Ketterer counters that because YTI has discriminated against him based on his association with minorities, he does have an actionable claim.

Although the Fifth Circuit has recognized Title VII discrimination claims based on a close interracial relationship, such as marriage or dating,[21] it has not extended coverage to non-

---

[20]Ketterer was terminated on two occasions for physical altercations with coworkers. Both times he returned to work after serving a suspension.

[21]*See Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 588-89 (5th Cir. 1998), *rev'd in part on other grounds*, 169 F.3d 215 (5th Cir.), *reinstated in relevant part on reh'g en banc*, 182 F.3d 333 (5th Cir. 1999) (en banc) (recognizing Title VII discrimination claim brought by Caucasian female who was dating African-American male).

intimate relationships.  Ketterer offers no argument for why the court should extend Title VII's antidiscrimination provision to cover him, and the court declines to do so on the facts of this case.  Ketterer alleges that he was discriminated against because of a general "association with minorities."  He neither describes the extent of his association nor identifies the minorities with which he associates.  Without deciding whether a non-intimate relationship could ever support a Title VII race discrimination claim, the court declines to extend the reach of Title VII to cover a vague and general association.

To the extent Ketterer asserts that his association with minorities consisted of opposing racial discrimination at YTI, this allegation supports his *retaliation* claim, not his *race discrimination* claim.  *See Burlington N.*, 548 U.S. at 63 (explaining that Title VII's "substantive provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status," while the statute's "anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct").

3

Ketterer's discrimination claims also fail for other reasons. Neither coworkers calling Ketterer a vulgar nickname nor coworkers making false statements against him constitute adverse employment actions taken *by YTI*.

And assuming *arguendo* that Ketterer has established a prima facie case based on being terminated, this claim fails under the modified *McDonnell Douglas* framework. YTI has provided legitimate, nondiscriminatory reasons for terminating Ketterer on both occasions. Regarding the first termination, YTI has presented summary judgment evidence that Ketterer was terminated following a physical altercation with coworker Bob Smiley ("Smiley"). After this incident, Ketterer and Smiley were both terminated, and the police charged Ketterer with simple assault. The second incident involved a physical altercation between Ketterer and coworker Josh Congleton ("Congleton"). Several witnesses provided statements averring that Ketterer pulled Congleton out of his truck and assaulted him. After an investigation, YTI terminated both Ketterer and Congleton for outrageous conduct. The police also charged Ketterer with assault. Assaulting a coworker violates YTI's policies and is certainly a legitimate reason for terminating or suspending an employee. *See Walker*, 2005 WL 2278080, at *6 ("An employee's violation of a company work rule is a legitimate, nondiscriminatory reason for discharging him.").

Ketterer has not offered evidence challenging YTI's reasons for terminating him. He has not argued that the grounds were mere pretexts for discrimination, nor has he posited that YTI was in part motivated by his association with minorities. Because Ketterer has not offered evidence creating a genuine issue of

material fact concerning YTI's legitimate, nondiscriminatory reasons for his terminations, YTI is also entitled on this basis to summary judgment dismissing his discrimination claims under Title VII, § 1981, and the TCHRA.

J

Trevino alleges that YTI has discriminated against him based on his race by assigning him heavier work loads than Caucasian employees receive and by allowing Caucasian employees to take extended breaks. YTI contends that Trevino has not established a prima facie case of disparate treatment because he has failed to allege an adverse employment action and to identify a similarly situated employee who was treated more favorably.

The court need not address whether Trevino has identified a similarly situated employee because it concludes that Trevino has failed to allege an adverse employment action taken against him. As discussed above, neither receiving a heavier work load nor receiving unequal breaks constitute an adverse employment action. Therefore, YTI is entitled to summary judgment dismissing Trevino's disparate treatment claims under Title VII, § 1981, and the TCHRA.

IV

YTI next maintains that it is entitled to summary judgment dismissing plaintiffs' retaliation claims.

Plaintiffs allege that, on numerous occasions and in a variety of ways, YTI has retaliated against them for complaining about and opposing racial discrimination at the company. They bring retaliation claims under Title VII, § 1981, and the TCHRA. Title VII's anti-retaliation provision prohibits employers from "discriminat[ing] against" an employee "because he has opposed any practice made an unlawful employment practice" by Title VII or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). The TCHRA has a similar anti-retaliation provision, and it is applied in the same manner as is the Title VII provision. *See* Tex. Lab. Code Ann. § 21.055 (Vernon 1996 & Supp. 2004-05); *Shackelford*, 190 F.3d at 404 n.2 ("[T]he law governing claims under the TCHRA and Title VII is identical."). Retaliation claims made under § 1981 are also treated the same as are Title VII retaliation claims.[22] For ease of reference, the court will refer only to Title VII in its analysis of plaintiffs' retaliation claims, but the reasoning and holdings apply equally to the claims to the extent brought under § 1981 and the TCHRA. *See Dumas v. Union Pac. R.R. Co.*, 2008 WL 4158736, at *2 n.2 (5th Cir. Sept. 8, 2008) ("When a plaintiff pursues both as parallel causes

---

[22]The Supreme Court recently confirmed that § 1981 encompasses retaliation claims. *See CBOCS W., Inc. v. Humphries*, ___ U.S. ___, 128 S.Ct. 1951, 1961 (2008).

of action, Title VII and § 1981 require the same proof to establish liability.").

Because plaintiffs offer only circumstantial evidence of retaliation, the court will apply the modified *McDonnell Douglas* burden-shifting paradigm.

Under this approach, each plaintiff must first establish a prima facie case of retaliation. To do so, each must demonstrate that (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment action. *Walker*, 2005 WL 2278080, at *9 (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)).

An employee engages in a protected activity by (1) opposing an employment practice made unlawful by Title VII, or (2) by making a charge or testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII. *See Long*, 88 F.3d at 304 (quoting 42 U.S.C. § 2000e-3(a)). The underlying practice need not actually be illegal, but the employee must at least reasonably believe that it is. *See id.*

The adverse employment action element encompasses a broader range of conduct in the retaliation context than it does in the

discrimination context. *See Wooten v. Fed. Express Corp.*, 2007 WL 63609, at *16 (N.D. Tex. Jan. 9) (Fitzwater, J.) ("The Supreme Court has recently broadened the meaning of actionable adverse employment action for the purposes of Title VII retaliation claims." (quoting *Rodriguez v. Gonzalez*, 2006 WL 2844185, at *4 (S.D. Tex. Oct. 2, 2006))), *appeal docketed*, No. 07-10555 (5th Cir. May 18, 2007).

> In [*Burlington Northern*] the Court rejected the "ultimate employment decision" standard—an exclusive list of actions such as hiring, [g]ranting leave, discharging, promoting and compensating. The Court instead adopted the broader "material adverse standard"-meaning an action which might dissuade a reasonable worker from making a charge of discrimination or sexual harassment.

*Rodriguez*, 2006 WL 2844185, at *4 (citing *Burlington N.*, 548 U.S. at 53).[23] The Court emphasized that the employment action must be

_____

[23]YTI argues that none of the plaintiffs has suffered materially adverse employment actions because all, except Crommedy, have filed discrimination charges. It reasons that because plaintiffs actually filed charges, the alleged actions did not, as a matter of law, dissuade them from making a charge. Under the *Burlington Northern* standard, however, the court does not consider whether the plaintiff actually filed a charge, but whether the action "might have dissuaded a reasonable worker" from making a charge. *Burlington N.*, 548 U.S. at 68. The Court adopted a reasonable employee standard to avoid determinations based on a plaintiff's unique subjective feelings. *See id.* Although the two cases that YTI cites—*DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. Appx. 437, 442 (5th Cir. 2007) (per curiam), and *Beaumont v. Texas Department of Criminal Justice*, 468 F.Supp.2d 907, 925 (E.D. Tex. 2006)—both note that the plaintiff filed a charge soon after the alleged employment act, they both held for other reasons that the alleged actions would not dissuade a reasonable employee from making a charge. Accordingly, although the fact that an employee filed a charge may persuade a jury to

*materially* adverse, because "it is important to separate significant from trivial harms," and an employee's engagement in a protected activity "cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, 548 U.S. at 68. The *Burlington Northern* standard is an objective one, and the court judges the seriousness of the action based on the "reactions of a *reasonable* employee." *Id.* "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69.

To state a prima facie case of retaliation against an employer, the adverse employment action alleged by the employee must be made by, or at least imputed to, the employer. The anti-retaliation provision of Title VII prohibits an *employer* from retaliating against employees. *See* 42 U.S.C. § 2000e-3(a). "The statements and actions of ordinary employees are normally not imputable to the employer." *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002) (citing *Long*, 88 F.3d at 306). The Fifth Circuit held in *Long*:

---

find there was in fact no retaliation, the court declines to hold that a retaliation claim is barred on this basis as a matter of law.

> Employers are liable under Title VII, in
> accordance with common law agency principles,
> for the acts of employees committed in the
> furtherance of the employer's business.
> However, we do not hold employers liable under
> Title VII for every discriminatory act
> committed by employees in the workplace
> . . . . [T]he "in furtherance of the
> employer's business" aspect of the doctrine of
> respondeat superior suggests that liability
> requires a direct relationship between the
> allegedly discriminatory conduct and the
> employer's business.

*Long*, 88 F.3d at 306 (citations omitted). Therefore, to establish

a prima facie case of retaliation, plaintiffs cannot rely on

allegedly retaliatory conduct that was not committed by YTI and was

not made in the furtherance of YTI's business.

### 3

As to the third element, the initial requirement that a

plaintiff show a "causal link" between a protected activity and an

adverse employment action is "much less stringent" than the "but

for" causation that a jury must find. *Montemayor v. City of San

Antonio*, 276 F.3d 687, 692 (5th Cir. 2001); *see also Khanna v. Park

Place Motorcars of Houston, Ltd.*, 2000 WL 1801850, at *4 (N.D. Tex.

Dec. 6, 2000) (Fitzwater, J.) (characterizing prima facie burden as

"minimal").

### 4

If plaintiffs establish a prima facie case, the burden shifts

to YTI to articulate a legitimate, nondiscriminatory reason for the

alleged retaliatory action taken. This burden is one of

production, not of proof.  *See Wooten*, 2007 WL 63609, at *16.

If YTI meets its production burden, plaintiffs must adduce evidence that would permit a reasonable jury to find that the adverse employment action would not have occurred but for the protected conduct.  *See Walker*, 2005 WL 2278080, at *9.  "After the employer has produced evidence to rebut the employee's *prima facie* case of retaliation, the showing that the plaintiff must make to establish causation is more onerous than that initially required to present a *prima facie* case."  *Phillips v. Credit Lyonnais*, 2002 WL 1575412, at *8 n.4 (N.D. Tex. July 16, 2002) (Fish, C.J.) (citing *Sherrod v. Am. Airlines*, 132 F.3d 1112, 1122 n.8 (5th Cir. 1998); *Long*, 88 F.3d at 305 n.4).  "The ultimate determination in an unlawful retaliation case is whether the conduct protected . . . was a 'but for' cause of the adverse employment decision."  *Long*, 88 F.3d at 305 n.4.  "[T]iming can sometimes be a relevant factor in determining whether a causal connection exists where the timing between a protected activity and an adverse employment action is 'suspicious[ly]' proximate."  *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 418 n.9 (5th Cir. 2003) (citing *Shackelford*, 190 F.3d at 409).  But evidence of temporal proximity between the protected act and the adverse employment action is alone insufficient to prove "but for" causation.  *See Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).

To prevent future litigants from relying on temporal proximity alone to establish but for causation, we once again attempt to clarify the issue. In *Clark County School District v. Breeden*, the Supreme Court noted that cases that accept mere temporal proximity as sufficient evidence of causality *to establish a prima facie case* uniformly hold that the temporal proximity must be very close. *Breeden* makes clear that (1) to be persuasive evidence, temporal proximity must be very close, and importantly (2) temporal proximity alone, when very close, can in some instances establish a *prima facie case* of retaliation. But we affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but for causation.

*Id.* (addressing Title VII) (citations, internal quotation marks, and ellipsis omitted).

C

The court now analyzes each plaintiff's claims under the modified *McDonnell Douglas* burden-shifting paradigm explained above.

As a preliminary matter, all the plaintiffs have demonstrated that they engaged in a protected activity. All plaintiffs except Calip have shown that, beginning in November 2004, they participated in picketing across the street from YTI's Dallas terminal. The picketing allegedly protested YTI's treatment of minority employees, including differential treatment of minorities in hiring, firing, and resolving grievances.[24] The extent of the

---

[24]Plaintiffs also allege that they individually complained numerous times to YTI management. The court will address these complaints when applicable to its retaliation analysis.

picketing is unclear, but at least some plaintiffs appear to have picketed twice a week during November 2004 and again in late 2005. YTI does not seriously dispute that plaintiffs engaged in protected activities, but it does contest that they suffered adverse employment actions and that plaintiffs have established a causal link between a protected activity and an adverse employment action. Therefore, the court focuses on these two elements.

1

Arrieta's retaliation claim rests on allegations that, after he picketed across the street from YTI, he received heavier work loads and his car was vandalized. Arrieta's allegations do not establish a prima facie case of retaliation. The vandalizing of his car is not an adverse employment action that can be imputed to YTI. Arrieta has offered no evidence tying the vandalism to YTI or suggesting that it was done in furtherance of YTI's business.

Arrieta also alleges that his supervisor, Jim Garner ("Garner"), retaliated against him by assigning him heavier work loads. YTI first argues that being assigned heavier work loads cannot constitute an adverse employment action, even in the retaliation context. To the contrary, *Burlington Northern* holds that assigning an employee a heavier work load or more arduous tasks *can* constitute an adverse employment action in the retaliation context. *See Burlington N.*, 548 U.S. at 70-71. A heavier work load, however, is not automatically actionable. The

Court noted that "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* at 71 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). This court will therefore consider whether a jury could reasonably find from Arrieta's evidence that a reasonable employee would have found the alleged heavier work load materially adverse.

Arrieta alleges that Garner assigned him several tasks in retaliation for picketing. First, on January 3, 2006 Garner asked him three times to replace a single axle tractor with a sleep tractor, a task that Arrieta alleges Garner was not authorized to assign to him. On January 9 Garner assigned Arrieta a move that involved setting a greasy stem pole, a task Arrieta believed should have been given to certain Caucasian employees. On January 10 Garner instructed Arrieta to replace a single axle sleep tractor with a tandem axle sleep tractor because the employee who was supposed to perform this task was in a meeting. Then, on February 25, 2006 Garner assigned him a hot-freight move that Arrieta says he should not have been assigned.

Considering all the circumstances, the court concludes that a reasonable jury could not find that these assignments were materially adverse. In a work environment such as this, where dock

workers receive dozens of assignments during a single shift, being assigned a handful of assignments one does not think he should have been assigned in the course of a week or a month would not dissuade a reasonable worker from making a charge of discrimination. Arrieta has not provided evidence that these assignments were worse than, or even materially different from, the assignments he normally performed. These assignments do not rise above the level of the "minor annoyances" that all employees experience, and that *Burlington Northern* holds do not constitute adverse employment actions. *See id.* at 68. Because Arrieta has failed to allege an adverse employment action, he cannot establish a prima facie case of retaliation. Therefore, YTI is entitled to summary judgment dismissing Arrieta's retaliation claims brought under Title VII, § 1981, and the TCHRA.

2

Calip alleges that YTI retaliated against him by denting his car, subjecting him to non-random drug tests, issuing him excessive warning letters, and assigning him fewer and less profitable loads than Caucasian drivers received. The court need not decide whether any of this conduct constitutes an adverse employment action because Calip provides no evidence linking the acts to a protected activity.

Calip makes a general allegation that YTI retaliated against him after he complained of discrimination, but the only complaint

of which he provides evidence is a February 2006 meeting with Tammy Hardge ("Hardge"), the Human Resources Director at YTI's Dallas terminal. Calip provides no evidence that would permit a reasonable jury to find that the alleged retaliatory acts occurred within close temporal proximity to this meeting, and all of the evidence indicates that the acts occurred *before* this meeting and that most of the alleged acts were, in fact, what Calip complained of during the meeting. Because Calip has not established a causal link between the alleged retaliatory acts and a protected activity, he has failed to establish a prima facie case. YTI is entitled to summary judgment dismissing Calip's retaliation claims under Title VII, § 1981, and the TCHRA.

3

Crommedy alleges that, since complaining of discrimination at YTI, his car was vandalized, the air line to his hostling mule was cut, he was cut off in the parking lot by a fellow employee, he was watched closely by his supervisor, he was given a heavier work load, and he received several warning letters. He argues that all these acts were undertaken in retaliation for his protests and complaints.

The court concludes in part that Crommedy has not established a prima facie case of retaliation.[25] The vandalizing of Crommedy's car and hostling mule cannot be imputed to YTI. Crommedy acknowledged that he does not know who performed either act of vandalism, and there is no evidence tying the acts to YTI supervisors or management. Similarly, being cut off in the parking lot by a fellow YTI employee is not an act of retaliation that can be imputed to YTI, because it is not in furtherance of YTI's business.

Crommedy also alleges that Ken Mink ("Mink"), a YTI city dispatcher, retaliated against him by watching his time card, frequently calling him on his radio to check up on him, and verbally warning him for taking too much break time. Crommedy has not alleged that he was harmed in any way by this conduct. These allegations are nothing more than petty slights and minor annoyances, and thus do not constitute adverse employment actions. Although plaintiffs' briefing mentions that Crommedy received a heavier work load, it neither describes the heavier work load nor cites evidence in the record that supports this assertion. Thus there is no evidence that would allow a reasonable jury to find that the alleged heavier work load was materially adverse.

---

[25]The court again assumes *arguendo* that Crommedy has exhausted his administrative remedies. *See supra* note 10.

Because it does not affect the outcome, the court will assume *arguendo* that Crommedy has established a prima facie case of retaliation based on the receipt of certain warning letters that he alleges he received in retaliation for opposing discrimination.

Crommedy received the first warning letter on March 21, 2005 for damaging a handheld computer.  He alleges that he did not damage the handheld computer and surmises that it was damaged after he returned it.  Crommedy received a second warning letter in June 2005 for pulling a trailer out the wrong door.  He admits that he pulled the trailer out of the wrong door, in violation of the rules, but he complains that other people who did the same did not receive warning letters.  He has not identified any of these other people.  Both warning letters were allegedly issued in retaliation for picketing that was occurring around that time.  Last, Mink issued Crommedy a written warning in August 2006 for failing to make a scheduled pick-up.  Crommedy again admits that he failed to make the pick-up, but he alleges that Caucasian drivers do not always receive warning letters for missing pick-ups.  This warning was allegedly in retaliation for filing the present lawsuit in November 2005.

YTI has introduced evidence of legitimate, nondiscriminatory reasons for all three warning letters.  According to YTI's proof, Crommedy committed all the acts on which the warning letters were

based, and the issuance of the letters was in accordance with company rules. Crommedy is therefore obligated to produce sufficient evidence for a reasonable jury to find that he would not have received these warning letters but for his participation in the protected activities.

Crommedy has not met this burden. He relies solely on the alleged temporal proximity between the protected acts and the issuance of the letters to show but for causation. But the Fifth Circuit has explicitly held that temporal proximity alone is insufficient to establish but for causation.[26] *See Strong*, 482 F.3d at 808. Therefore, Crommedy has not met his summary judgment burden, and his retaliation claims under Title VII, § 1981, and the TCHRA must be dismissed.

## 4

Hernandez appears to rest his retaliation claim solely on his discharge.[27] YTI terminated Hernandez on March 20, 2007 for

---

[26]Plaintiffs argue that close temporal proximity is enough to raise a genuine issue of material fact concerning but for causation, but, as discussed, the Fifth Circuit has held otherwise. *See supra* § IV(B)(5).

[27]In his deposition, Hernandez mentions in passing several other acts of "retaliation." He alleges that YTI did not donate money to his outside activities and the charities he supported, YTI arranged for unknown individuals in private cars to throw objects at his truck, he was called an "instigator," and a coworker placed a dead rat on his doorstep. He does not mention these in his response brief, however, and makes no attempt to link them to a protected activity. Even if he did, none of these acts rises to the level of an adverse employment action, and thus none can support a prima facie case of retaliation.

outrageous conduct, which consisted of confronting and threatening a coworker. Because the court has already discussed the circumstances leading to Hernandez's discharge, *see supra* § III(G)(3), it need not repeat them here. Hernandez alleges that YTI fired him in retaliation for filing an EEOC charge seven months beforehand and for complaining approximately one week before his discharge about discrimination in connection with the failure to investigate a threat made against him.

The court will assume *arguendo* that Hernandez has established a prima facie case of retaliation. As discussed above, YTI has offered a legitimate, nondiscriminatory reason for Hernandez's discharge. *See supra* § III(G)(3). The burden has therefore shifted to Hernandez to provide sufficient evidence to enable a reasonable jury to find that he would not have been discharged but for his complaints.

Hernandez has failed to satisfy this burden. In attempting to show but for causation, Hernandez relies only on the alleged close temporal proximity of a protected action and his belief that similarly situated Caucasian employees were not discharged for similar conduct. This is insufficient to enable a reasonable jury to find that Hernandez would not have been discharged but for his complaints, especially when it is considered that Hernandez admitted both that he committed the acts for which he was discharged and that the acts violated the CBA, and that a neutral

grievance committee upheld Hernandez's discharge. Because Hernandez has not presented evidence that would enable a reasonable jury to find the essential element of but for causation, his retaliation claims fail under Title VII, § 1981, and the TCHRA, and YTI is entitled to summary judgment.

5

Johnson's retaliation claims rest on allegations that someone placed a used condom on the shifter of his forklift and that DeLuna, a coworker, twice ran his forklift into Johnson's. He alleges that these acts were committed in retaliation for his complaining to YTI management about racial discrimination. Johnson has failed, however, to offer a basis for a reasonable jury to find that YTI is responsible for these acts or that they are adverse employment actions that are imputable to YTI. Johnson has therefore failed to establish a prima facie case of retaliation against YTI, and YTI is entitled to summary judgment on Johnson's retaliation claims brought under Title VII, § 1981, and the TCHRA.

6

Ketterer alleges that the following acts were taken in retaliation for his opposition to racial discrimination at YTI: (1) coworkers called him racial names; (2) a coworker threw a firecracker at him; (3) a group of coworkers intimidated him by circling him with their buggies while he was in the yard; (4) his supervisors stared at him and did not have casual conversations

with him; (5) he was assigned more work and dirtier jobs; and (6) he was discharged and reinstated without backpay following an altercation with a coworker. These alleged acts cannot support a retaliation claim for the following reasons.

A reasonable jury could not find that the first three acts are imputable to YTI, because they were made by ordinary employees and were not made in furtherance of YTI's business. The allegation that his supervisors stared at him and did not have casual conversations with him, but instead only talked business, is not materially adverse because it would not dissuade a reasonable employee from making a charge of discrimination. Although receiving more and dirtier work can constitute a materially adverse employment action in some situations, Ketterer does not offer any summary judgment evidence showing that he in fact received such work, much less that his assignments were causally linked to a protected activity. Bald assertions of "more work" and "dirtier jobs" without any evidence of more assignments or even a timeframe within which an increased work load occurred would not permit a reasonable jury to find that he has made a prima facie case of retaliation.

Finally, Ketterer alleges that his discharge and reinstatement without backpay were retaliatory. He does not indicate, however, what they were in retaliation for, and he cites no evidence of a causal link between them and his participation in a protected

activity. Even if a causal link could be established, YTI has provided evidence of a legitimate, nondiscriminatory reason for Ketterer's discharge and reinstatement without backpay. *See supra* § III(I)(3).[28] And Ketterer has failed to offer any evidence that would enable a reasonable jury to find that he would not have been subject to these actions but for his participation in some protected activity. Because none of Ketterer's allegations can support a claim of retaliation, YTI is entitled to summary judgment dismissing his retaliation claims under Title VII, § 1981, and the TCHRA.

7

Trevino alleges that one of his supervisors, Wayne Scott ("Scott"), retaliated against him on several occasions for opposing racial discrimination at YTI.[29] Most of the retaliatory acts that Trevino alleges cannot be viewed as materially adverse employment actions and are nothing more than minor annoyances that employees

---

[28]After an investigation, YTI discharged both Ketterer and Congleton, a coworker, for a physical altercation between the two. Ketterer refused union representation and negotiated his own reinstatement, which did not include backpay.

[29]Trevino also alleges that Audy Maggard retaliated against him by responding to Trevino's accusation that he was a liar with the statement, "This is an A/B conversation. C your way out." This is not an adverse employment action.

In addition, Trevino asserts that he switched from his preferred shift because Caucasian employees could get away with doing whatever they wanted to do. Because in making this assertion he does not identify a retaliatory act, the allegation cannot support a prima facie case of retaliation.

commonly experience.

Trevino alleges that Scott assigned him the task of moving a trailer that was in an area where he was not supposed to be working, but Trevino admits that this assignment was retracted after it was brought to Scott's attention. On another occasion, Scott asked Trevino to pull a trailer on the west side of the dock when Trevino was assigned to work the east side. Trevino did not perform this assignment. On October 28, 2006 Scott allegedly checked Trevino's production during the first 45 minutes of his shift. Trevino was not disciplined or even confronted because of his production on that day. On a few other days, Trevino had to work one side of the dock by himself. He alleges that the usual routine was for him to have help. Trevino acknowledges that on at least one of these instances, the other side of the dock was given extra help because it was behind, and he offers no evidence regarding the circumstances on the other days he was required to work alone. On Memorial Day 2006 Trevino's bid sheet was misplaced, and he was not allowed to work. After filing a grievance, he was paid for these hours.

The only acts that a reasonable jury could find of adverse employment actions are the written warnings that Scott issued to Trevino. Trevino alleges that he reported to Hardge that a racial slur was carved into a sleeper tractor in January 2006, and that Scott retaliated against him a few days later by issuing him three

warning letters.[30]    These warning letters concerned a string of incidents occurring on the same day.  Trevino admits to all of the conduct for which he received the letters.  He allegedly hurt his back moving trailers.  Instead of immediately reporting the injury, which he was required to do under company policy, Trevino left his workstation without permission and wandered around the terminal for nearly one hour and fifteen minutes.  During this time, Trevino admits that he got coffee, looked at bids, stretched his legs, spoke to a fellow employee, and performed no moves.  Also during this time period, Scott called him on his radio and instructed him to perform his assigned moves.  Trevino did not inform Scott that he was hurt at this time, but instead told him to assign the moves to someone else, and he immediately shut off his radio.  Later, over two hours after he allegedly hurt his back, Trevino informed Scott of his injury.  Scott issued Trevino three warning letters for his conduct.  The first was for abusing company time, in violation of the CBA, and it referenced Trevino's leaving his workstation without permission and wandering around the terminal. The second warning was for failing to report an injury immediately, which he was required to do under company policy.  Scott also

_____

[30]Trevino received another warning letter in July 2006 for admittedly leaving his workstation 30 minutes early to put his belongings in his car and go to the restroom.  Because he offers no evidence causally linking this letter to a protected activity, this act cannot, as a matter of law, support a prima facie case of retaliation.

issued Trevino a third warning letter for failing to follow instructions, which is a violation of the CBA.

Although it is not clear that receiving warning letters for admittedly violating company policy constitutes materially adverse employment actions, the court will assume *arguendo* that they do and that Trevino has established a prima facie case of retaliation.[31] YTI thus has the burden of producing legitimate, nondiscriminatory reasons for the warning letters, a burden that it has satisfied. Scott issued all three warning letters to Trevino for conduct he admitted to and that violated the CBA. Because YTI has produced evidence of these reasons, Trevino must provide proof that would permit a reasonable jury to find but for causation.

Trevino has not met this burden. He relies solely on the close temporal proximity of the warning letters to Trevino's complaint to Hardge. Temporal proximity alone is insufficient to establish but for causation. *See Strong*, 482 F.3d at 808. Therefore, YTI is entitled to summary judgment dismissing Trevino's claims of retaliation under Title VII, § 1981, and the TCHRA.

V

Finally, the court considers plaintiffs' hostile work environment claims brought under Title VII, § 1981, and the TCHRA.[32]

---

[31]The court also assumes *arguendo* that Scott knew of Trevino's complaints to Hardge.

[32]With the exception of the differing time bars discussed below, courts apply the same standard to hostile work environment

To establish a prima facie case of a racially hostile work environment, each plaintiff must show that (1) he belongs to a protected group, (2) he was subject to unwelcome harassment, (3) the harassment complained of was based on race, (4) the harassment complained of affected a term, condition, or privilege of employment, and (5) YTI knew or should have known of the harassment in question and failed to take prompt remedial action. *See Ramsey*, 286 F.3d at 268.[33]

"Harassment is based on race if 'the complained-of conduct had a racial character or purpose.'" *King v. Enter. Leasing Co. of DFW*, 2007 WL 2005541, at *10 (N.D. Tex. July 11, 2007) (Fitzwater, J.) (quoting *Harris-Childs v. Medco Health Solutions, Inc.*, 2005 WL 562720, at *6 (N.D. Tex. Mar. 10, 2005) (Means, J.)). Moreover, plaintiffs must demonstrate a "connection between the allegedly harassing incidents and [their] protected status." *Id.*

To satisfy the fourth element, plaintiffs must demonstrate

---

claims brought under Title VII, § 1981, and the TCHRA. *See, e.g.*, *Jackson*, 2006 WL 680471, at *9-*12 (applying same standard to hostile work environment claims brought under all three statutes).

[33]The fifth element need not be established if the harassment is allegedly committed by the victim's supervisor. *Celestine v. Petroleos de Venez. SA*, 266 F.3d 343, 353-54 (5th Cir. 2001); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998). Little, if any, of the harassment in this case was allegedly committed by a YTI supervisor. In any case, the court does not rest any of its conclusions on a failure to satisfy the fifth element of the prima facie case.

that the harassment affected a term, condition, or privilege of
employment. "For harassment on the basis of race to affect a term,
condition, or privilege of employment . . . it must be
'sufficiently severe or pervasive to alter the conditions of the
victim's employment and create an abusive working environment.'"
*Ramsey*, 286 F.3d at 268 (internal quotation marks omitted) (quoting
*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To be
actionable, the work environment must be "both objectively and
subjectively offensive, one that a reasonable person would find
hostile or abusive, and one that the victim in fact did perceive to
be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)
(addressing sex discrimination) (citing *Harris*, 510 U.S. at 21-22).
"In determining whether a workplace constitutes a hostile work
environment, courts must consider the following circumstances: 'the
frequency of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an
employee's work performance.'" *Ramsey*, 286 F.3d at 268 (quoting
*Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000)). As the
Supreme Court has stated:

> The real social impact of workplace behavior
> often depends on a constellation of
> surrounding circumstances, expectations, and
> relationships which are not fully captured by
> a simple recitation of the words used or the
> physical acts performed. Common sense, and an
> appropriate sensitivity to social context,
> will enable courts and juries to distinguish

> between simple teasing . . . and conduct which
> a reasonable person in the plaintiff's
> position would find severely hostile or
> abusive.

*Oncale*, 523 U.S. at 81-82. Merely offensive conduct is not actionable. *Harris*, 510 U.S. at 21.

B

As a preliminary matter, the court must decide whether Crommedy's hostile work environment claims brought under Title VII and the TCHRA are barred for failure to exhaust his administrative remedies. It is undisputed that Crommedy failed to file a charge with the EEOC or the TCHR.

To seek Title VII relief, a complaining employee must ordinarily exhaust his administrative remedies. *See Pacheco v. Mineta*, 448 F.3d 783, 788 n.7 (5th Cir. 2006). Exhaustion does not occur until the plaintiff files a timely charge with the EEOC and is entitled to receive a "right-to-sue" letter. 42 U.S.C. § 2000e-5(e) and (f); *see also Taylor v. Books a Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002). The purpose behind this requirement is to ensure "that the settlement of grievances be first attempted through the office of the EEOC." *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498 (5th Cir. 1968). "The lawsuit that follows is limited in scope to the EEOC investigation that could reasonably be expected to grow out of the charge of discrimination. In other words, the complaint may encompass any kind of discrimination 'like or related to' allegations contained in the EEOC charge." *Hayes*,

2004 WL 1283965, at *3 (citations omitted).

In certain circumstances, however, the Fifth Circuit has allowed a Title VII plaintiff to "piggyback" on the allegations contained in another Title VII plaintiff's EEOC charge. *See Price v. Choctaw Glove & Safety Co.*, 459 F.3d 595, 598 (5th Cir. 2006). This "carefully limited exception" to the Title VII exhaustion requirement enables plaintiffs who have not filed EEOC charges to "join or intervene in a lawsuit in which the original, similarly situated plaintiff had fully exhausted the administrative requirements." *Id.* This exception only applies, however, if the non-filing plaintiff is similarly situated to the filing plaintiff, the EEOC charge provided notice of the collective or class-wide nature of the charge, and the individual who filed the EEOC charge filed a lawsuit that the non-filing plaintiff is permitted to join. *Id.* at 599 (citing *Bettcher v. Brown Schs., Inc.*, 262 F.3d 492, 494 (5th Cir. 2001)).

YTI contends that it is entitled to summary judgment on Crommedy's Title VII claims because he did not file an EEOC charge and therefore failed to exhaust his administrative remedies. It also posits that Crommedy cannot piggyback on the charges of the other plaintiffs because all of their claims are distinct and he is not similarly situated. Crommedy asserts independent claims alleging harassment that was personal to him.

Crommedy responds in a footnote in his response brief that he

should be permitted to piggyback on the other plaintiffs' claims. His argument consists primarily of the conclusory statements that he is similarly situated to the other plaintiffs and that their charges provided some notice to YTI of the collective nature of their charges. He does not offer any explanation or argument to show how he is similarly situated to the other plaintiffs or how their charges provided the requisite notice to YTI.

Given the purpose of the exhaustion requirement and the limited nature of the piggybacking exception, a plaintiff may not simply assume that his independent, non-exhausted claims can be supported by the independent claims of others. The court declines under these circumstances to extend this "carefully limited exception" to the exhaustion requirement. YTI is entitled to summary judgment dismissing Crommedy's Title VII hostile work environment claim.

YTI is also entitled to summary judgment dismissing Crommedy's TCHRA-based hostile work environment claim. The TCHRA also requires exhaustion of administrative remedies, *see Jones v. Grinnell Corp.*, 235 F.3d 972, 973 n.1 (5th Cir. 2001), and Crommedy does not even attempt to argue that this failure to exhaust should be excused.[34]

---

[34]Because Crommedy was not required to administratively exhaust his § 1981-based hostile work environment claim, the court will address it on the merits below.

Plaintiffs aver that a plethora of incidents involving race-based harassment occurred at YTI. Among them is the use of racial slurs, racial graffiti and drawings throughout the premises, the displaying of nooses, the vandalizing of minorities' cars and equipment, and the physical intimidation of minorities. Plaintiffs' response brief contains over 20 pages of examples of alleged racial harassment.[35]

To establish a hostile work environment claim, however, a plaintiff must personally experience racial harassment. The court will therefore consider the harassment that a reasonable jury could find that plaintiffs experienced. *See, e.g.*, *Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir. 2005) (holding that harassment experienced by other women was irrelevant when determining whether harassment that plaintiff experienced was sufficiently severe or pervasive to establish hostile work environment claim).

YTI maintains that the court may only consider, and plaintiffs may only rely on, harassment that allegedly occurred within the applicable limitations period. The court disagrees. "A hostile work environment claim necessarily involves 'the cumulative [e]ffect of individual acts,' and evidence presented in support of

_____

[35]To be sure, not all of the examples are admissible summary judgment evidence, but many are. The court need not list the inadmissible evidence at this time because it bases its decision only on the admissible evidence that it discusses in this memorandum opinion and order.

these claims may fall outside of the statutory period." *Abner v. Kan. City S. R.R. Co.*, 513 F.3d 154, 166 (5th Cir. 2008) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). *Abner* adopts the following passage from the Supreme Court's *Morgan* decision:

> It does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that *an act contributing to the claim* occurs within the filing period, *the entire time period of the hostile environment may be considered* by a court for the purposes of determining liability.

*Id.* (quoting *Morgan*, 536 U.S. at 117). In deferral states such as Texas, a Title VII plaintiff must file an EEOC charge within 300 days of an allegedly unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e)(1). Under the TCHRA, an employee must make a charge not later than 180 days after the alleged practice. *See* Tex. Lab. Code Ann. § 21.202(a) (Vernon 2007). Claims brought under § 1981 are generally subject to a four-year limitations period. *See Jones v. R & R Donnelley & Sons Co.*, 541 U.S. 369, 382-83 (2004). The court must therefore find that plaintiffs have alleged that an act contributing to their hostile work environment claims occurred during these periods.

D

1

After considering plaintiffs' evidence and drawing all inferences in their favor, the court holds that there are genuine issues of material fact that preclude summary judgment on the hostile work environment claims of Arrieta, Calip, and Johnson brought under Title VII, § 1981, and the TCHRA, and of Crommedy brought under § 1981.[36]  These plaintiffs are all members of a protected class: they are either African-American or Hispanic.  And a reasonable jury could find that they were all subject to race-based harassment, of which at least one act occurred within 180 days of their filing a charge.  The following are examples[37] of these plaintiffs' evidence of race-based harassment: (1) Arrieta observed racially offensive graffiti, including offensive remarks about Hispanics, on a continuous basis during his employment, and his car, locker, and equipment were vandalized because of his race; (2) Calip observed the remains of a noose, saw a racial epithet carved into the dashboard of a truck, and saw racially offensive graffiti in employee bathrooms on numerous occasions; (3) Crommedy

_____

[36]As discussed *supra* at § V(B), Crommedy's Title VII and TCHRA claims fail as a matter of law because he failed to exhaust administrative remedies.

[37]When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact.  *See, e.g., Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.).

observed a noose, constantly observed threatening and offensive graffiti aimed at African-Americans, and his car and equipment were vandalized; and (4) Johnson observed nooses on three occasions, he saw racial epithets written on walls on numerous occasions, he was the subject of racially offensive cartoons, another employee purposely ran into his forklift and made racially derogatory comments, and his car was vandalized on several occasions.[38]

2

Given the frequency and threatening nature of the alleged harassment, the court concludes that there is a genuine issue of material fact regarding whether the harassment was so pervasive or severe that it affected a term, condition, or privilege of plaintiffs' employment.  The Fifth Circuit has recognized that "[t]he making of nooses is at least arguably objectively offensive, as it evokes the image of race-motivated lynching," and that "[t]he frequent making of nooses, coupled with the presence of allegedly offensive racial remarks and the presence of [Ku Klux Klan] graffiti at the worksite raise a fact issue regarding whether the

---

[38]YTI argues that Johnson cannot base his claim of a hostile work environment on allegations of racial graffiti and nooses because he did not explicitly identify these incidents in his EEOC charge, and thus failed to exhaust administrative remedies.  To satisfy the exhaustion requirement, however, Johnson is not required to identify every incident he raises in his complaint. Instead, he may allege any kind of discrimination that is like or related to the allegations contained in his EEOC charge.  *See, e.g.*, *King*, 2007 WL 2005541, at *4.  The allegations of nooses and racial graffiti are sufficiently related to the allegations of racial harassment contained in Johnson's EEOC charge.

work atmosphere . . . was racially hostile." *Bell v. Ingalls Shipbuilding, Inc.*, 207 F.3d 657, at *1 (5th Cir. 2000) (per curiam) (unpublished table decision) (reversing summary judgment in part); *see also Wesley*, 2008 WL 294526, at *19 (citing *Bell* and holding that presence of nooses and racial graffiti in workplace created genuine issue of material fact concerning whether employee's employment was affected). The Fifth Circuit has also recently held that African-American employees who testified to seeing wires in the shape of nooses and racially derogatory graffiti presented sufficient evidence for a reasonable jury to find that they experienced a hostile work environment. *See Abner*, 513 F.3d at 167. In the present case, Calip, Crommedy, and Johnson, all three of whom are African-American, allege that they have observed nooses and racially offensive or threatening graffiti at YTI. There is evidence that all three found this environment hostile. The court holds that a reasonable jury could find that the environment was objectively offensive.

Arrieta has produced evidence that he observed offensive graffiti directed at Hispanic employees, and that his car, locker, and equipment were vandalized. Although there is some evidence that the vandals were not motivated by Arrieta's race, he has introduced evidence that they were racially motivated. When the evidence is viewed in the light most favorable to Arrieta, the court holds that a reasonable jury could infer that the harassment

Arrieta experienced was based on his race and was severe enough to affect a term, condition, or privilege of his employment.

3

Under the fifth element of a hostile work environment claim, plaintiffs must establish that YTI knew or should have known of the harassment in question and failed to take prompt remedial action. Plaintiffs have raised a genuine issue of material fact as to this element. The court concludes that plaintiffs have created a fact issue regarding whether YTI had constructive knowledge of the race-based harassment.[39]

An employer has constructive knowledge of racial harassment "if through the exercise of reasonable care it should have known what was going on but failed to address it," or, in other words, "[i]f the harassment complained of is so open and pervasive that the employer should have known of it, had it but opened its corporate eyes." *Sharp v. City of Houston*, 164 F.3d 923, 930 (5th Cir. 1999). Here, plaintiffs have adduced evidence that racial graffiti could be observed throughout YTI's premises and that the remains of a noose hung on the dock for an extended period of time. Plaintiffs do not rely on covert harassment, but on harassment that

---

[39]Plaintiffs allege that YTI had actual knowledge of much of the harassment, and there is evidence that plaintiffs complained to YTI management on several occasions. At this stage of the litigation, the court need not parse through the conflicting evidence concerning how much of the harassment YTI actually knew about because it concludes that plaintiffs have raised a genuine fact issue regarding YTI's constructive knowledge.

a reasonable jury could find that YTI would have known about in the exercise of reasonable care.

YTI argues that, if harassment did occur, it took prompt remedial action in response. There is at least a genuine issue about whether this is so. YTI's evidence of prompt remedial action consists largely of instances in which it painted over racial graffiti. Even if it is conceded that YTI removed graffiti on numerous occasions, there is a fact issue as to whether it did so promptly. Plaintiffs have offered evidence that some racially offensive graffiti went untouched for months. And the harassment on which plaintiffs rely consists of much more than a few incidents of graffiti. Given the pervasive nature of the alleged harassment, which occurred over many years, a reasonable jury could find that YTI failed to promptly remedy the racial harassment. Therefore, Arrieta, Calip, Crommedy, and Johnson have successfully established a prima facie case of hostile work environment.

4

YTI argues that the plaintiffs' hostile work environment claims fail because they did not take advantage of available remedial opportunities. It contends that plaintiffs did not complain to management about all of the alleged incidents of harassment,[40] even though YTI had a complaint procedure in place.

---

[40]Plaintiffs provide evidence that they did complain about many of the incidents of harassment.

To be entitled to summary judgment, YTI must establish that plaintiffs unreasonably failed to take advantage of corrective opportunities. *See Wesley*, 2008 WL 294526, at *19 (citing *Woods v. Delta Beverage Group*, 274 F.3d 295, 300 n.3 (5th Cir. 2001), and *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 299 (4th Cir. 2004)). Unreasonable failure to take advantage of corrective opportunities is an affirmative defense that YTI has the burden of proving at trial. Accordingly, at the summary judgment stage, YTI has the burden of establishing all of the elements of the defense "beyond peradventure." *See id.* (citing *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F.Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.). The court has noted that the "beyond peradventure" standard is "heavy." *See, e.g., Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.).

YTI's showing is insufficient to meet this heavy burden. Although it has alleged that plaintiffs failed to complain to management about some of the harassment, YTI has not established beyond peradventure that the failure to complain was unreasonable. And plaintiffs have adduced evidence that they believed complaining was futile given YTI's repeated failure to remedy the harassment. They also allege that they feared retaliation from coworkers if they complained. Even if this evidence would be insufficient if plaintiffs had the burden of proof on this element, because YTI has

the burden, and because it is a heavy one, the court holds that YTI is not entitled to summary judgment on this basis.

E

The court concludes, however, that YTI is entitled to summary judgment on the hostile work environment claims of Hernandez, Trevino, and Ketterer.

1

A reasonable jury could not find that either Hernandez or Trevino suffered harassment based on their race that was severe enough to affect their employment at YTI. Hernandez only alleges two incidents of harassment that a reasonable jury could conclude were based on his race.[41] A coworker allegedly called him a "wetback" on one occasion, and he found a poster referring to "wetbacks" on another occasion. Although plainly offensive to a Hispanic person, these two incidents occurring during a period of more than one decade of employment at YTI do not constitute harassment sufficiently pervasive or severe to affect Hernandez's employment. Similarly, Trevino alleges that a coworker referred to

---

[41]Hernandez alleges that a coworker, Ron Green ("Green"), threatened him with a knife in 2003, but he offers no evidence that this was because of his race, and he admits that Green has never called him a racial slur. Indeed, Green and Hernandez are known to have personal issues between them, and Hernandez was discharged for threatening Green at a later date.

Hernandez also alleges that he observed harassment——including nooses and graffiti——aimed at *African-American* employees. Although Hernandez understandably may have been offended by observing this harassment, he cannot base his own hostile work environment claim on these observations.

- 74 -

Mexicans in a derogatory manner over a company radio on one occasion in September 2004, and that he has observed a discriminatory posting or drawing that he does not describe.[42] These allegations cannot support a hostile work environment claim.

2

Finally, the court concludes Ketterer cannot establish a prima facie case of hostile work environment because he does not belong to a protected group. *See supra* § III(I)(2) (discussing why Ketterer has not alleged an association with a protected group sufficient to bring him under the coverage of Title VII's substantive anti-discrimination provision). Moreover, he has not alleged harassment *based on his race* that was sufficiently pervasive to affect his employment. Accordingly, Ketterer's hostile work environment claims are dismissed.

VI

On September 11, 2008 YTI filed a motion to strike plaintiffs' response to defendant's motion for summary judgment, or, in the alternative, objections and motion to strike plaintiffs' summary

---

[42]Trevino, like Hernandez, also claims that he has seen the remnant of a noose and graffiti targeting African-American employees, however, he cannot base his claim on these observations, because they do not constitute harassment based on his race. Trevino also vaguely alleges that he was scared to take breaks in the breakroom and that he switched off his favorite shift because there were workers who could do anything they wanted against minorities and get away with it. He does not cite to any evidence supporting this or even explain what actions the workers took against minorities. Vague and unsupported allegations such as this cannot support a claim at the summary judgment stage.

judgment evidence.  YTI points to plaintiffs' failure to re-file their amended response brief in the same font and page margins used in their August 12, 2008 brief, as directed by the court in its August 20, 2008 order.  YTI also moves to strike specific portions of plaintiffs' appendix as conclusory, unsubstantiated, speculative, based on subjective belief, hearsay, not based on personal knowledge, nonspecific as to time and subject matter, and irrelevant to plaintiffs' claims.  Because the court has either granted summary judgment in favor of YTI notwithstanding the evidence to which objection has been made, or because it has denied summary judgment and has not relied on the objected-to evidence in doing so, the court denies YTI's motion as moot.

*     *     *

The court grants in part and denies in part YTI's July 8, 2008 motion for summary judgment.  The court grants summary judgment dismissing all of plaintiffs' race discrimination claims and retaliation claims, dismissing the hostile work environment claims of Hernandez, Ketterer, and Trevino, and dismissing Crommedy's Title VII and TCHRA hostile work environment claims.  The court denies summary judgment as to the hostile work environment claims of Arrieta, Calip, and Johnson under § 1981, Title VII, and the TCHRA, and as to Crommedy's § 1981-based hostile work environment claim.  The court also denies as moot YTI's September 11, 2008 motion to strike plaintiffs' response to defendant's motion for

summary judgment, or, in the alternative, objections and motion to strike plaintiffs' summary judgment evidence. A Rule 54(b) final judgment is being filed contemporaneously with this memorandum opinion and order.

**SO ORDERED.**

December 12, 2008.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE